# 17-0171-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

DERICK HERNANDEZ, AKA D-Nice, MERLYN BERNITEZ, AKA Frankie C,
DAQUANNE NUNN, AKA Trap, COURTNEY SMITH, AKA Court Dog, AKA
Cool, TYSHAWN GITTO, AKA Ta Ta, ROMMEL LOBBAN, AKA Rah Dolla,
RUDY MONTOUR, AKA Sus 1, KURTIS PHILLIP, AKA Knoxx,
JAHMANI HAMILTON, AKA G-Money, KWAME LAKE, AKA Paid,
BRANDON SHORT, AKA B-Shawt, ERIC SMITH, AKA Esama, AKA Esco,

*Defendants,*

RAPHAEL OSBORNE, AKA Gusto,

*Defendant-Appellant.*

―――――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANT-APPELLANT

ROBERT J. BOYLE
LAW OFFICE OF ROBERT J. BOYLE
*Attorney for Defendant-Appellant*
277 Broadway, Suite 1501
New York, New York 10007
(212) 431-0229

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES…………………………………………… v

JURISDICTIONAL STATEMENT……………………………….. 1

ISSUES PRESENTED…………………………………………….. 3

STATEMENT OF FACTS………………………………………… 4

    PRE-TRIAL MOTIONS…………………………………………... 4

    THE TRIAL……………………………………………………. 5

        Jury Selection……………………………………………. 5

        The Government's Case…………………………………… 6

            The Alleged Enterprise……………………………… 6
            The Alleged Narcotics Conspiracy…………………………10
            Conspiracy To Murder/Assault…………………………. 11
            The "Fish" Robbery…………………………………….17
            The "Trackside" Robbery……………………………….. 18
            The Shooting of Maurice Gardner…………………………..19
            The Shooting of Johnny Green……………………………. 26
            Possession of Ammunition……………………………… 27

        Motion To Call Case Agents As Witnesses………………………. 28

        The Charge……………………………………………….. 28

        The Verdict……………………………………………….. 29

    POST-TRIAL PROCEEDINGS

        The Presentence Report……………………………………… 29

            The Advisory Guideline Sentence…………………………. 29

i

Appellant's History And Characteristics……………………..32

THE SENTENCING………………………………………………… 32

SUMMARY OF ARGUMENT………………………………………….. 33

ARGUMENT………………………………………………………….. 35

POINT I:

THE EVIDENCE CONVICTING APPELLANT OF
RACKETEERING, RACKETEERING CONSPIRACY
AND CERTAIN SUBSTANTIVE COUNTS WAS
LEGALLY INSUFFICIENT…………………………………….. 35

    Introduction……………………………………………….. 35
    Legal Insufficiency Standard………………………………. 36
    The Narcotics Conspiracy…………………………………..37
    The "Fish" and "Trackside" Robberies……………………….39
    Shooting of Johnny Green……………………………………41
    Conspiracy to Murder/Assault……………………………….. 43

POINT II:

THE LOWER COURT COMMITTED CLEAR ERROR
WHEN IT DETERMINED THAT THE PROSECUTION'S
EXPLANATION FOR STRIKING AN AFRICAN-
AMERICAN JUROR WAS NOT PRETEXTUAL…………………..47

POINT III:

REVERSIBLE ERROR WAS COMMITTED WHEN
THE LOWER COURT INSTRUCTED THE JURY
THAT IT COULD CONVICT APPELLANT
ON THE BASIS OF *PINKERTON* LIABILITY FOR
OFFENSES ARISING UNDER NEW YORK LAW………………..50

POINT IV:

    THE LOWER COURT ERRONEOUSLY DENIED
    APPELLANT'S MOTION PURSUANT TO
    *FRANKS V. DELAWARE* TO SUPPRESS WIRETAP
    EVIDENCE AND TANGIBLE EVIDENCE
    SEIZED FROM HIS HOME…………………………………………59

        Standard of Review……………………………………………59
        Standard Under *Franks v. Delaware*……………………….. 59
        The Warrant Affidavit…………………………………………60
        The Lower Court's Decision…………………………………63
        The Lower Court Erred in Denying The Motion
            To Suppress……………………………………………64

POINT V:

    REVERSIBLE ERROR WAS COMMITTED WHEN THE
    COURT PRECLUDED APPELLANT FROM
    CALLING DETECTIVES MITCHELL AND
    COLBY AS DEFENSE WITNESSES………………………………69

POINT VI:

    APPELLANT WAS DENIED A FAIR TRIAL WHEN
    DARON MORRIS WAS PERMITTED TO OFFER
    HEARSAY…………………………………………………………..74

POINT VII:

    APPELLANT WAS DENIED A FAIR TRIAL WHEN
    THE LOWER COURT ADMITTED IRRELEVANT
    AND INFLAMMATORY PHOTOGRAPHS OF
    LLOYD CARTER, KAIL FERRO AND JAMES
    MCCLENIC………………………………………………………76

POINT VIII:

    THE SENTENCE OF THREE LIFE TERMS PLUS
    115 YEARS WAS SUBSTANTIVELY UNREASONABLE………78

POINT IX:

THE WRITTEN JUDGMENT SHOULD BE
AMENDED TO REFLECT THE SENTENCE
PRONOUNCED ORALLY…………………………………………79

CONCLUSION………………………………………………………………...81

CERTIFICATION……………………………………………………………...82

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

<u>Page</u>

*Arizona v. Fuliminante*, 499 U.S. 279 (1991)……………………………… 69

*Batson v. Kentucky*, 476 U.S. 79 (1986)…………………………………….. 47

*Bourjaily v. United States*, 483 U.S. 171 (1987)……………………………. 75

*Chambers v. Mississippi*, 410 U.S. 284 (1973)…………………………..69

*Chapman v. California*, 386 U.S. 18 (1967)………………………………68,73

*Crane v. Kentucky*, 476 U.S. 683 (1986)…………………………………….. 69

*Franks v. Delaware*, 438 U.S. 154 (1978)………………………………….. 59

*Galarza v. Keane*. 252 F.3d 630 (2nd Cir. 2001)……………………………… 48

*H.J. Inc v. Northwestern Bell Tel.Co.* 492 U.S. 229 (1989)………………….. 39

*Hernandez v. New York*, 500 U.S. 352 (1991)……………………………….. 48

*Illinois v. Gates*, 462 U.S. 213 (1983)………………………………………66,68

*Jackson v. Virginia*, 443 U.S. 307 (1979)…………………………………….. 36

*Kotteakos v. United States*, 328 U.S. 750 (1946)……………………………… 76

*Kyles v. Whitley*, 514 U.S. 419 (1995)…………………………………………70,73

*Lutwok v. United States*. 344 U.S. 604 (1953)………………………………… 75

*Nathanson v. United States*, 290 U.S. 41 (1933)……………………………… 68

*People v. Maldonado*, 126 A.D.2d 670 (2d Dept. 1987)……………………… 45

v

*People v. McGee*, 49 N.Y.2d 48 (1979)…………………………………..52,54,50

*People v. Ozarowski*, 38 N.Y.2d 481 (1976)…………………………..44,45,46

*Pinkerton v. United States*, 328 U.S. 40 (1946)…………………………………50

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244
    (2d Cir. 2009)………………………………………………………53

*State v. Walton*, 227 Conn. 32 (1993)…………………………………………… 54

*Tankleff v. Senkowski*, 135 F.3d 235 (2nd Cir. 1998)……………………………48

*United States v. A-Abras, Inc.* 185 F.3d 26 (2d Cir. 1999)……………………  80

*United States v. Alessi*, 638 F.2d 466 (2d Cir. 1980)…………………………  37

*United States v. Awadallah*, 349 F.3d 42 (2d Cir. 2003)………………………  59

*United States v. Bagaric*, 706 F.2d 42, 62 (2d Cir. 1983)
    *abrogated on other grounds by National Organization*
    *for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994)……………………  55

*United States v. Beech-Nut Nutrition*, 871 F.2d 1181 (2d Cir.),
    *cert denied*, 493 U.S. 933 (1989)………………………………………  39

*United States v. Brown*, 352 F.3d 654 (2d Cir. 2003)…………………………  48

*United States v. Bruno*, 383 F.3d 65  (2d Cir. 2004)…………………………..  75

*United States v. Carillo*, 229 F.3d 177 (2d Cir. 2000)……………52,53,55,56,57

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008)…………………………  78

*United States v. Chavez*, 549 F.3d 119 (2d Cir. 2008)………………………...  37

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991)………………………  54

*United States v. Daidone*, 471 F.3d 371 (2d Cir. 2006)………………………  40

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010)…………………………… 78

*United States v. Douglas*, 713 F.3d 694 (2d Cir. 2013)……………………….. 78

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999)………………………………… 54

*United States v. Elmore*, 482 F.3d 172 (2nd Cir. 2007)…………………………59

*United States v. Feliciano*, 223 F.3d 102 (2d Cir. 2000)……………..55,56,57,54

*United States v. Forrester*, 60 F.3d 52 (2d Cir. 1995)…………………………….75

*United States v. Fury*, 554 F.2d 522 (2d Cir. 1977)……………………………….66

*United States v. Glenn*, 312 F.3d. 58, 53 (2d Cir. 2002)…………………….36,37

*United States v. Hawkins*, 547 F.3d 66 (2d Cir. 2008)………………………… 38

*United States v. Henry*, 325 F.3d 93 (2d Cir. 2003)…………………………... 36

*United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008)………………………… 37

*United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989)…………………… 41

*United States v. Irving*, 452 F.3d 110 (2nd Cir. 2006)………………………… 66

*United States v. Marcus*, 560 U.S. 258 (2010)………………………………… 77

*United States v. Marquez*, 506 F.2d 620 (2d Cir. 1974)……………………….. 80

*United States v. Minicone*, 960 F.2d 1099 (2d Cir. 1992)……………………40,41

*United States v. Paone*, 782 F.2d 386 (2d Cir. 1986)………………………… 54

*United States v. Pimentel*, 346 F.3d 285 (2d Cir. 2003)…………………55,57 54

*United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013)…………………… 65

*United States v. Samas*, 561 F.3d 108 (2d Cir. 2009)………………………….. 78

*United States v. Sanchez*, 623 F.Appx. 35 (2d Cir. 2015)……………………... 55

*United States v. Tellier*, 83 F.3d 578 (2d Cir. 1996)……………………………36

*United States v. Thomas*, 299 F.3d 150 (2d Cir. 2002)…………………………. 80

*United States v. Tracy*, 12 F.3d 1186 (2nd Cir. 1993)…………………………... 75

*United States v. Tussa*, 816 F.2d 58  (2nd Cir. 1987)…………………………… 75

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2013)……………………..…… 72

*Walker v. Girdich*, 410 F.3d 120 (2nd Cir. 2005)……………………………..48,49

*Wong Sun v. United States*, 371 U.S. 471 (1963)………………..…………….. 68

*Zappulla v. New York*, 391 F.3d 462 (2nd Cir. 2004)…………….…………… 68

## Statutes

18 U.S.C. § 1959……………………………………………………………..51,53

18 U.S.C. § 1962…………………………………………………………… 39

18 U.S.C. § 3553…………………………………………………………..78,79

Fed.R.Crim.P. 43(a)………………………………………………………… 80

Fed.R.Crim.P. 52(b)………………………………………………………… 77

Fed.R.Evid. 403…………………………………………………………… 76

Fed.R.Evid. 801 (c)..………………………………………………………… 74

Fed.R.Evid. 801(d)(2)(E)…………………………………………………… 74

Fed.R.Evid. 802…………………………………………………………… 74

N.Y.P.L. § 20.00…………………………………………………..51,52,50

N.Y.P.L. §§ 110.00/ 125.25…………………………………………  51

N.Y.P.L. § 120.05…………………………………………………  51

## **Other Authorities**

1 Weinstein's Evidence P 403(03)………………………………………. 76

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**
-------------------------------------------------------------------X

**UNITED STATES OF AMERICA,**

Appellee,

-against-                                                    **17-171**

**RAPHAEL OSBORNE,**

Defendant-Appellant.

-------------------------------------------------------------------X

## BRIEF FOR DEFENDANT-APPELLANT
## RAPHAEL OSBORNE

## JURISDICTIONAL STATEMENT

Jurisdiction was conferred in the United States District Court for the Eastern District of New York by the filing of Indictment 14-CR-264 charging appellant Raphael Osborne with violating, 18 U.S.C. § 1962(c) (racketeering) (Count 1); 18 U.S.C. § 1962(d) (conspiracy to commit racketeering) (Count 2), 18 U.S.C. § 1951(a) (Count 3- Hobbs Act Conspiracy); 18 U.S.C. § 1951(a), 2 (Count 4-Hobbs Act Robbery; 18 U.S.C. § 18 U.S.C. 924(c)(1)(A)(i)(Count 5-Brandishing Firearms During Crime of Violence, Hobbs Act Conspiracy and Robbery); 18 U.S.C. § 1951(a)(Count 6-Hobbs Act Robbery Conspiracy), 18 U.S.C. § 1951(a), 2 (Count 7-Hobbs Act Robbery); 18 U.S.C. § 924(c)(1)(A)(i)(Count 8- Brandishing a Firearm

1

During a Crime of Violence, Hobbs Act Conspiracy and Robbery); 18 U.S.C. §

1959(a)(5)(Count 9-Conspiracy to Commit Murder); 18 U.S.C. § 1959(a)(5), 2

(Count 10-Attempted Murder); 18 U.S.C. § 1959(a)(3), 2 (Count 11-Assault With a

Dangerous Weapon); 18 U.S.C. § 1513(a)(1)(B)(Count 12-Witness Retaliation); 18

U.S.C. § 1513(f))(Count 13-Witness Retaliation Conspiracy); 18 U.S.C. §

924(c)(1)(A)(i)(Count 14-Discharging a Firearm, During a Crime of Violence); 18

U.S.C. § 1959(a)(5), 2 (Count 15-Attempted Murder of Rival Gang Member); 18

U.S.C. § 1959(a)(3), 2 (Count 16-Assault of a Rival Gang Member); 18 U.S.C. §

924(c)(1)(A)(i)(Count 17-Discharging a Firearm During a Crime of Violence); 21

U.S.C. § 846, 841(b)(1)(A)(iii)(Count 18-Conspiracy to Distribute Controlled

Substances); 18 U.S.C. § 924(c)(1)(A)(i)(Count 19-Use of Firearms during Drug

Trafficking Crime); 18 U.S.C. § 1959(a)(5), 1959(a)(6)(Count 20-Conspiracy to

Murder and assault Rival Gang Members With Dangerous Weapons); 18 U.S.C. §

922(g), 924(a)(2))(illegal possession of ammunition).

(ii)  Jurisdiction is conferred in this Court pursuant to 28 U.S.C. §1291 and

Rule 4(b) F.R.A.P.  This is an appeal from a judgment of the District Court (Seybert

J.) dated January 17, 2017 convicting appellant, after a jury trial, of  each of the

foregoing offenses.  Appellant was sentenced to consecutive terms of imprisonment

of life on Counts 1, 2 and 18;  consecutive terms of 300 months on Counts 5, 8, 14

and 17, a consecutive term of 60 months on Count 19, concurrent terms of 240

2

months on Counts 3, 4, 6, 7, 10, 11 and 16; concurrent terms of 120 months on Counts 9, 15, 20 and 21 and concurrent terms of 360 months on Counts 12 and 13. As set forth in the written judgment, the aggregate term of imprisonment was three consecutive life terms plus 135 years. At the sentencing the Court stated that its intention was to sentence appellant to three consecutive life terms plus 115 years. The court also imposed the mandatory assessment of $2100.00.

This is an appeal from a final order disposing all issues between the parties.

## **ISSUES PRESENTED**

I.    Whether the evidence convicting appellant of the racketeering counts and associated substantive counts was legally insufficient?

II.   Whether the court committed clear error when it denied appellant's *Batson* challenge?

III.  Whether the lower court committed reversible error when it instructed the jury that it could convict appellant based upon *Pinkerton v. United States*, 328 U.S. 40 (1946) for charges arising under New York law?

IV.   Whether the lower court committed error when it denied appellant's motion to suppress based upon *Franks v. Delaware*, 438 U.S. 154 (1978) without a hearing?

3

V.      Whether appellant was denied his right to present a defense when the lower court precluded him from calling Detectives Mitchell and Colby as witnesses?

VI.     Whether appellant was denied a fair trial when the lower court admitted hearsay through the witness Daron Morris?

VII.    Whether appellant was denied a fair trial through the admission of irrelevant and inflammatory photographs?

VIII.   Whether the sentence was excessive?

IX.     Whether the written judgment should be amended to reflect the oral pronouncement of sentence?

## STATEMENT OF FACTS

## I.      PRE-TRIAL MOTIONS

On December 8, 2015, appellant filed an omnibus pretrial motion. (Doc. 176).[1]   Of relevance to this appeal, appellant moved for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) to determine whether evidence obtained through an eavesdropping warrant for his cell phone should be suppressed.  He

---

[1] "A" refers to the appendix to this brief.  Numerals in parenthesis without a prefix refer to the trial transcript.  "PSR" refers to the Presentence Report prepared by the Probation Department.  All other documents are referenced by date and subject matter and/or docket number assigned to it in the lower court docket that is part of the Record on Appeal.

argued, *inter alia* that the affidavit in support of the warrant contained intentional

misrepresentations and omitted facts essential to a probable cause determination.

The affiant, Nassau County Police Detective John Mitchell represented to the court

that appellant Raphael Osborne had been the triggerman in the October 13, 2012

shooting of Maurice Gardner, a former Crips member cooperating with law

enforcement. (A81-A83). The motion alleged – and the government conceded –

that appellant was not the shooter. (Government Memorandum in Opposition to

Motion to Suppress, Doc. 183, p. 6). In addition, cell-tower information in the

investigators' possession placed appellant miles away from the scene of that

shooting. (A121, A129-A130).

The court denied the motion without a hearing. It held that even if the

challenged assertions were removed from the affidavit and omissions inserted, the

remaining allegations established probable cause. (A187-A188).[2]

## II.   THE TRIAL

### A. Jury Selection

Following *voir dire*, the parties exercised their peremptory challenges.

Appellant lodged a *Batson* challenge after the fourth round alleging that the

prosecution had used its challenged to exclude African-American jurors (A212-

A213). The government offered explanations for three of the challenges. (A213-

---

[2] Additional facts relevant to this motion are set forth in Point IV, *infra.*

A214-A215).  The court accepted them as non-pretextual (A216).  The exercise of

peremptories then continued.  The prosecution next struck Donna Brown, an

African-American juror (A216).  When asked to provide an explanation, the

government stated that she was stricken because she had a brother with a drug

problem who had been arrested.  Appellant pointed out that there had been at least

one other non-African American juror with family members with drug problems

who had not been stricken (A216).  The government responded that it had not

stricken other African-Americans with family members arrested for drug crimes.

The court overruled the *Batson* objection and allowed the challenge (A217).

### B. The Government's Case

#### 1.  The Alleged Enterprise

The indictment alleged that the Rollin 60's Crips of Roosevelt, New York

was an "enterprise" within the meaning of 18 U.S.S. § 1962.   Six Rollin 60's

members or associates, Aaron Halyard, Reynaldo Hernandez, Essix Robinson,

Jeffrey Appiagyei, and Denzel Smith, all testified against appellant in exchange for

leniency.

The Rollin 60's of Roosevelt, N.Y. was one branch or "set" of the Crips

organization that originated in California.  (Halyard: 269-270,  R. Hernandez:

1016, 1026).  Halyard joined the Rollin 60's in 2003 and was known by the

nickname "Slay".  He had known the appellant Raphael Osborne, known as

6

"Gusto" since his mid-teens. Halyard testified that appellant was one of the "Big Whales" or leaders of the Rollin 60's. (Halyard: 271, 278). Cooperators Hernandez, Robinson, and Smith also claimed that appellant was the leader of the Rollin 60's Crips and had been since the set's inception. (R. Hernandez: 1015, 1024; Robinson: 1380-84, 1565-67; Smith: 2012, 2095-96).[3] His approval was required for all major acts except hurting members of the rival Bloods (R. Hernandez: 1060-1064).

One could become a Crips' member in three ways. The first was by putting in "work". "Work" could be anything from performing errands, to selling drugs to engaging in acts of violence. Membership could also be obtained by being beaten for 60 seconds by other set members. The third method of entry was to be "blessed" in, or vouched for, by a higher-up in the set. That method would require a Big Whale's approval. (Halyard: 282-284, 835; R. Hernandez: 1017, Robinson: 1382, 1501).

---

[3] During Hernandez' testimony, the government introduced various text messages and Facebook excerpts referring to appellant as the Rollin 60's leader or "Big Homie". (R. Hernandez: 1231-55 referencing Gov't Ex. 179-C, 179-E 180-F, 180-C, 180-D, 180-E, 181-G). The government also played Exhibit 87, a video where appellant is seen rapping about violence and guns. (R. Hernandez: 1257, referencing Gov't. Ex. 87). Hernandez acknowledged that it was common for rappers to make exaggerated or false claims in their raps, a practice known as "fronting". (R. Hernandez: 1290-91).

"Membership" was loosely defined. For example, cooperating witness Reynaldo Hernandez, whose picture appeared on the government's chart of Rollin 60's Crips members, testified that he was never a Crip. (R. Hernandez: 1297-1318). Essix Robinson testified that he was "blessed" into the Crips by Derrick Hernandez. Yet he did not know whether appellant's approval was given or even sought (Robinson: 1501).

It was a violation of gang rules to cooperate with law enforcement. Violation of that rule could lead to violent punishment, including death. (R. Hernandez: 1037, 1336;. Robinson: 1409). A member was expected to follow the orders of higher-ranking members, not to engage in acts of violence against civilians and to avoid hard drugs such as cocaine, crack and heroin (Halyard: 286). Attendance at set meetings, known as "C-13" was mandatory. Missing a meeting was a "violation" that could result in punishment including expulsion. (R. Hernandez: 1035-36). However, there were not many meetings. Robinson regularly missed those that did take place. He was never given a violation and was never disciplined (Robinson: 1551, 1559-64). Other, more serious violations, also never led to discipline. Reynaldo Hernandez, for example, abandoned appellant at the scene of a robbery in Amityville simply because appellant was taking too long. He was not "violated" or disciplined (R. Hernandez: 1154-61;

8

1343-46, 1351). As Robinson observed, the "stuff" in the Crips "wasn't as organized as you think" (Robinson: 1547).

Some members engaged in drug sales and robberies. Halyard admitted to participating in 15 robberies and many more assaults (Halyard: 796). Proceeds from the robberies were the property of the perpetrators, not the set. (Robinson: 1540). Members were expected to send commissary money to incarcerated Crips. (Robinson: 1389). This "rule" was also ignored. Robinson sent commissary money to someone in prison once (Robinson: 1500-02). Reynaldo Hernandez sent commissary money only to incarcerated relatives who were Crips, not Crips members generally (R. Hernandez: 1052-53, 1294-95). During the time that appellant, the alleged leader, was incarcerated, Hernandez never sent him commissary money (R. Hernandez: 1296).

Members occasionally contributed some of the proceeds from robberies and drug sales to the set for firearms. But in large part members bought guns for themselves. (Halyard: 480-81, 898; R. Hernandez: 1021-22 1060-62; Robinson: 1412, 1532). Halyard testified that he traveled south to buy guns that he then sold to others at a profit. Over the course of his membership in the Crips he had purchased over 500 firearms. Some were re-sold to others, including appellant, some were used and discarded and others stored (Halyard: 360, 365-67). Appellant never gave Halyard money for a gun purchase prior to any of his trips

9

south (854).    Derrick Hernandez and Rudy Montour also sold firearms (Halyard:

365)    The set's guns were stored at Reynaldo Hernandez' own home, Derrick

Hernandez' home and in appellant's basement (Halyard: 365; R. Hernandez:

1023).

### 2. The Alleged Narcotics Conspiracy (Count One, Racketeering Act Six, Counts 18 and 19.

Several prosecution witnesses testified that over a course of years they

purchased controlled substances from appellant, sold them to appellant, and/or

observed appellant purchase and/or sell them.   (Halyard: 275-76; R. Hernandez:

1010-11, 1124, 1136; Robinson: 1441-43, Appiagyei: 1611-12, 1659; Daron

Morris: 1859).  Appellant primarily bought and sold marijuana.  (Halyard: 430-

432, 843; Robinson: 1441-43).  But at times he purchased and sold various

amounts of heroin, cocaine base and methylone ("Molly").  (Halyard: 402-03, 609

614-15, 681-82; 700-02, R. Hernandez: 1010, 1136, Robinson: 1449, Appiagyei:

1608-12, 1631-32, 1659, 1671; Morris: 1955).[4]

Appellant sold drugs for himself, not the Crips (Halyard: 275).  Halyard did

not know what he did with the money he obtained from drug sales (844-45).  He

did not consider himself as working for appellant or the Crips in general when he

---

[4] Halyard offered his interpretation of numerous telephone conversations made to or from appellant's cell phone, 516-451-9137.  Calls were intercepted from March 24, 2013 until April 16, 2013.  They contain exchanges that Halyard testified were drug related. (G. Ex. 105, 206-A; Halyard: 629-750).

sold drugs (*Id*.).  Halyard had his own suppliers and kept his own profits (761).

While appellant sometimes gave discounts to Crips members who purchased from

him, he never kicked money back to the set (Robinson: 1536).  Similarly, other

Crips members who sold drugs kept the proceeds for themselves. (Robinson: 1532;

Appiagyei: 1695).  Members even competed for customers.  For example, Merlyn

Benitez sold crack cocaine in the same general area that appellant did (*Id*.).  Some

of the Rollin 60's Crips worked with non-Crips, even members of the rival Bloods

gang (Halyard: 846, Robinson: 1534).  There was no evidence that members of

the Rollin 60's had a common stash of drugs for sale by members.

### 3. Conspiracy To Murder/Assault Rival Gang Members (Count One, Racketeering Act One; Count Twenty)

The Rollin 60's Crips were in conflict with the Bloods, a rival gang.  The

Bloods had chapters in Roosevelt and other parts of Long Island.  Witnesses

testified that Bloods assaulted or killed Rollin 60's members and members of the

Rollin 60's Crips assaulted or killed Bloods.  This included the deaths of Blood

members Kail Ferro in 2006, Lloyd Carter in 2008, and James McClenic in 2010.

No evidence was presented that appellant Osborne, who was incarcerated for much

of that period, directly participated in the murders of Ferro, Carter or McClenic or

had prior knowledge that those murders would be committed. (Halyard: 765).

The government maintained that the foregoing deaths and other instances of

violence allegedly committed by the Rolling 60's could be attributed to appellant

11

because they were the product of the alleged "on-sight" rule. According to the

cooperating witnesses, if a Crip saw a Blood "you have to cause as much harm as

you could, whether through fighting, stabbing, shooting." (Halyard: 483, 878-79).

This was particularly true if a Blood entered Crips' territory such as the Park Ave.

section of Roosevelt. (Halyard 767; R. Hernandez: 1130-31). The rule was

established, Halyard claimed by "Big Whales" Daquann Chambers, Jonathan

Green and the appellant Osborne. (Halyard: 487, 880).

The on-sight rule was neither clear nor regularly followed. Observed Bloods

were not routinely killed or assaulted. Rather, a Crip was simply expected to do

"something". (Halyard: 879-82; Robinson: 1413-15, 1465). The failure to take any

action was technically a violation that could result in discipline. But there were

many instances where Crips who failed to act were not disciplined (Halyard: 880-

82, R. Hernandez: 1032) . Essix Robinson, for example, saw Bloods daily. Yet he

took no action except in those instances when he was provoked (Robinson: 1485-

86). In a given situation, a member could decide for himself whether to take any

action. (Robinson: 1490-91).

Halyard and Hernandez testified that Blood member Kail Ferro was killed

by Crips member Devon Cabrera in 2006 because he walked down Park Avenue

(Halyard: 328-39, 910, R. Hernandez: 1070; Detective Richard Rinaldi: 1726-31

referencing autopsy photographs, G.Ex. 275: certificate of conviction). Lloyd

12

Carter was shot and killed in 2008 by Crips member Cody Hernandez because he allegedly disrespected the Crips set (Halyard: 354, 488; R. Hernandez: 1074; Detective Gordon Torravile: 1720-21 referencing autopsy photographs; G.Ex. 70: certificate of conviction). On July 4, 2011 Essix Robinson shot Chris Anderson, a Blood, at the Midway Deli (Robinson: 1436-38).

No evidence was presented that appellant Osborne participated in and/or had prior knowledge of, any of the foregoing shootings.

On January 10, 2006 a Crip known as "Ratchet" observed Blood member King Carter driving toward appellant's house on Debevoise St. Ratchet fired shots at Carter who then fled (Halyard: 376). Concerned that Bloods might return, appellant retrieved a gun. In fact, Bloods did return and fired shots at appellant's house (*Id*.). In response, Halyard and appellant set off in pursuit on Halyard's bicycle. At some point, appellant continued the pursuit in a car (Halyard: 378). According to Halyard appellant found no one and returned to Park Avenue. He was later stopped by police and arrested for possession of a .40 caliber handgun that police claimed he dropped during a pursuit. He was sentenced to state prison. (Halyard: 379; Det. Tedeschi: 999; Rivela: 2351). New York State Department of Corrections and Community Supervision reports reflected that when appellant appeared for his classification interview, he "confirmed" that he was a member of the Crips. (Rivela: 2356).

13

From 2006 until the fall of 2010 appellant was in and out of state prison. (Halyard: 765).   During that time the Crips lost control of  much of Roosevelt to the Bloods  (Halyard: 522).   Several Rollin 60's members were shot and at least one, Money Mel, was killed (Halyard: 522, 777).    Halyard testified that following appellant's release, there was a meeting of 15-20 Crips in appellant's backyard (Halyard: 522-23).   Reynaldo Hernandez claimed that the alleged meeting took place in appellant's home.    This alleged meeting was a "C-13"  meaning that attendance was mandatory. (R. Hernandez: 1352).   But some did not attend (R. Hernandez: 1354).   Essix Robinson did not even know about it.  (Robinson: 1556-57).

At the meeting, appellant expressed concern over the situation in Roosevelt. He asked about Blood members who had shot Crips.   Someone mentioned "Bubbz", i.e. James McClenic. (R. Hernandez: 1355-56)   Appellant allegedly stated that he wanted McClenic "dealt with" (Halyard: 523, 780; R.Hernandez: 1089, 1359).   That statement was made to the group generally.   No one responded and no one asked questions.    Appellant did not direct anyone to kill McClenic. Nor did he state that he wanted McClenic killed (Halyard: 785, 787).

14

No action taken against McClenic in September, October or November 2010 (Halyard: 786).[5]   During that time appellant never questioned anyone about the lack of action.  Nor did he and make complaints (Halyard: 792).  On December 15, 2010, three months after the "meeting", Halyard received a call from Crips member Kwame Lake, aka "Paid".  He told Halyard that Bubbz, i.e. McClenic, was "slipping" meaning he was off guard.  Lake added that Eric Smith, Rommel Lobban and Bryan Henry were watching McClenic (Halyard: 524).  Appellant Osborne was not made aware of the situation. (Halyard: 790).

Later that evening Halyard was at Derrick Hernandez' house.  Appellant was not present.  Eric Smith arrived and stated that he (Smith) shot and killed McClenic, a statement he later repeated to Reynaldo Hernandez (Halyard: 525, 910-12; R. Hernandez: 1091).[6]   Appellant was not informed of this development either (Halyard: 790).

---

[5]  Reynaldo Hernandez testified that on October 20, 2010 he shot Bloods member Jermaine Greene while driving passed a known Bloods hangout on Pleasant St. in Roosevelt.  Crips members Kwame Lake and Daquaan Nunn were present when Hernandez shot Jermaine Greene (Hernandez: 1082-84). There was no evidence that appellant Osborne was aware of that shooting.
[6] On December 15, 2010 Nassau County Police Officer found the deceased James McClenic inside a car parked adjacent to 711 Fulton St.  .40 caliber casings were found at the scene (Rich: 1579-84. The following day, Nassau County Police Officer Janette Nardo responded to the Nassau County morgue where she identified his body. (Nardo: 1742).

McClenic's murder prompted an immediate and violent response from the Bloods. Shots were fired at the known residences of Crips members Reynaldo Hernandez, Eric Smith, Merlyn Benitez and Daquann Nunn (Halyard: 527, R. Hernandez: 1092-93; Bunster: 2315-27, describing damage to Smith's house on Wagner Avenue and damage to house on Bookside Avenue that same night). [7] Former Nassau County Detective Steven Markakis testified that on December 16 he responded to a reported arson at 107 Debevoise St., the location where appellant resided with his mother and siblings. The car in the driveway had been severely burned. The fire was started by a makeshift Molotov cocktail (Markakis: 952-55).

A few days later a meeting was held at Derrick Hernandez' house on East Fulton. Appellant was present along with 15 or so other Crips members (Halyard: 531, 537, R. Hernandez: 1093). Appellant instructed some of the younger members to fire shots at the McClenic house on John St. and a house on Greenwich St., the home of another Blood, Justin Smith. (Halyard: 532-33, R. Hernandez: 1097). After they left, the group, listening at the window, could hear gunshots being fired (Halyard: 535; R. Hernandez: 1110). The younger members returned and discussed the shooting (Halyard: 538). After a few hours, a group

---

[7] Walter Collier, a technical engineer for Shotspotter testified that the Nassau County Police Department had installed an acoustic gunshot location system in Roosevelt. On December 16, 2010, the system recorded shots fired near 54 Westfield St. and 11 Wagner St at around midnight. (Collier: 984-85).

16

decision was made to send the same group out to fire additional shots at the

McClenic house (Halyard: 540). Those shots could also be heard (Halyard: 540-

41).[8]

Police responding to the house at 152 Greenwich St. on December 21, 2010

found gunshot damage to the building. They also recovered 19 shell casings and

bullet fragments (O'Hare: 1697-1701). On the same night gunshot damage was

also discovered near a house located at 42 John St. Police recovered ten 9-

millimeter casings and 6 .45 caliber casings outside the house and two bullets

inside (Crunin: 1752-63). The 9-millimeter casings recovered from the scene on

John St. (McClenic house) were fired from the same gun as the 9-millimeter

casings found at the scene on Greenwich St. (Smith house)( G.Ex. 369, 370:

Ballistics Summary).

### 4. The "Fish" Robbery (Count 1, Racketeering Act 2; Counts 3, 4, and 5

Halyard testified that Kwame Lake informed him of a marijuana dealer

known as "Fish" who might be an easy robbery target. (454-56). To win Fish's

trust, Halyard began buying small quantities from him. He gradually increased his

purchases to one-half pound (457-58). Halyard's plan was that he would rob Fish

---

[8] The same Shotspotter system recorded shots being fired near 154 E. Greenwich and 42 John St. on the night of December 21, 2010. (Collier: 989)

of the marijuana at the time of purchase. Halyard asked appellant to join the plan. But he admitted that he robbery would have taken place without him (838-42).

Halyard then contacted Fish and arranged for a 2-3-pound purchase. He went to Baldwin with appellant and Reynaldo Hernandez (Halyard: 459-60; R. Hernandez: 1012). He parked down the block from Fish's house. Eventually Fish pulled in behind him with his own car. Halyard entered Fish's car. Fish handed Halyard the marijuana. After he did so, Halyard drew a gun. At about the same time, appellant opened the drivers' side door, pulled Fish out of the car and struck him in the face with a gun (Halyard: 460-61; R. Hernandez: 1013, 1340-43). The three drove back to Roosevelt and divided the marijuana (Halyard: 461). None of the robbery's proceeds were contributed to the Rollin 60's set (Halyard: 843).

### 5. The "Trackside" Robbery (Count One, Racketeering Act Three, Counts Six, Seven and Eight)

Aaron Halyard testified that at some point in the fall of 2010, appellant told him of a potential robbery that could net $15000, powder cocaine and crack cocaine. Six individuals, including appellant, Eric Smith and Halyard drove to a location in the Trackside area of Hempstead. The victim's cousin, also in the car, directed the men to an apartment. Smith and Halyard, armed with guns, went into the building. Appellant did not enter. (Halyard: 452, 797). Smith and Halyard kicked in the apartment door and forced the occupant to the floor (Halyard: 451). They removed 15-20 grams of crack five grams of cocaine and $1500 cash from

18

the apartment (Halyard: 452-453). According the Halyard, appellant received some of the drugs stolen (Halyard: 454, 798). Neither money nor drugs went to the Rollin 60's Crips set (Halyard: 798).

### 6. Shooting of Maurice Gardner (Count 1, Predicate Act 4, Counts 9, 10, 11, 12, 13 and 14).

Shortly before 10 P.M. on October 13, 2012, Adriana Vargas of the Hempstead Police Department responded to Princeton St. in response to a 911 call. She discovered Maurice Gardner lying on the ground near 108 Princeton St. (2234). Gardner had been shot multiple times and was in obvious distress. Vargas asked Gardner "Who did this?". He responded that he had been "set up". He related that a friend from Roosevelt had come to his house, that they had gone to a delicatessen together and that Gardner had been shot as they turned onto Princeton St. (2237). He made no mention of appellant. Gardner survived the shooting but suffered extensive, permanent injuries. These include damage to his spinal cord, an injury that will permanent prevent him from walking and will significantly lower his life expectancy. (Kenneth Hall, M.D.: 1184-87, 1191).

Hempstead Police Officer Daniel Buonagurio was on patrol that evening when he heard gunshots. At about the same time he observed a man running on Bennet St. from Princeton St. (Buonagurio: 2240-42). Buonagurio stopped the man, later identified as Derrick Hernandez. Hernandez told him that someone was

19

shooting at him.  Hernandez had a small amount of marijuana on him but no weapons.  He was placed under arrest (Buonagurio: 2244-45).

Gardner remained in a medically-induced coma for several weeks.  When he regained consciousness approximately two months later, Nassau County Police Department Detective George Colby exhibited him a photo array containing appellant's picture.  According to Colby, Gardner pointed to appellant's picture and stated he was the shooter.   (Colby: 2436).  Appellant was charged in New York State Court with attempted murder and conspiracy arising out of his alleged participation in the Gardner shooting. (Colby: 2442)

Aaron Halyard was arrested in April 2013.  Shortly thereafter he  began cooperating with the government.  Halyard told Det. Colby that appellant did not shoot Gardner (Colby: 2441).  The government ultimately acknowledged that fact (Doc. 183, p. 6).  That act was done by Rollin 60's member and cooperating witness Denzel Smith.

Smith first came to the attention of law enforcement on March 11, 2013.  On that date Nassau County Detective James Schmettan arrested Smith and Greg Cruz for gun possession (Schmettan: 2382-84, 2392).  Smith was charged in state court with criminal possession of a weapon.  When released on bail in September 2013, Smith met with Nassau County Detectives Colby and John Mitchell (D. Smith:

2136, 2384-86).  When questioned, he told the detectives that he had never met the appellant Raphael Osborne (D. Smith: 2137-38).

Smith later learned that many members of the Rolling 60's Crips had been arrested and were cooperating with the government.  Because he feared that he might be charged with crimes he committed as a Crip  he decided to seek a cooperation agreement  (D. Smith: 2086, 2090, 2129).    At a proffer session Smith admitted he shot Maurice Gardner.  He claimed, however, that appellant and Derrick Hernandez instructed him to do so. (D. Smith: 2087).    Smith pled guilty to racketeering with a promise of leniency should he testify for the government at appellant's trial  (Smith: 2091-93).

At trial, Smith testified, contrary to his September 2013 statement to the Nassau County District Attorney's Office, that he knew the appellant Raphael Osborne as the leader of the Rollin 60's Crips.  (D. Smith: 2095).  He began associating with the Rollin 60's Crips in the summer of 2012 and earned membership by putting in "work".  At Derrick Hernandez's direction, Smith participated in three separate shootings of Bloods. (D. Smith: 2011-21, 2035-35, 2155-68, 2178-81). [9]    Smith was now invited to more Crips' functions.  But he was not yet a full member (D.Smith: 2037).

---

[9] Smith testified that in one of the shootings his accomplice Greg Cruz used a shotgun that Smith had purchased directly from appellant Osborne (D. Smith: 2028-32).

21

Shortly after the third shooting Smith was at Derrick Hernandez' house. (D.Smith: 2190). The latter showed him a letter stating that "Mo Diddy" (Maurice Gardner) was cooperating with law enforcement. (D. Smith: 2191). Hernandez told Smith that he had a plan to "deal" with him. He asked Smith to do the job. Smith agreed. (D.Smith: 2198-99).

A couple of days later Smith, Derrick Hernandez and a Crip named Knox went to a house in Baldwin. Appellant was present along with several Crips and their friends. There was a party taking place. At some point Hernandez and appellant went downstairs into the basement. After a few minutes Hernandez called for Smith to join them. (D. Smith: 2046, 2212). Appellant and Hernandez were conversing. While Smith admitted that he could not hear exactly what was being said, it seemed to him that they were discussing the Maurice Gardner situation. According to Smith appellant addressed him stating "when you hit him you got to leave him. He got to go, word to mother, word to mother, he got to get left." Smith replied, "I got you" (D.Smith: 2047, 2217, 2220). According to Smith, appellant and Hernandez then continued talking about how Gardner was a "rat", telling a story about how Gardner had tried to purchase a firearm from him (D. Smith: 2049, 2218-19).[10]

---

[10] At law enforcement's direction, Gardner made controlled purchases of firearms on May 2, 2012, May 15, 2012 and May 23, 2012. (Biddescomb: 171-191; G.Ex. 27, 30, 99: recordings; G.Ex. 322, 324, 325, 326, 327: firearms. The

Some days later, appellant had a telephone conversation with Gary Mosely, who was then incarcerated. During that conversation appellant repeated his belief that "Diddy" was cooperating with law enforcement. (G.Ex. 102).

On October 13, 2012, Smith received a text from Derrick Hernandez instructing him to come to his Fulton St. house. Hernandez gave Smith a gun, a Kel Tech 9mm, and described a plan Hernandez devised to shoot Gardner. (D.Smith: 2152). Appellant Osborne was not present and no evidence was presented that he approved or had knowledge of Derrick Hernandez' plan (D.Smith: 2054).

Hernandez and Smith went to the Heights neighborhood of Hempstead. Smith was wearing a red hoodie (D.Smith 2055-57). Hernandez went to Gardner's residence, leaving Smith in a dark section of the block. Eventually Smith

---

May 15 sale took take place in the basement of appellant's house, 107 Debevoise St. (Biddescomb: 230). All the sales were handled by Aaron Halyard who kept all the money (Halyard: 579). Appellant had no direct role in them. (Biddescomb: 232-234; Halyard: 579).

On June 7, 2012, Gardner met with appellant in a car parked on Nassau Road. While guns were discussed, no sale took place (Biddescomb: 193-94; G.Ex. 32: recording). According to Halyard, appellant became suspicious because there was a police van in the vicinity, the car's rearview mirror appeared to have a camera in it and it seemed that Gardner was willing to pay any price for the weapons (Halyard: 584). Reynaldo Hernandez testified that appellant told him he believed Gardner to be the "police" because there was a man in the drivers' seat yet Gardner sat in the rear (R. Hernandez: 1286).

observed Hernandez and one other (Gardner) coming from around the corner.

Smith fired 5-6 shots at Gardner who fell to the ground. (D. Smith: 2063-63).

Shortly after Halyard's October 2012 release from prison Derrick Hernandez allegedly told him that he had received a note stating that they had been "set up" by Gardner (Halyard: 590). Hernandez added that appellant was supposed to have paid him half for the shooting but hadn't (Halyard: 591). On a separate occasion appellant allegedly commented to him that "Derrick [Hernandez] got this dumb little nigger to do the hit and he missed." (Halyard: 593). After Gardner regained consciousness and fearing that Gardner might implicate him, Halyard fled. But before he did so, he telephoned Gardner and tried to pay him off. (599-600).

Cooperating witness Daron Morris testified that during 2013 he was on the run from law enforcement due to a parole violation. He was captured, served time and was released. (Morris: 1923-27). He was arrested again in July 2014, this time for possession of a firearm. (Morris: 1850, 1927 ). Now 35 years old, he faced significant jail time. Aware of the arrests in this case, he contacted federal law enforcement to secure leniency through cooperation. (Morris: 1851, 1930). He met with them many times. While he frequently lied, he was finally able to secure an agreement that involved testifying against appellant Osborne. (Morris: 1851-54).

Morris claimed that while incarcerated at the Nassau County Jail in 2013, he encountered appellant, someone he had not seen in the ten years since they had allegedly committed a few robberies together. (Morris: 1862, 1864-65, 1935-36, 1940). A former Blood, Morris claimed that he quashed effort by other Bloods in the jail to do appellant harm (1867).

In one of their conversations, Morris remarked that he was charged with a shooting that took place on October 13, 2012. In response, appellant allegedly remarked that he had a shooting on the same date (Morris: 1840). Morris claimed that appellant first stated that he was the shooter but that no one could identify him as he wore a red hoody (Morris: 1842, 1949-50, 1952). But on another occasion, Morris claimed, appellant stated that he had sent "Little Homies" to do the shooting because guns had been purchased at his home. (*Id.*). Morris admitted that as he was in general population with some Crips, he could have heard others talk about the charges against appellant (Morris: 1940).

On re-direct the prosecution elicited that Morris also spoke with a Crip named "Rah" at Nassau County Jail. Rah told Morris that on the evening of the shooting, appellant "got the call after it was done". The prosecutor then asked, "Now this conversation was clarifying that Gusto orders the hit, doesn't do the hit?" to which Morris replied "Yes". (A227-A228).

25

### 7. Shooting of Johnny Green (Count One, Racketeering Act Five; Counts Fifteen, Sixteen and Seventeen)

Jose Bonaficio testified that on January 30, 2013, he was sitting in his car in front of his Pleasant St. home (Bonaficio: 922). After a short time, he heard what sounded like firecrackers and some screams. A car he described as a champagne colored Chevy with two occupants was traveling eastbound. (925-926). Bonifacio telephoned 911. (Bonafacio: 926-27; G.Ex. 50: 911 call). Bloods member Johnny Green was taken from the scene to Nassau County Medical Center where he was treated for a gunshot wound to the abdomen. He was released the following day (David Fagan, M.D. 2299-2300; G. Ex. 48: medical records).

Nassau County Police Detective Steven Markakis recovered 8 .40 caliber casings, two .45 caliber casings and one bullet (Markakis: 936-937; G.Ex. 46, p. 48-71: photographs of ballistics evidence). Three bullet fragments and two bullets were recovered from a vehicle parked in the driveway. (Det. Daniel Miller: 963; G.Ex. 146, p. 1-47: photographs of vehicle).

In 2013, on one of his return trips to New York, Aaron Halyard had a conversation with appellant Osborne. Appellant allegedly told him that he and Frank "shot up a guy named Fat Johnny" utilizing a .40 caliber gun (Halyard: 601-02, 673-74, 864).

Rommel Lobban, a Crip known as "Rah", regularly drove an Impala registered to his girlfriend Monet Smith. (Halyard: 603; R. Hernandez: 1148-1150;

26

Robinson: 1448-49; G.Ex. 278: photograph of Lobban's girlfriend; G.Ex. 47:

NYSDMV registration for an Impala owned by Monet Smith). On March 2, 2013,

Lobban was chased by the police while driving the Impala. The car crashed.

Lobban was arrested with a small amount of marijuana and released. (Det. George

Colby: 2414-2419). Halyard testified that following the incident other Crips

chided Lobban for running from the police when all he had was the marijuana.

According to Halyard, appellant stated in response that the reason Lobban ran from

the police had nothing to do with the marijuana. Rather, following the Johnny

Green shooting, Lobban, monitoring a police scanner, learned that the police were

looking for an Impala. Lobban thought that was the reason the police were

pursuing him on March 2. (Halyard: 603-04, 674). [11]

### 8. Possession of Ammunition (Count Twenty-One).

On April 17, 2013 Nassau County law enforcement arrested appellant in Bay

Shore pursuant to an arrest warrant. Police recovered a bag of narcotics that they

claimed appellant dropped during a brief pursuit (Richard Ierardi: 1794-95).

Appellant was placed in the backseat of a police vehicle. Ierardi claimed that

---

[11] Robinson testified that at some unspecified time before Green was shot he was at
the In and Out Deli and observed Green with other Bloods. He telephoned
appellant who came to the scene. Nothing happened as the Bloods had already left
(Robinson: 1470-76).

appellant said, "What the fuck officer, I'm just trying to get back to the train to do my thing with the shit I threw, there's no need for all of this." (Ierardi: 1797).

On the same date law enforcement executed a search warrant at 107 Debevoise St. Recovered during the search of the basement were multiple rounds of various caliber ammunition (Marke Berte: 1770-78). No gun was found (Berte: 1779).

### C. Motion To Call Case Agents As Defense Witnesses

Following the government's case, appellant sought to call Nassau County Detectives John Mitchell and George Colby as defense witnesses. He argued that he could how that they sought to frame him for acts he did not commit. He pointed out that Detective Mitchell falsely represented to the Nassau County Court in the wiretap application that appellant was the triggerman in the Maurice Gardner shooting. Appellant further argued that he would be able to show that both agents coached other witnesses into giving inculpatory testimony at trial. (A250, A254). The court denied his motion, holding that it had addressed these issues when it denied the motion to suppress. (A257-A258).

### D. The Charge

With respect to counts four, five, seven, eight, ten, eleven, twelve and fourteen the court instructed the jury in accordance with *Pinkerton v. United States*, 328 U.S. 40 (1946). It instructed them that if it found appellant guilty of

the conspiracy associated with those substantive counts, it could find him guilty even if the jury was not convinced that appellant acted as a principal or acted in concert. The *Pinkerton* charge included the conspiracy to murder Maurice Gardner alleged in count nine and the substantive crimes associated with that conspiracy alleged in counts ten and eleven. Those charges arose under New York law (A258a-A258d).

### E. The Verdict

The jury found appellant guilty of each of the counts submitted to them and found, "proven" each of the acts associated with those counts. (Verdict Sheet: A259-A269).

## III. POST-TRIAL PROCEEDINGS

**The Presentence Report**

### The Advisory Guideline Sentence

The Probation Department calculated the advisory Guideline sentence to be life imprisonment. This was based upon a total offense level of 51 and a Criminal History Category of VI.

To determine the offense level, the Probation Department utilized four Count Groups, linking similar substantive counts with the racketeering acts alleged in Counts 1 and 2. The First Group was the so-called "Fish" robbery (Racketeering Acts 2A and 2B, Counts 3 and 4. The base offense level was 20 and

29

after adjustments was increased to 27 (PSR ¶¶ 75-81). Group 2 was the Trackside robbery (Racketeering Acts 3A and 3B, Counts 6 and 7. With enhancements, it too had an adjusted offense level of 27. (PSR ¶¶82-88).

Count Group Three referred to the October 13, 2012 shooting of Maurice Gardner (Racketeering Acts 4A and 4B and counts 9 through 13. The base offense level was 33. After enhancements, the adjusted offense level was 43 (PSR ¶¶ 89-94).

The January 30, 2013 shooting of Johnny Green (Racketeering Act 5 and Counts 15A and 16A) was calculated next. As per U.S.S.G. § 1B1.2(d) any increase due to the presence of other individuals in the car when Green was shot was not included when calculating this Group but calculated separately. The base offense level for the Green shooting was 33 and after enhancements the adjusted level was 39 (PSR ¶¶96-101).

The harm to individuals in the car with Green was designated by Probation as Count 1 and 2, Racketeering Acts 5B through 5E and Counts 15B through 15E. The base offense level was 33 and after enhancements the adjusted level was 37 (PSR ¶¶ 102-107).

Racketeering Act 6 and Count 18 concerned a conspiracy to possess with intent to distribute marijuana, heroin and cocaine base. Appellant was held accountable for the equivalent of 10198.8 kilograms of marijuana resulting in a

30

base offense level of 34. (PSR ¶ 108). A four-level role enhancement resulted in an adjusted offense level of 38. (PSR ¶ 113).

Racketeering Act 1 and Count 20 concerned the alleged general conspiracy to murder rival gang members. Appellant was held accountable for the murder of Kail Ferro, the murder of Lloyd Carter, the murder of James McClenic, and the December 21, 2010 shooting of Justin Smith's home and the shooting of the McClenic home that same night. Each act was treated separately and was given an adjusted offense level of 47 (PSR ¶¶ 114-144).

The final count, illegal possession of ammunition, has an adjusted offense level of 27 (PSR ¶¶ 145-150). The 18 U.S.C. § 924(c) counts 5, 8, 14, 17 and 19 did not factor into the guideline analysis as they are governed by statute. (PSR ¶¶ 151-153).

The "Multiple Count Adjustment" used the greatest offense level, 47, as a base. A four-level enhancement resulted in a total offense level of 51 (PSR ¶¶ 154-159). Appellant was accorded 13 criminal history points based upon prior convictions. Two additional points were added resulting in a total score of 15. This placed appellant in Category VI. (PSR ¶ 169. With a total offense level of 51 and a Criminal History category of VI, the advisory Guideline term was life imprisonment.

31

**Appellant's History And Characteristics**

Appellant Raphael Osborne was born on August 8, 1985 and was therefore twenty-seven years old at the time of his April 17, 2013 arrest. (PSR ¶ 175). Appellant was raised by his stepmother Rene Cabrera. He has had little contact with his father who provided no financial support. Prior to his arrest, he resided with his mother, sister and brother. The latter sibling is disabled with cerebral palsy (*Id.*). Appellant has two children, aged 10 and 6 with Simone Winter. His children reside with their mother in Bay Shore, N.Y. (PSR ¶ 178).

Appellant completed eleventh grade. While incarcerated he has attended GED preparation classes. Appellant is not a substance abuser. He has tried alcohol on only one occasion and has rarely smoked marijuana (PSR ¶ 184).

Appellant filed no objections to the Presentence Report.

## IV. THE SENTENCING

The parties appeared before the Court for sentencing on January 13, 2017. The court noted that Mr. Osborne was "looking at mandatory life imprisonment" (A273). His newly appointed attorney did not address the appropriate sentence (A279-A280). Nor did he submit a presentence memorandum. The government recommended a sentence of life plus 115 years. (A282). The Court imposed consecutive terms of life imprisonment on Counts One and Two (Racketeering and Racketeering Conspiracy) and Count 18 (Narcotics Conspiracy). On counts 3, 4,

6, 7, 10, 11 and 16, the court imposed concurrent terms of 20 years, the statutory

maximum. On counts 9, 15, 20 and 21 the court imposed the statutory maximum

of ten years also to run concurrently. On counts twelve and thirteen the court

imposed a sentence of 30 years, also to run concurrently. With respect to the 18

U.S.C. § 924(c) counts, the court imposed a 25-year term on counts 5,8,14, and 17

and a 5-year term on count 19. As per statute, the § 924(c) terms were ordered to

run consecutively with each other and all other counts. The court stated that its

intention was to impose an additional 115 years to the consecutive life terms.

(A290-A291). The written judgment signed on January 17, 2017. Contrary to the

oral pronouncement, it states that the sentence was three life terms plus 135 years.

(A295-A300).

## **SUMMARY OF ARGUMENT**

The judgments on the two RICO counts and the related substantive counts

should be vacated and those counts dismissed as they were not supported by

legally sufficient evidence. There was no evidence that the "Fish" and "Trackside"

robberies were related to the affairs of the enterprise and therefore were not

predicate acts under Counts One and Two. With respect to the conspiracy to

murder and assault rival gang members there was insufficient evidence that

appellant agreed with anyone to commit those specific crimes, as required by New

York law. Likewise, while there was sufficient evidence that appellant bought and

sold narcotics as part of any narcotics conspiracy. Finally, there was no evidence that would support an inference that he shot Johnny Green on January 30, 2013.

The prosecution offered a plainly pretextual reason for striking an African-American woman from the jury thereby denying appellant equal protection.

It was error to instruct the jury that it could find appellant guilty based upon *Pinkerton v. United States*, 328 U.S. 40 (1946) for offenses arising under New York law as New York does not recognize *Pinkerton* liability.

The lower court should have held a *Franks v. Delaware* hearing to determine whether the eavesdropping warrant affidavit contained material misrepresentations as the remaining allegations did not establish probable cause.

The trial court abused its discretion when it precluded appellant from calling the case agents on the defense case as their testimony would have supported his defense.

Appellant was denied a fair trial when the court permitted cooperator Daron Morris to offer hearsay testimony. Additional reversible error was committed when the government introduced irrelevant and inflammatory photographs of three Bloods allegedly killed by Crips.

The sentence of three consecutive life terms plus 135 years was excessive as it far exceeds what is sufficient to satisfy the goals of sentencing.

34

# ARGUMENT

## POINT I

### THE EVIDENCE CONVICTING APPELLANT OF RACKETEERING, RACKETEERING CONSPIRACY, AND CERTAIN SUBSTANTIVE COUNTS WAS LEGALLY INSUFFICIENT.

### I.  Introduction

Appellant Raphael Osborne was convicted, *inter alia*, of racketeering, (Count 1), racketeering conspiracy, (Count 2), attempted murder of rival gang members, (Count 15-Johnny Green) assault of rival gang members with a dangerous weapon (Count 16-Johnny Green), discharging firearms during a crime of violence (Count 17-Johnny Green), Conspiracy to Distribute Controlled Substances (Count 18), Use of Firearm During a Drug Trafficking Crime (Count 19) and Conspiracy to Murder and Assault Rival Gang Members With Dangerous Weapons (Count 20).    For the reasons set forth *infra*., the evidence convicting him of each of the foregoing counts was insufficient as a matter of law.

With respect to the RICO predicate act and substantive count that charged appellant Osborne with a general conspiracy to assault and/or murder rival gang members (Count 1, Racketeering Act 1 and Count 20) and the predicate acts and substantive counts charging him with the January 30, 2013 shooting of Johnny

35

Green, (Count 1, Racketeering Act 5, Counts, 15, 16 and 17)  the evidence was

legally insufficient to prove that appellant participated in or aided and abetted

those crimes.  With respect to the RICO predicate acts that charged him with the

robbery of "Fish" (Racketeering Act 2) and the "Trackside" robbery (Racketeering

Act 3), the evidence was legally insufficient to establish that those robberies were

related to the activities of the alleged enterprise.  Finally, with respect to the

alleged narcotics conspiracy (Count 1, Racketeering Act 6, Counts 18 and 19) the

evidence was legally insufficient to establish an agreement to possess with intent to

distribute controlled substances.   Given the foregoing, the judgments on Counts 1,

2, 15, 16, 17, 18 and 19 should be vacated and those counts of the indictment

dismissed.[12]

## II.     Legal Insufficiency Standard

A jury verdict of guilty cannot be sustained unless "any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Henry*, 325 F.3d

93, 103 (2d Cir. 2003); *United States v. Glenn*, 312 F.3d. 58, 53 (2d Cir. 2002).

When considering a sufficiency challenge on appeal, the evidence must be viewed

---

[12] The evidence convicting appellant of all but one of the racketeering acts alleged
in Count 1 was legally insufficient.  Thus, both the substantive RICO count (Count
One) and the RICO conspiracy count (Count Two) should be dismissed. *United
States v. Tellier*, 83 F.3d 578 (2d Cir. 1996).

36

in its totality and in the light most favorable to the government. Deference must be given "to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." *Id*. at 64.

### III. The Narcotics Conspiracy (Count One, Racketeering Act Six; Counts Eighteen and Nineteen).

"In order to convict a defendant of conspiracy, the government must prove both the existence of the conspiracy alleged and the defendant's membership in it beyond a reasonable doubt." *United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008) citing *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008). The "essence" of any conspiracy, this Court has observed, is an "agreement" and in order to establish a conspiracy "the government must show that two or more persons entered into a joint enterprise with consciousness of its general nature and extent." *Id*. citing *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980).

The superseding indictment alleged a single narcotics conspiracy, to wit, that from at least 2010 until the date of the superseding indictment appellant Osborne conspired with others to violate the narcotics laws. (A32). Appellant was alleged to be accountable for 280 grams or more of crack cocaine, 100 grams or more of heroin, and 100 kilograms of marijuana (A33 ). The evidence was legally insufficient because while the evidence established that members of the Crips, including appellant Osborne, possessed and/or distributed controlled substances,

they did so individually and not as part of any joint enterprise.    There was no
"agreement" to violate the narcotics laws.

Government cooperating witness Aaron Halyard was aware that appellant
sold crack cocaine, heroin and marijuana.  But appellant sold those drugs for
himself, not the Crips (Halyard: 275, 844-45).    Halyard himself sold drugs.  But
he was not working for appellant or vice versa (Halyard: 844-45).  There was no
common stash and members kept profits for themselves.  (Halyard: 761, Robinson:
1532, Appiagyei: 1695).    Members of the Rollin 60's who sold drugs were free to
do business with whomever they chose (Appieyei: 1695).  In fact, they sometimes
worked with members of the rival Bloods and competed with other Crips for
customers. (Halyard: 846; Robinson: 1532-34; Appieyei: 1695).

Halyard claimed, without offering specifics, that while he sometimes gave
some drug money to the Crips set, appellant never did so  (Halyard: 617;
Robinson: 1536).

Hernandez and Robinson testified that they often purchased marijuana from
appellant (R. Hernandez: 1137; Robinson: 1381).   But it was Courtney Smith who
was Hernandez's business partner in the drug trade, not Raphael Osborne.  (R.
Hernandez: 1295).  Appellant was simply their supplier.  A buyer-seller
relationship, without more, does not establish a conspiracy.  *United States v.*

*Hawkins*, 547 F.3d 66, 72 (2d Cir. 2008) citing *United States v. Beech-Nut Nutrition*, 871 F.2d 1181, 1191 (2d Cir.), *cert denied*, 493 U.S. 933 (1989).

## IV.   The "Fish" and "Trackside" Robberies (Count 1, Racketeering Acts Two and Three).

Halyard and Hernandez testified that appellant Osborne participated in two robberies in the fall of 2010.  The first, committed with both Halyard and Hernandez, was of a drug dealer identified only as "Fish".  Two to three pounds of marijuana were seized during that robbery (Halyard: 478-81; R. Hernandez: 1153-54).   The second robbery also occurred during late 2010.  In the so-called "Trackside" robbery Eric Smith and Halyard entered the apartment of a drug dealer.  They removed 15-20 grams of crack cocaine and $1500.  Appellant Osborne remained in a car outside (Halyard: 452-53, 797).  Because neither robbery was "related" to the affairs of the alleged RICO enterprise, they cannot be deemed part of a "pattern of racketeering activity" as required by 18 U.S.C. § 1962.

To establish a "pattern of racketeering activity" the government must prove that the criminal acts it claims are racketeering acts "are related *and* that they amount or pose a threat of continued criminal activity." *H.J. Inc v. Northwestern Bell Tel.Co.* 492 U.S. 229, 239 (1989)(emphasis in original).  The predicate acts "must be related to each other ('horizontal relatedness') and they must be related to

39

the enterprise ('vertical' relatedness). *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992). Of relevance to the instant appeal, to show that the predicate acts are vertically related to the RICO enterprise, the government was required to prove "(1) that the defendant was enabled to commit the predicate acts solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise or (2) that the predicate offenses are related to the activities of the enterprise." *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) quoting *United States v. Minicone*, 960 F.2d at 1106 (internal quotation marks omitted).

Viewed in the light most favorable to the government, the evidence failed to satisfy either prong. There was no evidence that appellant's membership in the Crips or his position in that group played any role whatsoever in his ability to participate in either robbery. Indeed, Halyard stressed that the Fish robbery would have been done with or without appellant's participation (Halyard: 838-842). The "Trackside" robbery was no different.

The robberies were not "related" to the alleged enterprise. The undisputed evidence was that they were committed for personal enrichment and had nothing to do with the Crips. The marijuana stolen in the Fish robbery was sold and the proceeds of that sale split among the participants (Halyard: 894). No money was given to the set (Halyard: 843). The same was true for the proceeds from the

40

Trackside robbery. The participants split the proceeds and never contributed anything to the Rollin 60's (Halyard: 843).

The relatedness requirement prevents the finding of a "pattern" from "sporadic" criminal acts. *United States v. Minicone*, 960 F.2d at 1106 citing *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989). The Fish and Trackside robberies were committed for personal gain and would have been committed them even if the participants were not Rollin 60's members. Accordingly, the robberies were not part of a "pattern of racketeering" activity.

## V. Shooting of Johnny Green (Count One, Racketeering Act Five; Counts 15, 16 and 17).

It was the government's theory that on January 30, 2013 appellant Osborne and at least one other fired shots into a car parked in the driveway of 64 Pleasant St. in Roosevelt, a location frequented by members of the Bloods. Johnny Green was wounded in the shooting. (Markakis: 934-944; Fagan: 2303-04). The evidence was legally insufficient to prove that appellant participated.

The only evidence that arguably placed appellant at the scene of the shooting came from Aaron Halyard. According to Halyard, at some undefined time appellant said to him that "we have to go over there and light up Fat Johnny." Halyard continued: "I asked [appellant] what guns were used, what he got hit with

41

and he said the 40 and the 4 pound." (Halyard: 601-605; 864). The first sentence implies that the shooting had not yet happened. In the second Halyard seems to state that it had already happened. Was appellant stating that he was going to shoot Green in the future? Or was he relating what already had been done?

On cross-examination, Halyard could not state if anyone else was present when appellant allegedly made that comment. Nor did he provide a date for that alleged statement. (Halyard: 864). He did not know why Green was targeted. He acknowledged that appellant had never mentioned doing any harm to Green. (Halyard: 861-62). Such confusing testimony, even when viewed in the light most favorable to the government, does not support an inference that appellant participated in the Green shooting.[13]

In addition, Halyard had every reason to curry the favor of law enforcement by implicating appellant in crimes. He was arrested in April 2013 and charged with selling guns and conspiracy to commit murder. (Halyard: 268). He immediately reached out to federal authorities in order to secure the best possible deal (Halyard:

---

[13] Robinson testified that at some unspecified time before Green was shot he was at the In and Out Deli and observed Green with other Bloods. He telephoned appellant who came to the scene. Nothing happened as the Bloods had already left (Robinson: 1470-76).

506-07).  By implicating appellant, the person that the government believed headed the alleged enterprise,  he secured that deal.  (Halyard: 516).

At trial the government made much of another alleged statement made by appellant Osborne.  According to Halyard, members of the Crips were making fun of Rommel Lobban for fleeing from police on March 2, 2013 while driving his girlfriend's Impala when all he had was a small amount of marijuana (Halyard: 604-05; 861-64).  Appellant later came to Lobban's defense.  He explained that Lobban thought he was being pursued for the Green shooting.  Even if  credited, that testimony does not place appellant at the scene on January 30.  Appellant was clearly relating what Lobban thought when he was being pursued by police.  While it arguably places Lobban – or the car - at the scene of the shooting it does not place appellant there.

## VI.  Conspiracy To Murder/Assault Rival Gang Members (Count One, Racketeering Act One; Count 20).

Other than the Johnny Green shooting discussed above, it was not alleged that appellant Osborne personally participated in, or had prior knowledge of, any

of the instances where members of the Bloods were shot by Crips members.  This includes the shooting deaths of Kail Ferro, Lloyd Carter and James McClenic.[14]

Appellant's membership in a conspiracy to murder rival gang members could be inferred, the government argued, from 1) his issuance of the so-called "on sight" rule that allegedly required that Crips kill and/or assault Bloods "on sight" and 2) appellant's statements at a fall 2010 meeting where James McClenic's name was mentioned.  Neither supports that inference.

Under New York law, to be guilty of conspiracy, the government was obligated to prove that appellant Osborne entered into an agreement knowing that the specific goal of it was the murder and/or assault of  members of the Bloods. *People v. Ozarowski*, 38 N.Y.2d 481, 489 (1976) (to be guilty of conspiracy defendant must have the specific intent to commit the underlying offense). Assuming *arguendo* that appellant had a role in crafting an "on sight" rule at some point in the past, that rule, standing alone, does not constitute an <u>agreement</u> to murder or assault Bloods. This is so because the "on sight" rule did not <u>require</u> that a Blood be killed or assaulted.    Rather, if he saw a Blood, a Crip was supposed to "something"  (Halyard: 879; Robinson: 1413-15, 1465).  It was left up to the

---

[14] The government presented evidence of additional shootings, including Robinson's July 4, 2011 shooting of Chris Anderson. (Robinson: 1436-38)  There was no claim that appellant participated or had prior knowledge of that shooting.

member himself to decide what action, if any, to take (Robinson: 1490-91).

Robinson, for example saw Bloods daily. He never took any action unless

provoked (Robinson: 1485-86). Both Halyard and Reynaldo Hernandez testified

that they violated the so-called rule and were never disciplined. (Halyard: 880-82;

R. Hernandez: 1032). The Crips, as Robinson testified "were not as organized as

you think" (Robinson: 1547). A "rule" that is unclear and not regularly followed

cannot rationally provide a basis for an inference that appellant was a member of a

conspiracy to commit the specific intent crimes of murder and assault. *People v.*

*Ozarowski, supra*. *Cf People v. Maldonado*, 126 A.D.2d 670, 672 (2d Dept.

1987) (motive, coupled with presence in car from which fatal shots were fired

insufficient to establish accomplice liability.

The government's remaining basis for arguing that appellant was part of a

conspiracy to kill and/or assault Bloods derived from a meeting in a Roosevelt

sometime in September 2010. The meeting concerned recent shootings of Crips

and loss of territory to Bloods (Halyard: 780; Hernandez: 1355-56). Someone

mentioned "Bubbz" i.e. James McClenic. Following that remark appellant

allegedly stated, to no one in particular, that he wanted Bubbz "dealt with"

(Halyard: 523, 780, 785; R. Hernandez: 1089, 1359). No one responded and no

one asked questions. (Halyard: 785). Appellant never said he wanted McClenic

killed (Halyard: 785-787).   That ambiguous comment met with silence does not establish an "agreement" to act.

Subsequent events did not prove otherwise.  Three months went by. Nothing was done (Halyard: 792).  James McClenic was shot and killed on December 15, 2010. (Rich: 1579-84).   But there was no evidence that appellant was present or had prior knowledge of the shooting.  (Halyard: 790).  Nor was there evidence that the perpetrators, Rommel Lobban, Eric Smith and Bryan Henry shot McClenic because of appellant's alleged remark at the September meeting.

There was evidence from which a jury could rationally conclude that appellant directed that shots be fired at the homes of Bloods after the Bloods took retaliatory action. (Halyard: 532-33, R. Hernandez: 1097).   However, nothing in appellant's alleged statement directed that any person be assaulted and/or killed. Under New York law, a conspirator must have the specific intent to commit the underlying crime, *People v. Ozarowski, supra*.,   While directing that shots be fired at a house would certainly violate some law, it does not constitute the crime of conspiracy to commit murder or assault.

## POINT II

## THE LOWER COURT COMMITTED CLEAR ERROR WHEN IT DETERMINED THAT THE PROSECUTION'S EXPLANATION FOR STRIKING AN AFRICAN-AMERICAN JUROR WAS NOT PRETEXTUAL

*Batson v. Kentucky*, 476 U.S. 79 (1986) established a defendant's right to challenge, on equal protection grounds, a prosecutor's use of peremptory challenges to exclude jurors on the basis of race. *Batson* established a three-step procedure courts must utilize when determining the validity of an equal protection challenge. *Batson v. Kentucky*, 476 U.S. at 96-98. This Court has summarized this procedure as follows

> First, a trial court must decide whether the party challenging the strike has made a *prima facie* showing that the circumstances give rise to an inference that a member of the venire was struck because of his or her race…If the party making the *Batson* challenge establishes a *prima facie* case, the trial court must require the non-moving party to proffer a race neutral explanation for striking the potential juror. *See Batson* at 97. This second step does not require the party to give an explanation that is persuasive or even plausible. *See Purkett*, 514 U.S. at 768. Finally, if the non-moving party proffers a race neutral explanation, the trial court must determine whether the moving party has carried his or her burden of proving that the strike was motivated by purposeful discrimination. *See Batson* at 98…We have repeatedly emphasized that a trial court may not deny a *Batson* motion without determining

47

whether it credits the race-neutral explanations of the challenged peremptory strikes. *See Jordan v. LeFevre,* 206 F.2d 196] at 200 [2nd Cir. 2000].

*Galarza v. Keane.* 252 F.3d 630, 636 (2nd Cir. 2001). Where race-neutral explanations are offered, the issue of whether a *prima facie* case has been established becomes moot. *Hernandez v. New York*, 500 U.S. 352, 359 (1991). The striking of even a single juror for an impermissible purpose violates the Equal Protection Clause. *Walker v. Girdich*, 410 F.3d 120, 123 (2nd Cir. 2005). *Batson* violations are deemed "structural" and are not subject to harmless error analysis. *Tankleff v. Senkowski*, 135 F.3d 235, 240 (2nd Cir. 1998). A trial court's factual findings on a *Batson* challenge are reviewed for clear error. *United States v. Brown*, 352 F.3d 654, 661 (2d Cir. 2003).

Appellant's equal protection rights were violated when the court overruled his *Batson* challenge to the prosecution's strike of prospective juror Donna Brown. After the fourth round of challenges, appellant lodged a *Batson* objection to the strike of juror 22, Danielle Dotson, an African-American like the appellant (A212). He noted that the prosecution had to that point used three of its four challenges against African-Americans (A215). The government offered race-neutral explanations for those challenges that the court accepted (A215). Two rounds later, the government challenged juror Donna Brown, also African-American. Appellant renewed his

48

*Batson* motion.  The prosecution stated that it struck Ms. Brown because she had a brother who had a drug problem and had been arrested.  The government also noted that it had kept two other Black jurors on the panel with similar issues (A216-A217). Appellant noted, however, that at least one non-African American juror had a family member with drug problems (A216).  The lower court denied the *Batson* and allowed Ms. Brown to be excused (A217).

The court's determination was clearly erroneous.  At least two other non-African American jurors, Ms. Nunez and Ms. Luongo had relatives arrested for drug problems, were qualified, and not stricken by the government.  Ms. Nunez' brother served six years for smuggling drugs (A197).  Ms. Luongo's brother had a drug problem, was arrested, and served time in prison. (A208-A209).[15]  This refutes the government's assertion that its challenge to Ms. Brown was not racially motivated. That other African Americans remained on the jury is of no moment.   Striking even a single juror for racial reasons violates equal protection.  *Walker v. Girdich*, 410 F.3d at 123.  This Court should vacate the judgment and order a new trial.

---

[15] Ms. Luongo was stricken by the defense during the alternate rounds. (Voir Dire: 499).

49

**POINT III**

**REVERSIBLE ERROR WAS COMMITTED
WHEN THE LOWER COURT INSTRUCTED THE
JURY THAT IT COULD CONVICT APPELLANT
ON THE BASIS OF *PINKERTON* LIABILITY
FOR OFFENSES ARISING UNDER NEW YORK LAW.**

The lower court instructed the jury that if it found that appellant Osborne was a member of any of the conspiracies charged, it could convict him of certain substantive crimes if it found that those crimes were committed in furtherance of the particular conspiracy and were reasonably foreseeable (A258a-A258d). The jury was instructed that it could apply this *Pinkerton*[16] instruction to several counts including Count 10, the attempted murder of Maurice Gardner and Count 11, assault of Maurice Gardner with a dangerous weapon. (A258b). Both charged violations of 18 U.S.C. § 1959 with the predicate crimes being crimes of violence under New York State law. For the following reasons, charging *Pinkerton* liability for those counts was erroneous and the resulting prejudice to appellant denied him a fair trial.

Counts 10 and 11 charged violations of 18 U.S.C. §1959(a) commonly referred to as VICAR. That section provides as follows:

---

[16] *Pinkerton v. United States*, 328 U.S. 40 (1946).

> Whoever as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires to do so

is guilty of a crime and subject to various punishments. The § 1959 counts subject to the *Pinkerton* charge, Counts Ten and Eleven, alleged violations of New York law prohibiting attempted murder, N.Y.P.L. §§ 110/125.25(1) and 20.00, and assault with a dangerous weapon, N.Y.P.L. § 120.05(2) and 20.00. Each count alleged that appellant was liable as a principle under New York's aiding and abetting statute, P.L. § 20.00. (A29).[17]

To obtain a conviction under the 18 U.S.C. § 1959 offenses alleged in Counts 10 and 11 the government was obligated to prove beyond a reasonable doubt each of the elements of the predicate crimes as defined by New York law.

---

[17] N.Y.P.L. §20.00 provides as follows:
When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

*United States v. Carillo*, 229 F.3d 177, 183 (2d Cir. 2000).  Moreover, the trial court was obligated to instruct the jury on those elements.  *Id*.

The lower court did charge the elements of the New York's murder, attempted murder and assault statutes.  It also instructed the jury on the elements of acting in concert as defined by P.L. § 20.00.   The error was committed when the court added a federal *Pinkerton* theory of liability to those state law crimes    In doing so, the lower court permitted the jury to convict appellant upon proof that is legally insufficient under New York law. *Id*.

The New York State Court of Appeals has held that "one's status as a conspirator standing alone is insufficient to support a conviction for a substantive offense committed by a coconspirator." *People v. McGee*, 49 N.Y.2d 48, 57 (1979).  The only basis under New York law for holding a criminal defendant responsible for the acts of another is P.L. § 20.00.  "Conspicuously absent from P.L. § 20.00", said the Court, "is reference to one who conspires to commit an offense.  That omission cannot be supplied by construction."  Thus,

> to permit mere guilt of conspiracy to establish the
> defendant's guilt of the substantive crime without any
> evidence of further action on the part of the defendant,
> would be to expand the basis of accomplice liability
> beyond the legislative design.

52

*Id*.   That is exactly what the lower court did here.  It told the jury that it could

convict appellant Osborne of attempting to murder and/or assaulting Maurice

Gardner simply on the basis of his membership in a conspiracy.

The court's error is fatal to appellant's convictions under Counts 10 and 11.

A 18 U.S.C. §1959 offense requires that the government prove all of the elements

of the state law offense charged.  "[T]he text of VICAR demand that the predicate

acts constitute state law crimes…[The statute] therefore seem[s] to require of  a

predicate act based on state law that the act include the essential elements of the

state crime."  *Carillo*  at 186.  Under New York law, a conviction for  attempted

murder and assault require, at a minimum, that the defendant "act in concert" with

the actor as that term is defined in N.Y.P.L. § 20.00.  It does not permit a

conviction based upon mere membership in a conspiracy.  *People v. McGee*, *supra*.

Accordingly,  *Pinkerton* cannot be used to establish appellant's guilt of a § 1959

offense predicated on crimes defined by New York law.  *United States v. Carillo*,

*supra*.  *See also Presbyterian Church of Sudan v. Talisman Energy, Inc*., 582 F.3d

244 (2d Cir. 2009)(holding that *Pinkerton* could not be basis for liability under

Alien Tort Statute where international law did not recognize that basis for

liability).

To be sure, by enacting RICO and VICAR "Congress did not intend to

incorporate the various states' procedural and evidentiary rules" into those statutes.

53

*United States v. Coonan*, 938 F.2d 1553, 1564 (2d Cir. 1991) quoting *United States v. Paone*, 782 F.2d 386, 393 (2d Cir. 1986). However, by refusing to include *Pinkerton* liability in P.L. § 20.00, the New York State Legislature was not simply enacting an "evidentiary or procedural rule". It was defining an <u>element</u> of the crime that must be proven beyond a reasonable doubt. As the New York Court of Appeals noted

> It is repugnant to our system of jurisprudence, where guilt is generally personal to the defendant to impose punishment not for the socially harmful agreement to which the defendant is a party, but for substantive offenses in which he did not participate. We refuse to sanction such a result and thus decline to follow the rule adopted for Federal prosecutions

*People v. McGee*, 49 N.Y.2d at 58.

This argument is not foreclosed by *United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999). In that case, this Court found no error where the trial court charged *Pinkerton* in a case where Connecticut law defined the underlying crimes.

*Diaz* is distinguishable and not binding precedent. Contrary to New York State which has expressly rejected *Pinkerton*, Connecticut has expressly adopted that theory of criminal liability. *State v. Walton*, 227 Conn. 32, 45-46 (1993). VCAR instructs that the law of the forum state be applied when defining the elements of its predicate crimes. Thus, *Diaz* has no application where, as here, the

54

forum state's law rejects *Pinkerton* liability. *But cf United States v. Sanchez*, 623 F.Appx. 35 (2d Cir. 2015)(noting differences in New York and Connecticut statutes but nonetheless applying *Diaz.*).

This Court has expressly disapproved of *Diaz*. *Carillo*, *supra*. is illustrative as are two other cases decided after *Diaz*, *United States v. Pimentel*, 346 F.3d 285 (2d Cir. 2003) and *United States v. Feliciano*, 223 F.3d 102 (2d Cir. 2000).

This Court noted in *Carillo* that the *Diaz* court primarily relied upon this Court's earlier decision in *United States v. Bagaric*, 706 F.2d 42, 62 (2d Cir. 1983) *abrogated on other grounds by National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994) wherein this Court stated that "[u]nder RICO…state offenses are included by generic description." *Carillo* at 182 quoting *Bagaric* at 62. This Court acknowledged that while

> [i]t is true [that] *Bagaric* …establishes that, as a theoretical matter at least, a district court may, within the court discretion, charge a predicate RICO offense by generic description rather than giving the jury the elements in full. It does not follow, however, that such practice gives the jury sufficient instruction and the defendant adequate protection in all circumstances. *Bagaric* does not guarantee that such practice might be found an abuse of discretion if, on the circumstances of the particular case, it risks prejudice to the defendant. Declining to instruct the jury on the elements of state law offenses charged as predicate acts under RICO, VICAR

55

and similar statutes, can prejudice the defendant.
Notwithstanding *Bagaric's* theoretical approval, the
practice risks reversal on appeal.  The safer course if for
trial judges to instruct the jury on the elements of the
predicate offenses.

*United States v. Carillo*, 229 F.3d at 185.   "*Diaz*", this Court noted went "far

beyond *Bagaric*".  *Bagaric*

> neither stated nor implied that the government did not
> need to prove all elements of state law crimes
> constituting RICO or VICAR predicate acts…The
> *Bagaric* holding therefore extended only to the principle
> that where the jury has found all elements of an offense
> have been proved, a conviction cannot later be
> overturned on the formalistic grounds that the jury charge
> had omitted to state all elements.

Contrary to *Bagaric* and *Diaz*,  and like *Carillo*, the *Pinkerton* charge permitted the

jury to convict appellant Osborne of the VICAR offenses without having found all

of the elements of the state law offense, to wit, the elements of  accessorial liability

under N.Y.P.L. § 20.00.

That *Diaz* is not binding precedent is further demonstrated by the following.

In *United States v. Feliciano*, 223 F.3d 102 (2d Cir. 2000), decided one month

before *Carillo*,  the defendants were convicted of VICAR offenses.  They argued

on appeal that the district court committed error when it failed to instruct the jury

56

on the elements of 18 U.S.C. §§ 841(a)(1) and 846. This Court observed that while the appellant's argument that the district court failure constituted plain error "may have some force", reversal was not required as substantial rights were not affected. *Id*. at 115. *Feliciano* stands for the proposition that it is error, even "plain error" for a court not to define the elements of the predicate offenses that form the basis of a VICAR charge.

*United States v. Pimentel*, 346 F.3d 285 (2d Cir. 2003) was decided three years later. In it this Court reiterated that "since *Bagaric* was decided, we have on more than one occasion cautioned the Government and district judges" to instruct juries on all the elements of VICAR predicate acts noting again that a failure to do so might be deemed plain error. *Id*. at 302, 304 (pointing out that the *Feliciano* court stated that the defendant's plain error argument "may have some force").

Appellant Osborne was tried in 2016. In the years since *Carillo*, *Feliciano* and *Pimentel*, this Court has not retreated from the principle that in VICAR prosecutions, the elements of the predicate offenses, including those arising under state law, must be proven beyond a reasonable doubt.

Appellant Osborne was prejudiced by the lower court's decision to give a *Pinkerton* charge. Appellant Osborne was not present when shots were fired on October 13, 2012. It was the prosecution's theory instead that he ordered the

57

shooting.  Their primary proof  was the testimony of the actual shooter, Denzel

Smith.  Initially, Smith denied that he had ever met appellant Osborne.  It was only

after he learned that he might be charged with additional crimes that he contacted

the government and agreed to implicate appellant in exchange for leniency.  (D.

Smith: 2086-87, 2090, 2129, 2137-38).

Daron Morris testified that appellant allegedly made admissions to him.  He,

too,  imparted that information to law enforcement when he was seeking a

cooperation agreement and after he was in a position to have learned details of the

shooting from others (Morris: 1842, 1949, 1952).

This Court did not vacate the convictions in *Carillo, United States v.

Feliciano*, and *United States v. Pimentel*, because this Court found that

notwithstanding defects in the charge, the essential elements under New York law

had been proven.  That is not true here.   In the instant case, the court specifically

told the jury that if they were not convinced that appellant aided and abetted the

charged crimes, they could nonetheless convict appellant under *Pinkerton*. (A258a-

A258d).

This Court should vacate the judgments under Counts l0 and 11 and order a

new trial.

## POINT IV

## THE LOWER COURT ERRONEOUSLY
## DENIED APPELLANT'S MOTION PURSUANT
## TO *FRANKS V. DELAWARE* TO
## SUPPRESS WIRETAP EVIDENCE AND
## TANGIBLE EVIDENCE SEIZED FROM HIS HOME.

### 1. Standard of Review

This Court reviews a District Court's decision on a suppression motion *de novo*. *United States v. Elmore*, 482 F.3d 172, 178 (2nd Cir. 2007).

### 2. Standard Under *Franks v. Delaware*, 438 U.S. 154 (1978)

In *Franks v. Delaware*, 438 U.S. 154 (1978), the United States Supreme Court held that while a presumption of validity attaches to a law enforcement affidavit submitted in support of a search warrant, in certain circumstances a defendant is entitled to an evidentiary hearing to test the veracity of the affiant's statements. *Franks v. Delaware*, 438 U.S. at 171. The Fourth Amendment requires such a hearing if the defendant makes a "substantial preliminary showing" that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary for the judge's finding of probable cause. *Franks v. Delaware*, 438 U.S. at 155-56. The same principle applies to affidavits that intentionally omit facts that would negate a finding of probable cause. *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir.

2003)(*Franks* doctrine may be invoked where defendant makes a showing that there were intentional and material misrepresentations or omissions in the warrant affidavit).

### 3. The Warrant Affidavit

On or about March 22, 2013 the District Attorney of Nassau County applied for an eavesdropping warrant for appellant Raphael Osborne's cell phone    The application was supported primarily by the affidavit of Nassau County Police Department Detective John Mitchell. (A54-A112).    Mitchell asserted that he had "familiarity" with the structure and hierarchy of the Rollin 60's Crips and their off-shoot in Nassau County (A56).  The first 45 paragraphs of the affidavit contain conclusory statements about appellant's alleged role in the Rollin 60's, the criminal activities of Rollin 60's members other than appellant Osborne and two gun sales in May 2012 where appellant was present but did not participate.  In addition, he stated that he "knew" that appellant Osborne is the "OG", or highest-ranking member of the Rollin 60's Crips.  (A62).

The centerpiece of the warrant application, and the one that was critical to a probable cause determination, was Mitchell's representation that Raphael Osborne was the triggerman in the October 13, 2012 shooting of Maurice Gardner:

> 46. Upon interview of [redacted] I learned the following
> information: on October 13, 2012 at approximately 9:50

60

p.m. Derrick Hernandez conspired with Raphael Osborne
to attempt to murder [redacted]. [Redacted] was walking
eastbound on Princeton St in Hempstead with Derrick
Hernandez. [Redacted] had not seen Derick Hernandez
in many months leading up to this incident and found it
suspicious that Derick Hernandez wanted to take a walk
with [redacted]. [Redacted] further informed me that
[redacted] would never have walked eastbound on
Princeton Street and that [redacted] indicated such to
Derick Hernandez. [Redacted] wished to remain inside
[redacted's] house, where they originally met. It was at
the urging of Derick Hernandez that they left to walk to
the deli. On the way back from the deli, Derick
Hernandez led [redacted] on a roundabout path, taking
the long way back to [redacted's] house. Additionally
Derick Hernandez was communicating with someone via
text message while they were walking. Once they turned
onto Princeton Street, Derick Hernandez, who had been
walking next to [redacted] moved away from [redacted]
and walked to the other side of the street. At that point,
[redacted] saw Raphael Osborn (sic). According to
[redacted], as soon as [redacted] saw Raphael Osborne on
the street, [redacted believed that he was set up. While
walking a male black dressed in a red hooded sweatshirt
approached [redacted] and then began shooting at
[redacted's] back with a 9mm handgun. Derick
Hernandez led [redacted] right into Raphael Osborne's
path. Raphael Osborne fired multiple times. [Redacted]
was shot several times in the back and legs while
attempting to flee the scene....

(A81-A82). Mitchell buttressed his representation that appellant shot Gardner by

including cell phone records. He informed the court that between October 11,

61

2012 and October 15, 2012 there were 7 calls between Hernandez's phone and appellant's. He then opined "I believe this demonstrates discussion between Derick Hernandez and Raphael Osborne about the shooting…" (A106, ¶¶ 60-61). That there were 26 phone calls between Hernandez and appellant in the two weeks following the shooting was also, according to Mitchell, evidence that "Derick Hernandez and Raphael Osborne were discussing the shooting." (*Id.*).

In the early stages of this prosecution and in response to appellant's *Franks* motion, the government conceded, contrary to Mitchell's sworn representation, that appellant Osborne was <u>not</u> the triggerman in the attack on Gardner and was not even present when Gardner was shot. (Gov't Opposition Memorandum, Doc. 183, p. 6). Indeed, at the time he executed the affidavit, Mitchell knew that appellant was nowhere near the scene of the shooting. As demonstrated by his call analysis, he had access to the Osborne cell phone records. (A105, ¶ 57: "I have analyzed phone records including subscriber information and call detail records.") Det. Mitchell did not inform the magistrate that at or about the time of the shooting, Mr. Osborne was in Roosevelt or North Merrick. The Gardner shooting occurred miles away in Hempstead (A123, A129-A130).[18]

---

[18] Cell tower data attached to appellant's motion to suppress show that appellant received one call at or about the time of the shooting, "21:38:27 (9:38 p.m.) and one after it, "22:27:24 p.m. (10:27 p.m.) On both occasions cell phone tower data

Mitchell's affidavit also implied that there were two shooters: Mr. Osborne and a black man wearing a red hoodie. (A81-A82). According to Mitchell, both fired their weapons. Attached to appellant's motion was a police report prepared by crime scene investigators. They recovered five shell casings. All were fired from the same gun, indicating a single shooter. (A131).

### 4. The Lower Court's Decision

The lower court denied the motion to suppress without a hearing. The court held that even if Mitchell's representations about the Gardner shooting were excised from the affidavit and the omissions added, there was sufficient probable cause for issuance of the eavesdropping warrant:

> It appears that there was a great deal of probable cause based upon the information Detective Mitchell conveyed, albeit a portion of it with regard to the October shooting of the confidential information that paralyzed him. [T]here were so many other places that fit in to give a judge the justification to order a eavesdropping warrant.

> There were numerous texts and calls between the various alleged members of the group. The necessity is clear to me. I don't think the case law requires any more…

---

shows that he was in Roosevelt or North Merrick, not Hempstead. (A123, A129, A130).

I don't see that one incident of misinformation even including the business with the telephone, the cell phone which could really be anyplace. The government has indicated on more than one occasion that others were using Mr. Osborne's cell phone. And there is enough going on communications-wise between Mr. Osborne, Mr. Hernandez, and other gang members that it was indeed justified.

(A187-A188).

### 5. The Lower Court Erred in Denying The Motion To Suppress.

### a. A Hearing Was Required To Determine Whether Det. Mitchell's False Assertions Were Intentional Misrepresentations And Omissions.[19]

In the warrant affidavit, Detective Mitchell represented that appellant himself shot the informant Maurice Gardner. The government has conceded that is not true. At the time he drafted the warrant affidavit Mitchell knew or should have known that there was only one shooter and that the cell tower records for appellant's telephone placed him far from the scene on Pleasant Street in

---

[19] While it appears that the court found it unnecessary to determine whether there were any intentional misrepresentations, the oral decision, as recorded in the transcript is somewhat unclear and is therefore addressed.

Hempstead. These undisputed facts are more than sufficient for the "preliminary showing" required for a *Franks* hearing. *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013).

Only at a hearing could appellant satisfy his burden of proving that Mitchell knew, at the time he executed the affidavit that appellant was not a shooter and that he was miles away when Gardner was shot. He would also have had the opportunity to determine the basis, if any, for Mitchell's assertion that appellant shot Gardner and that appellant and Hernandez discussed the Gardner shooting on the telephone. He would also be able to demonstrate that Mitchell made these assertions while knowing that 1) appellant was miles away from the scene when the shooting occurred and 2) that incarcerated Crip member Gary Mosely had ordered a "hit" on suspected informants just a few weeks before Gardner was shot (A77-A80).[20]

Had appellant been able to explore these and other issues at a *Franks* hearing he could have demonstrated that Det. Mitchell intentionally misrepresented appellant's relationship to criminal acts committed by other members of the Rollin 60's Crips.

---

[20] During a September 23, 2012 telephone call Mosely tells an unidentified female "Yo, go kill that [redacted] for me matter fact. Go find that nigger and murder that nigger." (A79, ¶ 41).

65

### b. The Misrepresentations and Omissions Were Material

To be valid under the Fourth Amendment, a warrant must be supported by probable cause. *United States v. Irving*, 452 F.3d 110, 125 (2nd Cir. 2006). The standard for assessing probable cause for an eavesdropping warrant is no different from that required for a search warrant. *United States v. Fury*, 554 F.2d 522, 530 (2d Cir. 1977). When making that determination a court must determine whether, given the "totality of the circumstances" set forth in the affidavit there is a "fair probability" that evidence of a crime will be obtained through the electronic surveillance. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

Detective Mitchell's affidavit is replete with allegations of crimes committed by individuals he asserted were members or associates of the Rollin 60's Crips, including narcotics transactions, completed gun sales and acts of violence. But with the notable exception of the Gardner shooting, none involved appellant Osborne. As the following demonstrates, the paragraphs that do mention appellant Osborne do not show his personal participation in criminal activity.

Paragraph 25 (A66-A67) describes a transaction in which a cooperating witness purchased a firearm from Aaron Halyard. While appellant Osborne was present, he played no role in the sale. The money was given directly to Halyard. Paragraph 26 (A67) sets forth similar facts. Appellant is merely present while

66

Aaron Halyard effects a sale.  Paragraph 27 (A69)  describes a purported

conversation between appellant and a cooperating witness about the sale of a

firearm.  However, no sale took place.  In paragraph 49, (A84)  it is alleged that

appellant and a cooperating witness shared text messages about the purchase of a

gun.  There was no follow-up.  Paragraph 55 (A98) sets forth a purported

conversation between appellant and Derick Hernandez.  While Mitchell opines that

it refers to a gun purchase, that is not clear from the words used in the call.  There

was no allegation that appellant Osborne personally possessed either firearms or

narcotics, or that he participated in any violent act, other than the October 13, 2012

shooting.

The "totality of the circumstances" simply establishes that appellant Osborne

communicated with members of the Rollin 60's Crips, witnessed crimes committed

by them and, on two occasions, engaged in what could be described as

unsuccessful attempts at gun sales.  This does not amount to probable cause to

believe that monitoring of his cell phone would reveal evidence of criminal

activity.

The lack of probable cause is not cured by Detective Mitchell's

unsubstantiated statement that appellant Osborne was an "OG" and occupied a

leadership position in the Rollin 60's Crips.  (A62,  ¶ 18).  This kind of conclusory

67

statement is wholly inadequate to establish probable cause. *Illinois v. Gates*, 462 U.S. at 239; *Nathanson v. United States*, 290 U.S. 41, 54 (1933).

Given the foregoing, the false allegation that Mr. Osborne was personally involved in the October 13, 2012 shooting of Maurice Gardner was material to the determination of probable cause for the warrant that authorized monitoring of his cell phone. In addition, information obtained from that monitoring provided probable cause for the April 2013 warrant to search appellant's 107 Debevoise St. residence. Accordingly, the tangible property seized during that search should be suppressed as the fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471 (1963).[21]

The erroneous denial of the motion to suppress was not harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967). One hundred twenty-six pages of Aaron Halyard's trial testimony involved his interpretation of, and comment upon, the content of appellant's cell phone conversations (626-751).

Erroneously admitted evidence is less likely to be harmless if the prosecution emphasizes it during summation. *Zappulla v. New York*, 391 F.3d 462,

---

[21] The Mitchell affidavit that was used to obtain the search warrant for 107 Debevoise is included in the Appendix at pages A131b to A159. Information obtained from the cell phone conversations over appellant's telephone in included at paragraphs 31-39 of that affidavit.

471 (2ⁿᵈ Cir. 2004) citing *Arizona v. Fuliminante*, 499 U.S. 279 297-298 (1991).

In summation, the government argued that the recordings proved appellant's

leadership role in the Crips (2683-89), that they committed robberies together

(2702) and that appellant was a member of a narcotics conspiracy (2702, 2750-55).

Under Count 21, appellant was convicted of possession of ammunition

found during the search of the Debevoise St. house.  Since that search was

conducted pursuant to the tainted warrant, the ammunition should have been

suppressed.  That renders the conviction on Count 21 insufficient as a matter of

law.

This Court should vacate the judgment of conviction and order a new trial.

## POINT V

### REVERSIBLE ERROR WAS COMMITTED WHEN THE COURT PRECLUDED APPELLANT FROM CALLING DETECTIVES MITCHELL AND COLBY AS DEFENSE WITNESSES

Whether grounded in the Fifth Amendment's Due Process Clause or the

Sixth Amendment's Confrontation Clause, it is well-settled that a criminal

defendant has the right to present a defense.  *Crane v. Kentucky*, 476 U.S. 683, 687

(1986); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  Included in that right

is the opportunity to challenge the integrity of law enforcement's investigation into

the offense charged.  This is so because where "the probative force of evidence

69

depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work till diminish it." *Kyles v. Whitley*, 514 U.S. 419, 448-449, n. 15  (1995).

It was the defense theory  that as the perceived leader of the Rollin 60's Crips, the government sought to implicate appellant in every criminal act committed by members and/or associates of the Crips.  This included attempting to frame him for the October 13, 2012 shooting of Maurice Gardner and as the driving force behind the murder of James McClenic.  (A232, A245-A246).

That defense was not speculative.  In his March 2013 affidavit submitted in support of the government's application for an eavesdropping warrant NCPD Detective John Mitchell represented to the court that appellant was the triggerman in the Gardner shooting. (A81-A82).   The government ultimately conceded that this representation was false. (Doc. 183, p. 6).   Appellant argued that Mitchell knew this claim was false because he knew, through cell phone data, that appellant was far away from the shooting when it occurred. (A124, A129, A130).   In addition, Mitchell knew that someone else, Crips member Gary Mosely, had ordered a "hit" on suspected informants just days before Gardner was shot. (A79, ¶¶ 41-42).

`Detective George Colby, the co-case agent with Mitchell, was called as part of the government's case. On cross- examination, counsel questioned him about Gardner's purported identification of appellant. Colby maintained that during an interview two months after the shooting, Gardner named appellant as one of the shooters. While he acknowledged that he now knew that appellant did not shoot Gardner, he claimed that the first time anyone said appellant was not the shooter was after the April 2013 arrests in this case. Colby denied that he had ever reviewed cell phone records. (A239-A240).

Appellant moved to call both Detective Colby and Detective John Mitchell on the defense case. He addressed the issue himself. Appellant made clear that he did not want to re-litigate the issues that were presented in the motion to suppress. Rather, he explained, he should be able to demonstrate that the detectives falsified evidence. This included 1) the representations that he shot Gardner, 2) that he and Derrick Hernandez discussed the shooting in a telephone conversation and 3) that he had engaged in gun sales. The phone records, to which Mitchell had access long before the April 2013 arrests, would have proven that appellant was not a shooter because he was miles away (A250, A254). Finally, appellant informed the court that during the course of the trial, Detectives Colby, Mitchell or both, were in the company of the cooperating witnesses. Appellant argued that he should be able to question them about that fact to lay a foundation to argue that the

witnesses had been coached (A250-A255).   In response the government

acknowledged that Detectives Mitchell and Colby "have been present for all of the

witnesses" and have had "exposure" to the cooperators but had done nothing

improper (A251-A253).

The court denied appellants application to call the Detectives.  The court

stated

> I have decided, whether its right or its wrong, I have
> decided the wiretap application, whether or not there was
> probable cause for a judge to issue the order, I made up
> my mind and now we are ready to proceed.
>
> I suggest that you speak to [defense counsel] Mr. Carman
> and Mr. Carman is going to spend as much time as is
> humanly possible, and I know that you will reach a
> decision on Friday and let me know how you want to
> proceed.
>
> [AUSA] BOECKMAN: Your Honor, just so the
> record is clear –
>
> … With respect to calling Detective Mitchell and
> Detective Colby.
>
> THE COURT: Yes.
>
> I decided that you are not permitted to call them.

(A257-A258).

The court's decision to preclude the witnesses was an abuse of discretion.

*United States v. Yousef*, 327 F.3d 56, 128 (2d Cir. 2013) (preclusion of evidence

reviewed for abuse of discretion).  Appellant made it clear that he was not seeking to relitigate the suppression motion.  Instead he wanted to be able to demonstrate to the jury that Detectives Colby and/or Mitchell improperly influenced Gardner into identifying him as one of the shooters and then put that information in an affidavit to secure an eavesdropping warrant.   Had he been able to do so, he could have argued that other cooperating witnesses, including the true shooter Denzel Smith, were pressured into implicating him for not only the Gardner shooting but other acts alleged in the indictment.  *Kyles v. Whitley, supra*.  In addition, appellant could have brought out that Mitchell knew that Gary Mosely had ordered a "hit" on suspected informants just weeks days before Gardner was shot. This evidence would have contradicted the government's theory that it was appellant ad Derrick Hernandez who ordered that shooting.

The error, one of constitutional dimension, was not harmless beyond a reasonable doubt.  *Chapman v. California*, 386 U.S. 18, 24 (1967).  As argued in Point I five of the six predicate acts were not supported by legally sufficient evidence.  With respect to the remaining predicate act, the Gardner shooting, the evidence was far from overwhelming.  While witnesses testified that appellant had a motive to harm Gardner, it was Denzel Smith, the admitted shooter seeking leniency who provided crucial evidence linking appellant to it. This Court should reverse the judgment of conviction and order a new trial.

73

## POINT VI

## APPELLANT WAS DENIED A FAIR
## TRIAL WHEN DARON MORRIS WAS
## PERMITTED TO OFFER HEARSAY.

On re-direct examination Daron Morris was permitted to testify concerning a conversation he had with Rommel Lobban, aka "Rah", while the two were housed at the Nassau County Jail.   The conversation took place sometime after July 2014 when Morris had already started cooperating.  (A227).  According to Morris, Rah told him that appellant, Rah's sister and Rah himself were together in Rah's basement on the night of the Gardner shooting.  Rah told Morris "he [appellant] got the call after it was done."   The testimony continued with the following question from the prosecutor:

> Q. Now this conversation was clarifying that Gusto [appellant] orders the hit, doesn't do the hit?
>
> A. Yes.

(A228).

The foregoing testimony was inadmissible hearsay.  The statements were made by Rah, an out-of-court declarant, and admitted for the truth of the matter asserted, i.e. that appellant ordered the hit on Gardner.  Fed.R.Evid. 801(c), 802.

The statements were not admissible  pursuant to Fed.R.Evid. 801(d)(2)(E), statements of co-conspirators.  To be admissible under that rule a court must be satisfied that the statement actually falls within the definition contained in that

74

Rule. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). To qualify for admission,

> a court must find (1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy.

*United States v. Tracy*, 12 F.3d 1186, 1196 (2nd Cir. 1993). Morris' alleged conversation with Rah occurred sometime after July 2014. That was at least <u>one year</u> after the April 2013 termination of the alleged conspiracy. As the United States Supreme Court has stated "[t]here can be no furtherance of a conspiracy that has ended. Therefore, the declarations of a coconspirator do not bind the co-conspirator if made after the conspiracy has ended." *Lutwok v. United States*. 344 U.S. 604, 617-18 (1953).

Erroneously admitted evidence is harmless only if it is "highly probable" that it did not contribute to the verdict. *United States v. Bruno*, 383 F.3d 65, 80 (2d Cir. 2004); *United States v. Forrester*, 60 F.3d 52, 64 (2d Cir. 1995), citing *United States v. Tussa*, 816 F.2d 58, 67 (2nd Cir. 1987). Error going "to the heart of a critical issue is less likely to be harmless…Moreover, even if an appellate court is without doubt that a defendant is guilty, there must be a reversal if the error is sufficiently serious." *Id*. As argued *supra*., the evidence connecting appellant to the Gardner shooting was far from overwhelming. Morris' testimony that Rah

75

told Morris that appellant "ordered" the "hit" on Gardner undoubtedly had a "substantial and injurious effect" of the verdict and warrants reversal of the conviction and a new trial. *Kotteakos v. United States*, 328 U.S. 750, 756 (1946).

## POINT VII

### APPELLANT WAS DENIED A FAIR TRIAL WHEN THE LOWER COURT ADMITTED IRRELEVANT AND INFLAMMATORY PHOTOGRAPHS OF LLOYD CARTER, KAIL FERRO AND JAMES MCCLENIC

Evidence that appeals to a jury's sympathies and connects a party to a "highly charged public issue" must be carefully evaluated before it is admitted under Fed.R.Evid. 403. 1 Weinstein's Evidence P 403(03) at 403-16-403-17 (1980). That rule was violated herein when the lower court permitted inflammatory and irrelevant morgue photographs of the deceased Lloyd Carter (Ex. 64, A224)), Kail Ferro (Ex.193, 195, A225-A226) and James McClenic (Ex. 1, A222). Because appellant was prejudiced by the admission of that evidence, this Court should reverse the judgment of conviction and order a new trial.

Bloods member Kail Ferro was killed by Crips member Devon Cabrera in 2006 (Halyard: 328-39, G.Ex. 275) Lloyd Carter was shot and killed by Cody Hernandez in 2008 (Halyard: 354, 488; G. Ex. 70). On December 15, 2010, Crips

76

member Eric Smith killed Blood James McClenic (Halyard: 525; 910-12). Although no substantive count charged appellant with any of these acts, they were admitted on the theory that tended to prove a general conspiracy among Crips to murder and/or assault Bloods.

That theory, however, does not render the autopsy/morgue photographs relevant. That these murders occurred and were committed by Crips was not disputed. What <u>was</u> disputed was whether appellant was a member of a conspiracy that led to those murders. Photographs of the deceased had no bearing on that issue. Their only possible purpose was to flame the jury against appellant.

To the extent that the government was obligated to prove that the deaths occurred, that was accomplished by other evidence. The cooperating witnesses testified about their knowledge of each shooting. The government introduced certificated of conviction for the Carter and Ferro shootings.

Although no objection was lodged to the photographs, their admission constituted plain error. Fed.R.Crim.P. 52(b); *United States v. Marcus*, 560 U.S. 258 (2010). This Court should reverse the judgment of conviction and order a new trial.

# POINT VIII

## THE SENTENCE OF THREE CONSECUTIVE LIFE TERMS PLUS 115 YEARS WAS SUBSTANTIVELY UNREASONABLE.

This Court's review of the reasonableness of a district court's sentence "encompasses two components: procedural review and substantive review." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). When undertaking substantive review, this Court determines whether the district court abused its discretion. *Id*. While reasonableness review is deferential, this Court remains guided by the parsimony clause of 18 U.S.C. § 3553(a). That section mandates that sentencing courts "impose a sentence sufficient but not greater than necessary to comply with" the factors set forth in 18 U.S.C. § 3553(a)(2). *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) citing *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010). A sentence that is within the range as calculated under the advisory United States Sentencing Guidelines is not presumed to be reasonable. *United States v. Dorvee*, 616 F.3d at 182-183, citing *United States v. Cavera*, 550 F.3d at 189 and *United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009).

Appellant was convicted of five counts arising under 18 U.S.C. § 924(c). He was sentenced to the minimum term on each, i.e. 25 years on counts five eight, fourteen, seventeen and nineteen and five years on count twenty-one. Because the statute requires that the sentences on each run consecutively to all other counts, the

78

§ 924(c) counts alone resulted in mandatory term of 105 years, essentially a life term. A life term is certainly "sufficient" to serve 18 U.S.C. § 3553(a)'s goals of adequately addressing the seriousness of the offense, providing protection for the public and deterring appellant from committing additional crimes. 18 U.S.C. § 3553(a). Given the foregoing this Court should vacate the sentence imposed and remand for resentencing.

## POINT IX

### THE WRITTEN JUDGMENT SHOULD BE AMENDED TO REFLECT THE SENTENCE PRONOUNCED ORALLY.

The court imposed consecutive life terms on counts one, two and eighteen. When imposing terms of years on the remaining counts, the court stated that its intention was to impose an additional, consecutive term of 115 years. (A290-291: "It should be 115 years.") That additional 115 years was also what was contemplated by the government. (A282: "[W]e think that the life sentence is appropriate, the 115 years is mandatory and is an appropriate sentence…").

The paper judgment, however, lists the sentence as three consecutive life terms plus 135 years (A297). Should this Court not vacate the sentence as substantively unreasonable, it should order that the paper judgment be amended to reflect a sentence of three life terms plus 115 years.

79

Fed.R.Crim.P. 43(a) requires that "[t]he defendant … be present at…sentencing".  Accordingly, this Court has held that "[i]t is the oral sentence which constitutes the judgment of the court, and which is authority for the execution of the court's sentence." *United States v. Thomas*, 299 F.3d 150, 152 (2d Cir. 2002) quoting *United States v. Marquez*, 506 F.2d 620, 622 (2d Cir. 1974). Where there is a conflict between the oral sentence and the written judgment, it is the written judgment that controls.  *United States v. Thomas*, 299 F.3d at 153 citing *United States v. A-Abras, Inc.* 185 F.3d 26, 29 (2d Cir. 1999).

It was the intention of the court and the recommendation of the government that appellant receive a sentence of three consecutive life terms plus 115 years. The written judgment states 135 years plus three life terms.  Given that conflict, the judgment should be amended to reflect the 115-year additional sentence.

## **<u>CONCLUSION</u>**

WHEREFORE, for all the foregoing reasons, this Court should issue an order a) vacating the judgment of conviction and dismissing with prejudice those counts not supported by legally sufficient evidence b) with respect to the remainder of the counts, vacating the judgment of conviction and ordering a new trial, or, alternatively, c) ordering a *de novo* resentencing and d) granting such other and further relief as this Court deems just and proper.

Dated: October 20, 2017     Respectfully submitted

ROBERT J. BOYLE
277 Broadway
Suite 1501
New York, N.Y.  10007
(212) 431-0229
Attorney for Raphael Osborne

# **CERTIFICATION**

This Brief is in compliance with this Court's typeface requirements in that it has been typed in Times New Roman 14 Point. This Brief is not in compliance with this Court's word limitations in that it is 17,734 words in length. However, this Court has granted appellant leave to file a brief that does not exceed 18,000 words.

_Robert J. Boyle_

**SPECIAL APPENDIX**

# TABLE OF CONTENTS

**Page**

Judgment………………………………………………………………………...SPA-1

SPA-1

Case 2:14-cr-00264-JS   Document 414   Filed 01/17/17   Page 1 of 6 PageID #: 5895

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 1

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 17 2017 ★

LONG ISLAND OFFICE

# UNITED STATES DISTRICT COURT
Eastern District of New York

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | JUDGMENT IN A CRIMINAL CASE |
| v. | ) | |
| RAPHAEL OSBORNE | ) | Case Number:  CR 14-264 (JS)   Deft. #2 |
| | ) | USM Number:  83520-053 |
| (AUSA Nicole Boeckmann) | ) | Richard Miller, Esq. |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1rssss - 21rssss of superseding indictment (S-5), as redacted for trial
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18-1962(c), -1963 | Racketeering | 4/17/2013 | 1rssss |
| 18-1962(d), -1963 | Racketeering conspiracy | 4/17/2013 | 2rssss |
| 18-1951(a) | Hobbs Act robbery conspiracies | 12/20/2010 | 3, 6rssss |

   The defendant is sentenced as provided in pages 2 through __6__ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   earlier indictments   ☐ is   ☑ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/13/2017
Date of Imposition of Judgment

/s/ Joanna Seybert
Signature of Judge

JOANNA SEYBERT, U.S.D.J.
Name and Title of Judge

1/17/2017
Date

SPA-2

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 1A

| | Judgment—Page | 2 | of | 6 |

DEFENDANT: RAPHAEL OSBORNE
CASE NUMBER: CR 14-264 (JS)   Deft. #2

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18-1951(a) | Hobbs Act robberies | 12/20/2010 | 4, 7rssss |
| 18-924(c)(1)(C)(i) | Brandishing firearms during crimes of violence | 12/20/2010 | 5, 8rssss |
| 18-1959(a)(5) | Conspiracy to commit murder in aid of racketeering | 4/30/2013 | 9, 15, 20rssss |
| 18-1959(a)(3) | Attempted murder in aid of racketeering John Doe 1, 2 | 1/30/2013 | 10, 16rssss |
| 18-1959(a)(3) | Assault with a dangerous weapon in aid of racketeering of John Doe 1 | 10/13/2012 | 11rssss |
| 18-1513(a)(1)(B), (2)(B) | Witness retaliation | 10/13/2012 | 12rssss |
| -1513(f), (a)(1)(B), (2)(B) | Witness retaliation conspiracy | 10/13/2012 | 13rssss |
| 18-924(c)(1)(C)(i) | Discharging a firearm during crimes of violence | 1/30/2013 | 14, 17rssss |
| 21-846; -841(a)(1), (b)(1)(A)(iii), (b)(1)(B)(i), (b)(1)(C), (b)(1)(B)(vii) | Conspiracy to distribute and possess with intent to distribute at least 280g. cocaine base, 100g. heroin, 100Kg. marijuana, and methylone | 4/17/2013 | 18rssss |
| 18-924(c)(1)(A)(i) | Possession of firearm during controlled substance off. | 4/17/2013 | 19rssss |
| 18-922(g)(1); 924(a)(2) | Illegal possession of ammunition | 4/17/2013 | 21rssss |

SPA-3

AO 245B (Rev. 11/16)  Judgment in Criminal Case
          Sheet 2 — Imprisonment

|  | Judgment — Page | 3 | of | 6 |
|---|---|---|---|---|

DEFENDANT:  RAPHAEL OSBORNE
CASE NUMBER:  CR 14-264 (JS)   Deft. #2

## IMPRISONMENT

       The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

   1620 mos. (i.e., 135 yrs.) plus 3 consecutive life terms:
   Counts 3, 4, 6, 7, 10, 11, 16: 240 mos.; Counts 9, 15, 20, 21: 120 mos.; Counts 12, 13: 360 mos. (ALL CONCURRENT)
   Counts 1, 2, 18: LIFE,  consecutive to each other and to all other counts.  Count 19: 60 mos., consecutive to all other counts.
   Counts 5, 8, 14, 17: 300 mos., consecutive to each other and to all other counts.

☐  The court makes the following recommendations to the Bureau of Prisons:

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at  _____  ☐ a.m.  ☐ p.m.  on  _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on  _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

a  _____ , with a certified copy of this judgment.

    _____
    UNITED STATES MARSHAL

    By  _____
    DEPUTY UNITED STATES MARSHAL

SPA-4

Case 2:14-cr-00264-JS   Document 414   Filed 01/17/17   Page 4 of 6 PageID #: 5898

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

|  | Judgment—Page | 4 | of | 6 |

DEFENDANT:   RAPHAEL OSBORNE
CASE NUMBER:   CR 14-264 (JS)   Deft. #2

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :    NONE

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

SPA-5

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

| | Judgment — Page 5 of 6 |
|---|---|

DEFENDANT: RAPHAEL OSBORNE
CASE NUMBER: CR 14-264 (JS)   Deft. #2

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 2,100.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| **TOTALS** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA-6

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT: RAPHAEL OSBORNE
CASE NUMBER:  CR 14-264 (JS)   Deft. #2

Judgment — Page   6   of   6

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ 2,100.00  due immediately, balance due

     ☐  not later than _____ , or
     ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
     term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
     imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.