# 17-171

*To Be Argued By*:
NICOLE BOECKMANN

# United States Court of Appeals

## For the Second Circuit

◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

DERICK HERNANDEZ, also known as D-NICE, MERLYN BERNITEZ, also known as FRANKIE C, DAQUANNE NUNN, also known as TRAP, COURTNEY SMITH, also known as COURT DOG, also known as COOL, TYSHAWN GITTO, also known as TA TA, ROMMEL LOBBAN, also known as RAH DOLLA, RUDY MONTOUR, also known as SUS 1, KURTIS PHILLIP, also known as KNOXX, JAHMANI HAMILTON, also known as G-MONEY, KWAME LAKE, also known as PAID, BRANDON SHORT, also known as B-SHAWT, ERIC SMITH, also known as ESAMA, also known as ESCO,

*Defendants,*

RAPHAEL OSBORNE, also known as GUSTO,

*Defendant-Appellant.*

_____

**On Appeal From The United States District Court
For The Eastern District of New York**

---

**BRIEF AND SPECIAL APPENDIX FOR THE UNITED STATES**

---

JO ANN M. NAVICKAS,
NICOLE BOECKMANN,
CHRISTOPHER C. CAFFERONE,
  *Assistant United States Attorneys,
    Of Counsel.*
MICHAEL MAFFEI,
  *Special Assistant United States Attorney
    Of Counsel.*

RICHARD P. DONOGHUE,
*United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000*

i

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...........................................vi

PRELIMINARY STATEMENT..........................................1

STATEMENT OF FACTS.............................................5

I.   Overview................................................5

II.  The Trial...............................................6

     A.   The Government's Case.............................. 6

          1.   The Enterprise: The Rollin' 60s Crips........... 6

          2.   The Crimes..................................... 9

               a.   Conspiracy To Murder Rival Gang
                    Members................................... 9

                    i.   The Gang's "On Sight Rule"........... 9

                    ii.  Osborne's Acts Of Violence.......... 11

                         1.   The Attempt To Shoot King
                              Carter......................... 11

                         2.   Osborne's Attempted Murder
                              Of Bloods In The Summer Of
                              2012........................... 12

                         3.   The Attempted Murder Of
                              Johnny Green................... 13

                    iii. Targeted Attacks On Rival
                         Gang Members Ordered By
                         Osborne............................ 14

                         1.   Murder Of James McClenic....... 15

                         2.   Retaliation Against
                              Revenge Shootings.............. 15

               b.   The Attempted Murder Of Informant
                    Maurice Gardner........................ 16

        c.    Controlled Substances Offense: Conspiracy To Distribute Narcotics........ 19

        d.    Hobbs Act Robberies...................... 21

            i.   The "Trackside" Robbery............. 21

            ii.  The "Fish" Robbery.................. 22

     3.   Corroborating Evidence........................ 23

  B.   Defense Case........................................ 24

  C.   Verdict............................................ 24

III. Sentencing................................................24

ARGUMENT......................................................27

POINT ONE - THE EVIDENCE WAS SUFFICIENT TO CONVICT OSBORNE OF RACKETEERING, RACKETEERING CONSPIRACY, VIOLENT CRIMES IN AID OF RACKETEERING, AND CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCES........................................27

I.   Legal Standard..........................................27

II.  The Evidence Was Sufficient.............................29

  A.   The Evidence Established That Osborne Conspired With Others, Including Gang Members, To Distribute Controlled Substances (Count One, Racketeering Act Six; Count Eighteen)............................... 29

  B.   The Evidence Established That The "Trackside" And "Fish" Robberies Were Related To The Affairs Of The Enterprise (Count One, Racketeering Acts Two And Three)............................................. 36

  C.   The Evidence Was Sufficient To Convict Osborne Of The Attempted Murder And Assault Of Johnny Green (Count One, Racketeering Act Five; Counts Fifteen, Sixteen, and Seventeen)........................... 38

D.    The Evidence Was Sufficient To Establish
Osborne's Membership In The Conspiracy
to Murder And Assault Rival Gang Members
(Count One, Racketeering Act One; Count
Twenty)........................................... 41

POINT TWO - THE DISCOURT COURT CORRECTLY FOUND
THAT THE  GOVERNMENT'S RACE NEUTRAL
EXPLANATION FOR STRIKING JUROR NUMBER
25 WAS NOT PRETEXTUAL...............................47

I.   Factual Background.......................................47

II.  The Applicable Law......................................48

    A.    The *Batson* Ruling.................................. 48

    B.    Procedures Under *Batson*........................... 49

    C.    The Standard Of Review............................. 50

III. The District Court's Finding That The
Government's Race-Neutral Explanation
Was Not Pretextual Was Not Clearly Erroneous..............51

POINT THREE - THE DISTRICT COURT PROPERLY
INSTRUCTED THE JURY REGARDING
THE APPLICATION OF *PINKERTON* LIABILITY...........53

I.   Applicable Law.........................................53

    A.    The Standard Of Review............................. 53

    B.    The VICAR Statute And *Pinkerton* Liability.......... 54

II.  The Giving Of The *Pinkerton* Charge Does
Not Vitiate Osborne's Convictions On
Counts Ten And Eleven...................................56

POINT FOUR - THE DISTRICT COURT DID NOT ERR IN
DENYING A *FRANKS* HEARING; NOR DID
IT WRONGLY REFUSE TO SUPPRESS THE
EVIDENCE OF THE SEARCH...........................61

I.   The Relevant Facts.....................................61

    A.    The Wiretap Of Osborne's Phone..................... 61

B.    The Search Of Osborne's Home........................ 65

C.    Pre-Trial Motions.................................. 66

II.   Applicable Law.........................................68

A.    The Standard Of Review............................ 68

B.    Requirement Of A *Franks* Hearing.................... 68

C.    The "Good Faith" Exception........................ 70

III.  The District Court Did Not Err In Refusing
      To Conduct A *Franks* Hearing............................70

IV.   The Search Was Valid...................................74

POINT FIVE - THE DISTRICT COURT DID NOT ABUSE ITS
            DISCRETION IN PRECLUDING OSBORNE
            FROM CALLING CERTAIN DEFENSE WITNESSES...........76

I.    The Relevant Facts.....................................76

II.   The Law................................................80

III.  The District Court Did Not Err In Limiting
      Irrelevant Testimony...................................81

POINT SIX - THE GOVERNMENT DID NOT ELICIT
            IMPROPER HEARSAY TESTIMONY.........................84

I.    Relevant Facts.........................................84

II.   The Standard Of Review.................................89

III.  No Improper Hearsay Was Admitted.......................90

POINT SEVEN - THE DISTRICT COURT PROPERLY ADMITTED
            CRIME SCENE AND AUTOPSY PHOTOS DURING
            THE TRIAL........................................93

I.    The Law................................................93

II.   The Morgue Photographs Were Not Unfairly Prejudicial......94

POINT EIGHT - OSBORNE'S SENTENCE WAS REASONABLE................98

I.    The Reasonableness Standard............................98

v

II.  The Sentence Was Reasonable Given The Crimes.............100

POINT NINE - THE WRITTEN JUDGMENT IS CONSISENT
             WITH THE ORAL PRONOUNCEMENT OF SENTENCE.........101

CONCLUSION.................................................103

TABLE OF AUTHORITIES

Page

CASES

Barnes v. Anderson,
  202 F.3d 150 (2d Cir. 1999) ................................. 50

Batson v. Kentucky,
  476 U.S. 79 (1986) ......................................... 49

Chambers v. Mississippi,
  410 U.S. 284 (1973) ........................................ 81

Chapman v. California,
  386 U.S. 18 (1967) ......................................... 82

Costantino v. Herzog,
  203 F.3d 164 (2d Cir. 2000) ................................ 95

Delaware v. Van Arsdall,
  475 U.S. 673 (1986) ........................................ 81

Franks v. Delaware,
  438 U.S. 154 (1978) ........................................ 69

Gall v. United States,
  552 U.S. 38 (2007) ........................................ 100

H.J. Inc. v. Northwestern Bell Tel. Co.,
  492 U.S. 229 (1989) ........................................ 36

Hernandez v. New York,
  500 U.S. 352 (1991) ........................... 49, 50, 51, 52

Herring v. United States,
  555 U.S. 135 (2009) ........................................ 71

Hudson v. Michigan,
  547 U.S. 586 (2006) ........................................ 71

J.E.B. v. Alabama ex rel. T.B.,
  511 U.S. 127 (1994) ........................................ 49

Jackson v. Virginia,
  443 U.S. 307 (1979) ........................................ 28

Kimbrough v. United States,
  552 U.S. 85 (2007) ......................................... 100

Latine v. Mann,
  25 F.3d 1162 (2d Cir. 1994) ................................ 74

McKinney v. Artuz,
  326 F.3d 87 (2d Cir. 2003) ................................. 51

Michigan v. Lucas,
  500 U.S. 145 (1991) ........................................ 82

Ohler v. United States,
  529 U.S. 753 (2000) ........................................ 90

Old Chief v. United States,
  519 U.S 172 (1997) ..................................... 97, 98

Pinkerton v. United States,
  328 U.S. 640 (1946) ........................................ 56

Purkett v. Elem.,
  514 U.S. 765 (1995) ........................................ 50

Rock v. Arkansas,
  483 U.S. 44 (1987) ..................................... 81, 82

Singleton v. Wulff,
  428 U.S. 106 (1976) ........................................ 90

Thomas v. Roach,
  165 F.3d 137 (2d Cir. 1999) ................................ 29

United States v. Al Kassar,
  660 F.3d 108 (2d Cir. 2011) ................................ 54

United States v. Autori,
  212 F.3d 105 (2d Cir. 2000) ................................ 28

United States v. Awadallah,
  349 F.3d 42 (2d Cir. 2003) ............................. 69, 70

United States v. Bagaric,
  706 F.2d 42 (2d Cir. 1983),
  abrogated on other grounds by
  National Org. for Women, Inc. v. Scheidler,
  510 U.S. 249 (1994) ........................................ 58

United States v. Bok,
  156 F.3d 157 (2d Cir. 1998) ................................. 54

United States v. Botti,
  711 F.3d 299 (2d Cir. 2013) ............................ 55, 60

United States v. Brock,
  789 F.3d 60 (2d Cir. 2015) ............................. 27-28

United States v. Broxmeyer,
  699 F.3d 265 (2d Cir. 2012) ................................ 99

United States v. Bruno,
  383 F.3d 65 (2d Cir. 2004) ................................. 37

United States v. Canfield,
  212 F.3d 713 (2d Cir. 2000) ................................ 70

United States v. Carillo,
  229 F.3d 177 (2d Cir. 2000) ............................ 59, 60

United States v. Cavera,
  550 F.3d 180 (2d Cir. 2009) ........................... 99-100

United States v. Chavez,
  549 F.3d 119 (2d Cir. 2008) ................................ 30

United States v. Coonan,
  938 F.2d 1553 (2d Cir. 1991) ........................... 59, 97

United States v. Crosby,
  397 F.3d 103 (2d Cir. 2005),
  abrogated on other grounds by
  United States v. Fagans,
  406 F.3d 138, 142 (2d Cir. 2005) .......................... 99

United States v. Diaz,
  176 F.3d 52 (2d Cir. 1999) ........................ 49, 58, 59

United States v. Feliciano,
  223 F.3d 102 (2d Cir. 2000) ...................... 59, 60 n.29

United States v. Ferguson,
  758 F.2d 843 (2d Cir. 1985) ............................ 70-71

United States v. Fernandez,
  443 F.3d 19 (2d Cir. 2006) ................................ 100

United States v. Franklyn,
  157 F.3d 90 (2d Cir. 1998) ................................... 50

United States v. Freeman,
  735 F.3d 92 (2d Cir. 2013) ................................... 69

United States v. Gallerani,
  68 F.3d 611 (2d Cir. 1995) ................................... 57

United States v. Guadagna,
  183 F.3d 122 (2d Cir. 1999) ................................. 28

United States v. Hawkins,
  547 F.3d 66 (2d Cir. 2008) ...................... 33, 34 & n.19

United States v. Hernandez,
  377 F. App'x 81 (2d Cir. 2010) ............................ 100

United States v. Holmes,
  44 F.3d 1150 (2d Cir. 1995) ................................. 81

United States v. Huezo,
  546 F.3d 174 (2d Cir. 2008) ................................. 30

United States v. Jackson,
  335 F.3d 170 (2d Cir. 2003) ................................. 29

United States v. Jackson,
  345 F.3d 59 (2d Cir. 2003) .................................. 28

United States v. Katsougrakis,
  715 F.2d 769 (2d Cir. 1983) ........................... 83 n.37

United States v. Leon,
  468 U.S. 897 (1984) .................................... 71, 76

United States v. Martin,
  426 F.3d 68 (2d Cir. 2005) .................................. 70

United States v. Martinez,
  621 F.3d 101 (2d Cir. 2010) ................................. 49

United States v. Miller,
  116 F.3d 641 (2d Cir. 1997) ................... 28, 37, 58, 59

United States v. Minicone,
  960 F.2d 1099 (2d Cir. 1992) ........................... 36, 37

x

United States v. Moore,
  968 F.2d 216 (2d Cir. 1992) ................................. 77

United States v. Norman,
  776 F.3d 67 (2d Cir. 2015) ................................. 99

United States v. Olano,
  507 U.S. 725 (1993) ............................... 55, 90, 98

United States v. Onumonu,
  967 F.2d 782 (2d Cir. 1992) ................................. 95

United States v. Paone,
  782 F.2d 386 (2d Cir. 1986) ................................. 59

United States v. Parker,
  554 F.3d 230 (2d Cir. 2009) ................................. 34

United States v. Payne,
  591 F.3d 46 (2d Cir. 2010) .............................. 37-38

United States v. Pierce,
  785 F.3d 832 (2d Cir. 2015) ................................. 97

United States v. Pimentel,
  346 F.3d 285 (2d Cir. 2003) ...................... 59, 60 n.29

United States v. Polouizzi,
  564 F.3d 142 (2d Cir. 2009) ................................. 97

United States v. Pope,
  554 F.3d 240 (2d Cir. 2009) ............................... 100

United States v. Quinones,
  511 F.3d 289 (2d Cir. 2007) ................................. 90

United States v. Rajaratnam,
  719 F.3d 139 (2d Cir. 2013) ....................... 69, 70, 71

United States v. Rea,
  958 F.2d 1206 (2d Cir. 1992) ................................ 29

United States v. Reifler,
  446 F.3d 65 (2d Cir. 2006) ................................. 28

United States v. Rigas,
  490 F.3d 208 (2d Cir. 2007) ................................. 82

United States v. Robilotto,
  828 F.2d 940 (2d Cir. 1987) .................................. 37

United States v. Romero,
  897 F.2d 47 (2d Cir. 1990) ................................... 57

United States v. Salameh,
  152 F.3d 88 (2d Cir. 1998) ..................... 57, 69, 70, 97

United States v. Sanchez,
  623 F. App'x 35 (2d Cir. 2015),
  cert. denied, 136 S. Ct. 1235 (2016) ....................... 59

United States v. Temple,
  447 F.3d 130 (2d Cir. 2006) .................................. 28

United States v. Torres,
  604 F.3d 58 (2d Cir. 2010) ................................... 29

United States v. Vanwort,
  887 F.2d 375 (2d Cir. 1989) .................................. 30

United States v. Velazquez,
  246 F.3d 204 (2d Cir. 2001) .................................. 97

United States v. Vernace,
  811 F.3d 609 (2d Cir. 2016),
  cert. denied, 137 S. Ct. 691 (2017) ......................... 37

United States v. Walker,
  191 F.3d 326 (2d Cir. 1999) .................................. 28

United States v. Wexler,
  522 F.3d 194 (2d Cir. 2008) ........................... 34 n.19

United States v. Yousef,
  327 F.3d 56 (2d Cir. 2003) .................................. 100

United States v. Yu-Leung,
  51 F.3d 1116 (2d Cir. 1995) .................................. 90

Watson v. Greene,
  640 F.3d 501 (2d Cir. 2011) .................................. 81

STATE CASES

People v. Mateo,
  2 N.Y.3d 383 (2004) ..................................... 56, 61

People v. McGee,
  49 N.Y.2d 48 (1979) ........................................ 56

People v. Ozarowski,
  38 N.Y.2d 481 (1976) ...................................... 43

### FEDERAL STATUTES

18 U.S.C. 1959(a) ................................... 54, 55, 56

18 U.S.C. § 924(c) .................................... 99, 103

18 U.S.C. § 3553(a) .................................. 99, 101

### STATE STATUTES

New York Penal Law § 20.00 ........................... 56 & n.28

New York Penal Law § 105.05 .............................. 42

New York Penal Law § 105.15 .............................. 42

New York Penal Law § 110 ................................. 56

New York Penal Law § 120.05(2) ......................... 42, 56

New York Penal Law § 125.25(1) ......................... 42, 56

### RULES

Fed. R. Crim. P. 30(d) ................................... 55

Fed. R. Crim. P. 52(b) ................................... 55

Fed. R. Evid. 102 ............................... 83 n.38, 95

Fed. R. Evid. 103 ................................... 94 n.40

Fed. R. Evid. 401 ................................... 83 n.38

Fed. R. Evid. 403 .......................... 83 n.38, 95, 97

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 17-171

UNITED STATES OF AMERICA,

<u>Appellee</u>,

-against-

DERICK HERNANDEZ, also known as D-NICE, MERLYN BERNITEZ, also
known as FRANKIE C, DAQUANNE NUNN, also known as TRAP, COURTNEY
SMITH, also known as COURT DOG, also known as COOL, TYSHAWN
GITTO, also known as TA TA, ROMMEL LOBBAN, also known as RAH
DOLLA, RUDY MONTOUR, also known as SUS 1, KURTIS PHILLIP, also
known as KNOXX, JAHMANI HAMILTON, also known as G-MONEY, KWAME
LAKE, also known as PAID, BRANDON SHORT, also known as B-SHAWT,
ERIC SMITH, also known as ESAMA, also known as ESCO,

<u>Defendants</u>,

RAPHAEL OSBORNE, also known as GUSTO,

<u>Defendant-Appellant</u>.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

<u>PRELIMINARY STATEMENT</u>

Raphael Osborne appeals from a judgment entered on
January 17, 2017, in the United States District Court for the

Eastern District of New York (Seybert, J.), convicting him, after a jury trial, of: (1) racketeering in violation of 18 U.S.C. § 1962(c) (Count One); (2) racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count Two); (3) Hobbs Act robbery conspiracy in violation of 18 U.S.C. § 1951(a) (Count Three); (4) Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) (Count Four); (5) brandishing firearms during a crime of violence, Hobbs Act conspiracy and robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(i); (6) Hobbs Act robbery conspiracy in violation of 18 U.S.C. § 1951(a) (Count Six); (7) Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) (Count Seven); (8) brandishing a firearm during a crime of violence, Hobbs Act conspiracy and robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Eight); (9) murder conspiracy in violation of 18 U.S.C. § 1959(a)(5) (Count Nine); (10) attempted murder in violation of 18 U.S.C. § 1959(a)(5) (Count Ten); (11) assault with a dangerous weapon in violation of 18 U.S.C. § 1959(a)(3) (Count Eleven); (12) witness retaliation in violation of 18 U.S.C. § 1513(a)(1)(B) (Count Twelve); (13) witness retaliation conspiracy in violation of 18 U.S.C. § 1513(f) (Count Thirteen); (14) discharging a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Fourteen); (15) attempted murder of a rival gang member in violation of 18 U.S.C. § 1959(a)(5) (Count

Fifteen); (16) assault of a rival gang member in violation of 18 U.S.C. § 1959(a)(3) (Count Sixteen); (17) discharging a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Seventeen); (18) conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(iii) (Count Eighteen); (19) use of firearms during a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Nineteen); (20) murder and assault of rival gang members with dangerous weapons in violation of 18 U.S.C. §§ 1959(a)(5), 1959(a)(6) (Count Twenty); and illegal possession of ammunition in violation of 18 U.S.C. §§ 922(g), 924(a)(2) (Count Twenty-One). The district court sentenced Osborne principally to consecutive life terms of imprisonment on Counts One, Two and Eighteen, to be followed by 135 years' imprisonment as to all other counts. The court also imposed a mandatory assessment of $2,100.

On appeal, Osborne raises several claims. First, Osborne contends that the evidence was insufficient to convict him of racketeering, racketeering conspiracy, and the substantive charges associated with the racketeering counts. Osborne also claims that the district court committed error when it: (1) denied his Batson challenge at trial; (2) instructed the jury that it could convict him based upon a Pinkerton theory of liability for charges arising under New York State law; (3) denied his pre-trial

4

<u>Franks</u> motion to suppress evidence without a hearing; (4) precluded him from calling two Nassau County Police Department ("NCPD") detectives as witnesses; (5) admitted hearsay evidence via the testimony of cooperating witness Daron Morris; and (6) admitted purportedly irrelevant and inflammatory photographs at trial. Finally, Osborne contends that his sentence is excessive and that the written judgment must be amended to reflect the oral pronouncement of sentence.

For all the reasons stated below, these claims are without merit and Osborne's convictions and sentence should be affirmed.

STATEMENT OF FACTS

I.  Overview

Raphael Osborne's April 17, 2013 arrest and later conviction arose out of his participation in and direction of the Roosevelt, New York "set" of the Rollin' 60s Crips, a nationwide street gang with members on Long Island, New York (also referred to herein as the "Rollin' 60s" or "the gang").  (T 269, 271, 278, 908, 1014-15, 1378-80, 2005, 2095-96).[1]  Osborne, whose gang name was "Gusto," was the leader, and founder, of the Rollin' 60s Crips. (T 271, 278, 908, 1014-15, 1378-80, 2005, 2095-96).  As is relevant to this appeal, the charges against Osborne involved racketeering, including the predicate acts of: (1) conspiracy to distribute controlled substances; (2) conspiracy to murder and assault rival gang members; (3) the attempted murder of Johnny Green, a rival gang member; (4) robberies of two separate drug dealers in the Fall of 2010; and (5) the 2012 conspiracy to murder a federal informant.

---

[1]     Parenthetical references to "A," "Br.," and "GA" are to Osborne's appendix and brief and the government's appendix, respectively. References to "T" and "GX" are to the trial transcript and government trial exhibits, respectively.

6

II.   The Trial

   A.   The Government's Case

         At a five-week trial commencing March 8, 2016, the government provided a multitude of evidence, including: (1) testimony of four former members of the Rollin' 60s Crips (Aaron Halyard, Reynaldo Hernandez, Essix Robinson, and Denzel Smith), some of whom participated in the crimes at issue; (2) testimony of a close associate of the Rollin' 60s (Jeffrey Appiagyei), who participated in Osborne's narcotics dealing operation; (3) the testimony of Daron Morris, who participated in drug trafficking and robberies with Osborne and to whom Osborne admitted that he attempted to kill a person (Maurice Gardner) cooperating with local law enforcement; (4) the testimony of various federal and local law enforcement officers; (5) audio recordings of cell phone conversations and copies of text messages; (6) social media postings and photographs; (7) audio recordings of gunfire; and (8) the testimony of several expert witnesses.

         1.   The Enterprise: The Rollin' 60s Crips

         The Rollin' 60s Crips gang originated in Los Angeles, California and is comprised of smaller sets located throughout the United States. (T 269, 289-91, 1026-27). Across the country, Rollin' 60s Crips members identify themselves, to other members as well as to rival gangs, by wearing the gang's colors — primarily

the color blue — and by use of tattoos, hand signs and graffiti.
(T 293-354, 1040-49, 1393-1403, 2102-07).

The Rollin' 60s Crips set based in Roosevelt, New York
was founded by Osborne, along with Daquan Chambers ("Dulo") and
Johnny Green ("J-Loc"), in or about 2003. (T 279, 293, 1028,
1071). Among other practices, Roosevelt Rollin' 60s members
conducted formal meetings known as "C-13s" (T 1049-52, 1411, 2100),
pooled resources to purchase firearms to be made available to the
gang generally (T 355-62, 691-92, 714, 1022-23, 1061-63, 1412,
2101-02), and contributed money to support incarcerated members
(T 354-55, 1052-55, 1389-90). To enrich themselves and to maintain
respect for the gang, Roosevelt Rollin' 60s members also engaged
in criminal activity ("put in work"), including murder, robbery
and narcotics trafficking. (T 1052-55, 1061-63). Indeed,
participation in these types of crimes affected the degree of
respect afforded members[2] (T 899, 1016-22, 1068, 1387, 2013, 2095),
who were assigned different ranks, ranging from "Big Whale,"
Osborne's position, to "Big Hoodstas" or "Big Hoods," followed by
"Hoodstas," "Baby Hoods" and "Tiny Hoods" (T 279, 1025, 1228-50,
1386-89, 2096). The more "work" put in on behalf of the gang, the

---

[2] Involvement in these activities also could lead to the
induction of new gang members. (T 282-83, 1017-18, 1383-84, 2013-
14).

8

higher the rank.  (T 280-81, 502-03, 899-900, 1028, 1068, 1387, 1431-34, 2102).

Although gang members, including Osborne, maintained contact with the nationwide leadership of the Rollin' 60s Crips, Osborne had final say in the local operations of the gang.  (T 291, 1026-27).  Under Osborne, members were obligated to: (1) refuse cooperation with law enforcement officials; (2) attack, injure and kill rival gang members on sight and by whatever means available (the "on sight rule");[3] (3) maintain respect for the gang and its territory; and (4) remain loyal to the gang above all else.  (T 286-88, 481-505 878-82, 1017-18, 1029-33, 1070-71, 1407-11, 1413, 2098-99).  Gang members who violated the rules, or failed to follow Osborne's instructions, were disciplined.  The form of the discipline would vary depending on the nature of the infraction.  Minor infractions of gang rules could result in a beating or expulsion from the gang.[4]  More serious infractions, such as cooperating with law enforcement against the gang, were punishable by death.  (T 288, 1024, 1409, 2100).

---

[3]    This rule was established by Osborne, Chambers and Green.  (T 483, 490-91, 878-82, 1029-33, 1413, 1465, 2098-99).

[4]    When Rollin' 60s members "Rock" and "Melman" failed to attend a meeting called by Osborne in December of 2010, both individuals were disciplined by the gang.  Specifically, Rock was robbed, and Melman was expelled from the gang.  (T 531-32, 1035-37).

2. <u>The Crimes</u>

    a.   Conspiracy To Murder
       <u>Rival Gang Members</u>

       i.   <u>The Gang's "On Sight Rule"</u>

As noted above, persons joining the Roosevelt Rollin' 60s were made aware of the "on sight rule" that existed within the gang. (T 487, 501, 2098). This rule required gang members to shoot, kill, stab or fight any members of the rival Bloods gang whenever and wherever encountered. (T 483, 490-91, 878-82, 1029-33, 1413, 1465, 2098-99). The "on sight rule" remained in effect the entire time Osborne was the leader of the Roosevelt Rollin' 60s, from 2003 until his arrest in April of 2013. (T 881).

The results of this Osborne-imposed rule were staggering. For example, on October 21, 2006, Rollin' 60s member Devon Cabrera ("Sty") chased Bloods member Kail Ferro ("Beast") down Park Avenue in Roosevelt, and shot Ferro in the back, killing him, for no reason other than the lack of respect demonstrated by that Bloods member's decision to walk in enemy territory. (T 495-97, 1068-71).

Similarly, on June 22, 2008, 15-year-old Rollin' 60s member Cody Hernandez ("Monsta Cody") shot and killed Bloods member Lord Carter based on nothing other than Carter's gang affiliation. (T 488-89, 1074-75).

Then, on September 20, 2010, Rollin' 60s associate Reynaldo Hernandez and Rollin' 60s member Daquanne Nunn shot Bloods member Jermaine Green at a local Bloods hangout located at 63 Pleasant Avenue in Roosevelt.  (T 1368-70).

Less than a year later, on July 4, 2011, Rollin' 60s member Derick Hernandez ("D Nice") directed lower-ranking gang members, including Robinson, to "shoot up" a Bloods house party, where Hernandez had earlier seen Bloods member Daquan Wagner ("Studder").  (T 1429-33).  Armed with semi-automatic handguns and an assault rifle, Robinson and two other Rollin' 60s members went to the house and fired numerous shots at Bloods members and associates standing outside.  (Id.).

On August 30, 2012, Derick Hernandez and other gang members, including Denzel Smith and Kurtis Philip, followed Bloods member Cornell Brown in his car as it drove through Roosevelt, eventually opening fire on him and striking him in the arm. (T 2016-22, 2184).[5]

_____

[5]    In addition to these violent crimes that were committed as part of the ongoing war between the Roosevelt Crips and Bloods, Osborne's gang members committed numerous other attempted murders and assaults pursuant to the "on sight rule," including: (1) the Thoma Place Bloods shooting (where Rollin' 60s member Smith shot at individuals because they were using "Bloods lingo") (T 2076-79); (2) the Midway Deli shooting (in the early evening Crips member Jahmani Hamilton fired several shots at Bloods member Christopher Anderson on a crowded street in front of the deli) (T 1437-39); (3) Halyard's shooting of Bloods member Shane Howell for walking in Crips territory (T 502-03); (4) Halyard and Crips

### ii. <u>Osborne's Acts Of Violence</u>

In addition to the murders and assaults committed by Osborne's gang carried out pursuant to Osborne's edict to harm Bloods members whenever the opportunity presented itself, Osborne, himself, assaulted and attempted to assault and murder rival gang members in adherence to the "on sight rule" and in furtherance of the ongoing war between the Crips and Bloods in Roosevelt.

### 1. <u>The Attempt To Shoot King Carter</u>

One example of Osborne's personal involvement in violence directed at rivals occurred on January 10, 2006, when, from his vehicle, Bloods member King Carter (Lord Carter's brother) shot at Osborne, Rollin' 60s member Halyard, and others inside Osborne's home. (T 375). Osborne responded by retrieving two firearms from his residence, one of which was a 40-caliber pistol with a laser sight, and set off with Halyard in an attempt to find

---

member Daquann Nunn's assault of Bloods member Jermaine Berry (they stabbed him in the chest and hit him with a baseball bat) (T 504-05); (5) Halyard and several other Rollin' 60s members shooting at Bloods members at 2 Williams Street (T 519-21); (6) the shooting of Bloods member Allazeem Carter (T 490); (7) the assault of Bloods member Lord Carter (T 1413-18); (8) the shooting of a Bloods member known as "Stacks" (T 2014-15, 2184); (9) the shooting of a Bloods member known as "Reek Da Villain" (T 2025-35, 2184); (10) the attempted shooting of a Bloods member known as "Lawrence" (T 2023-25); and (11) multiple shootings of Bloods member King Carter (T 485-87).

and shoot Carter. (T 375-78, 484-86). Ultimately, Osborne was unsuccessful in his attempt to locate Carter.[6]

### 2. Osborne's Attempted Murder Of Bloods In The Summer Of 2012

Another incident occurred in the Summer of 2012, after Osborne had been contacted by Robinson, who had observed a group of Bloods members (Cornell Brown, Jermaine Green and Jermaine Green's brother Johnny Green[7] ("Fat Johnny" or "Snacks")) inside a local delicatessen. (T 1453-54, 1470-72). Robinson, in an effort to comply with the "on sight rule," first called Rollin' 60s member Timothy Gaines ("T-Hood") to acquire a firearm to shoot the Bloods. (T 1455, 1472-73). But because Gaines did not have a firearm available, he suggested that Robinson contact Osborne. (Id.). Robinson called Osborne, and Osborne directed Robinson to remain where he was until Osborne arrived. (Id.). Armed with a handgun, Osborne arrived minutes later, but the Bloods had already left. (Id.). Osborne told Robinson that the Bloods members were fortunate that they were gone because had Osborne seen them, he would have "popped" one, meaning shot or killed one of them. (T 1456, 1473-78).

---

[6]  Instead, later that day, Osborne was arrested on a firearm (the 40-caliber pistol) charge. (T 378, 996-1006).

[7]  This Johnny Green is not the Johnny Green, also known as "J-Loc," who had helped Osborne to found the Rollin' 60s Crips in Roosevelt. (T 673-74).

### 3.  The Attempted Murder
Of Johnny Green

A third example of Osborne's participation in the campaign of violence directed at rivals and adherence to his "on sight rule" occurred on the night of January 30, 2013, when Osborne and gang members Rommel Lobban ("Rah") and Merlyn Benitez ("Frankie C") conspired to and then attempted to kill Bloods member Johnny Green.  Driving in Lobban's silver four-door Chevy Impala, Osborne fired several shots at a vehicle in which Green was riding with others.  Bullets ripped through the vehicle, including a bullet that passed through the driver's headrest and the back seat. (T 921-32, 959-74).  Green was struck once in the stomach, with the bullet lodging in his exterior fat.  (T 2302-03).  At the scene of the shooting, law enforcement officers recovered eight 40-caliber shell casings and two 45-caliber shell casings.  (T 935-44).

Subsequently, Osborne told Halyard that he "and Frank just shot up a guy named Fat Johnny."  (T 601).  In response to Halyard's question about what Green "got hit with," Osborne replied, "the forty and the four pound," meaning a 40-caliber and a 45-caliber firearm.  (T 600-06, 861-64).

In a later conversation at which Halyard was present, Osborne defended gang member and best friend Lobban[8] from gang chiding due to Lobban's decision to run from police attempting to stop him in his car about a month after the Gardner shooting.[9] During the course of the conversation, Osborne explained that Lobban knew that law enforcement officials were interested in examining the silver Impala owned by the mother of Lobban's child in connection with the shooting of Fat Johnny.[10] (T 605-06, 674-75, 863-84).

### iii. Targeted Attacks On Rival Gang Members Ordered By Osborne

Osborne's campaign against rival Bloods members was not limited to the application of the "on sight rule" or his personal attacks on rivals. There were several instances in which Osborne specifically ordered his gang to kill a particular Bloods member.

---

[8] Halyard, Reynaldo Hernandez and Robinson testified that Lobban was Osborne's best friend within the gang and often served as Osborne's driver. (T 604-05, 1148, 1448).

[9] Police records confirmed that on March 2, 2013, NCPD detectives, George Colby and John Mitchell, attempted to stop Lobban while he was driving a gray Chevy Impala. Lobban led them on a pursuit, which ended in Lobban's apprehension and arrest for marijuana possession. (T 2414-21).

[10] New York State Department of Motor Vehicles ("DMV") records confirmed that on January 30, 2013, the woman that Halyard identified as the mother of Lobban's child was the registered owner of a gray Chevy Impala. (T 1783-89). Reynaldo Hernandez also testified at trial that Lobban was driving a silver Chevy Impala in January of 2013. (T 1148).

### 1.    Murder Of James McClenic

Shortly after Osborne returned from a stint in prison in the Fall of 2010, he called a gang meeting and learned that a younger Bloods member, James McClenic ("Bubbz"), had been committing assaults against Crips members.  (T 522-28, 779-87, 909, 1086-88).  In an effort to maintain control of the neighborhood, and to keep the Bloods in line, Osborne ordered that McClenic be "dealt with," i.e., killed.  (T 523, 779-87, 909, 1088-89).  Subsequently, on December 15, 2010, Rollin' 60s members Kwame Lake and Terrell Dash reported McClenic's location to other members of the gang.  (T 523-24, 787-90).  Upon learning of McClenic's location, Rollin' 60s members Eric Smith (Esama"), Bryan Henry ("C-Ross"), and Lobban went looking for McClenic in Henry's car.  (T 524-25, 788).  Later that evening, Smith, Henry and Lobban located McClenic in a vehicle parked at a gas station in Hempstead, New York.  Smith approached the vehicle, fired two shots into the front passenger seat where McClenic was seated, striking him in the neck and killing him.  (T 525-28, 1081, 1088-90).

### 2.    Retaliation Against
### Revenge Shootings

In the wake of McClenic's murder, members of the Bloods in Roosevelt retaliated against the Crips, shooting up Smith's home, shooting up Reynaldo Hernandez's home, and setting Osborne's mother's car on fire in the driveway of Osborne's home.  (T 526-

30, 1092-94).    In response, a furious Osborne called another
meeting of the Rollin' 60s.    (T 530—31, 1093-95).    During the
course of the meeting, Osborne told younger gang members that it
was their time to "put in work," directing them to shoot up the
home of a Bloods member (Justin Smith) believed to be involved in
the retaliatory shootings and the home of the deceased McClenic.
(T 530-34, 1096-99).    In response, these gang members shot dozens
of bullets through these two homes in the middle of the night.
(T 534-43, 1099-1101, 1699-1705, 1710-13, 1751-67).

> b.    The Attempted Murder Of
> Informant Maurice Gardner

        In the Spring of 2012, members of the Federal Bureau of
Investigation's ("FBI") Long Island Gang Task Force and the NCPD
began conducting an investigation into the activities of the
Roosevelt Rollin' 60s.    (T 171).    During the course of that
investigation, a member of the Rollin' 60s, Maurice Gardner, began
operating as a confidential informant for the FBI.    (T 171-72).
In that capacity, Gardner purchased five firearms from members of
the Rollin' 60s, including from Halyard and Derick Hernandez.  One
such sale occurred outside Osborne's home, while another occurred
inside Osborne's residence with Osborne present.    (T 173-81, 182-
86, 187-91, 192-94, 558-70, 578-81, 583-87, 1284-86, 2048).
Gardner also arranged to purchase a firearm from Osborne, although
the deal did not occur because Osborne had become suspicious that

Gardner was cooperating with law enforcement. (T 583-85, 1285-87).

Specifically, while the law enforcement investigation was ongoing, Osborne learned of information indicating that Gardner was working as a federal informant. (T 590, 1287, 1847, 2038). As a result, Osborne and Hernandez decided to kill Gardner. (T 590-91, 1842-43). To commit the murder, Derick Hernandez recruited a 17-year-old male, Denzel Smith, who was interested in joining the gang. (T 2008, 2012-13, 2038-51). At a meeting attended by Osborne, Hernandez, Kurtis Philip and Smith prior to the planned murder, Osborne told Smith that "when you hit him, you got to leave him . . . he got to get left." (T 2048). Smith understood this to mean that when he shot Gardner, Smith was to make sure he was dead. (T 2048, 2200).

On October 13, 2012, Smith met Hernandez and Philip at Hernandez's home in Roosevelt, where they developed a plan to lure Gardner out to kill him. (T 2052-56). Hernandez, Philip and Smith, who was carrying a 9 mm pistol that had been provided by Hernandez,[11] proceeded to the Heights section of Hempstead, where

---

[11] A ballistics expert compared the shell casings recovered from the Gardner attempted murder, the August 30, 2012 Crips shooting of Bloods member Cornell Brown, and the March 21, 2012 Crips shooting, in which Crips member Jahmani Hamilton shot at Bloods member Christopher Anderson, and concluded that the same firearm was used in all three shootings. (T 1437-39, 2016-22, 2184, 2530).

Gardner lived. (T 2053, 2057-58). There, Hernandez met Gardner while Philip accompanied Smith to the location where Smith would lie in wait. (T 2060-61). As Hernandez and Gardner approached Smith, Hernandez began to cross the street and Gardner began to run. Smith shot Gardner several times as Gardner attempted to escape. Gardner fell to the ground, while Smith and Hernandez fled the scene in opposite directions.[12] (T 2062-67).

In the wake of the shooting, civilian eye witnesses called 911 and members of law enforcement responded to the scene. (T 1964-77). Gardner remained conscious for a short time before being transported by ambulance to a local hospital. (T 2236-37). There, Gardner received emergency lifesaving treatments from medical professionals to address the five gunshot wounds he had sustained. (T 1183-88). Although Gardner ultimately survived, he was left permanently paralyzed from his waist down. (T 1189-99). After he awoke from a coma, Gardner told law enforcement officials that he saw who had shot him and identified Osborne as the shooter. (Mitchell ¶ 46). Gardner maintained this mistaken belief for a long time. (A 166).

---

[12] Derick Hernandez was stopped by the Hempstead Police Department in the vicinity of the shooting and arrested for marijuana possession. (T 2242-45).

c.   Controlled Substances Offense:
     Conspiracy To Distribute Narcotics

The Roosevelt Rollin' 60s' drug business began with Osborne's formation of the gang in 2003.  Initially, the business principally involved the sale of crack cocaine on Park Avenue in Roosevelt (T 274-77) but later expanded to include sales of marijuana, heroin and methylone ("molly") (T 608-17).[13]  One of the primary ways that gang members aided each other in narcotics distribution was the commission of robberies of drug dealers to obtain cash and narcotics, the latter of which would be sold for profit.  For example, when Osborne returned from prison in the Fall of 2010, he and members and associates of the Rollin 60s committed a series of robberies of drug dealers in order to enrich themselves quickly.[14]  (T 449-53, 455-63, 798, 838-42, 1012-13, 1154).

---

[13]   For example, in early 2012, Osborne employed Rollin' 60s associate, Jeffrey Appiagyei, to cook the powder cocaine Osborne brought him into crack and to "cut" or "stretch" and package the raw heroin Osborne brought him for distribution.  (T 1635-39). Appiagyei worked for Osborne continuously from the Spring of 2012 until Osborne's arrest in April of 2013, ultimately turning out an estimated 320 grams of crack cocaine and 600 grams of heroin for Osborne to resell.  (T 1671-72).  Indeed, at the time of his arrest on April 17, 2013, Osborne was in possession of more than 16 grams of heroin, 7.75 grams of marihuana and 2.5 grams of methylone. (T 64-66, 121-24).  A portion of the heroin was packaged in 230 individual doses.  (T 66, 122).

[14]   Two of these robberies are discussed in more detail, infra, at 21-23.

In addition to obtaining narcotics through robberies,
Osborne and fellow gang members would assist one another in
acquiring narcotics from various suppliers. For example, on
several occasions, Osborne helped gang members and associates
obtain narcotics from his suppliers or simply supplied them with
drugs himself. (T 429-35, 901-02, 1010-11, 1124-48, 1154).
Similarly, if Osborne needed drugs to sell, members and associates
of the gang would supply him directly or assist him in obtaining
a supply from others. (T 901-02, 1143-44). In fact, gang rule
required members to keep the business within the gang (T 1407-08),
unless the gang was without supply (T 1536). Moreover, in
supplying fellow gang members, discount prices were the rule.
(T 1533-36).

In addition to supplying drugs, Rollin' 60s Crips
members also covered transactions for one another by referring
sales to other gang members, including Osborne, when they did not
have sufficient drug supply, and serviced other members' clients
if those members were incarcerated. (T 1127-28, 1147). Further,
gang members provided one another with security. Indeed, members
knew that anyone seeking to interfere with their sales, by robbery
or otherwise, would face severe repercussions. (T 480, 616-17,
1078-79, 1446-47).

Lastly, Rollin' 60s members often shared drug profits, by pooling proceeds to purchase firearms or to support gang members financially. For example, Halyard was wired proceeds from drug transactions to purchase firearms for the gang from locations in the South (T 365-67), while Reynaldo Hernandez and other Rollin' 60s members provided Osborne with money earned selling drugs to assist Osborne in getting back on his feet after Osborne returned from prison (T 1054).

### d. Hobbs Act Robberies

As noted above, the Rollin' 60s Crips frequently robbed drug dealers as a means of obtaining money and narcotics to sell.

### i. The "Trackside" Robbery

In the Fall of 2010, Osborne approached Halyard, who, like Osborne, had recently returned from prison and was in need of money, with a plan to rob a drug dealer. (T 449-50). Shortly thereafter, Osborne, Halyard, Eric Smith, Bryan Henry, and the drug dealer's cousin (who had provided the target) drove to the Trackside neighborhood of Hempstead in Henry's car. (T 449). There, Halyard and Smith, armed with firearms, proceeded to the target's apartment, where they robbed the drug dealer of 15 to 20 grams of crack cocaine, five grams of cocaine and $1,000. (T 450-52). These proceeds later were divided among all participants, with Osborne obtaining a portion of the drugs to sell. (T 452-53, 798).

ii.  The "Fish" Robbery

Also in the Fall of 2010, Osborne and Halyard, with the aid of several other Rollin' 60s members, committed a robbery of a marijuana dealer known as "Fish."  (T 455-56).   In this case, it was Halyard who provided Osborne with information from two lower level gang members, Kwame Lake and Terrell Dash, about a marijuana supplier named "Fish" who might be a good robbery target.  (T 455-57, 837).

In anticipation of the robbery, Osborne and Halyard began making small purchases of marijuana from Fish to establish a trust relationship.[15]  Eventually, however, they ordered a much larger quantity (several pounds) of marijuana that they intended to rob.  (T 457-58).  On the day of the robbery, Reynaldo Hernandez drove Osborne and Halyard to meet Fish.  Upon arrival, Halyard entered Fish's vehicle, and took possession of the drugs, at which point Halyard displayed a firearm.  Osborne then pulled Fish out of his car and hit him with the butt of a gun.  (T 459-60, 838-841, 1012-13, 1154).  The proceeds of the robbery were later distributed among the participants, including Lake and Dash.

---

[15]   The marijuana that was being purchased to build trust with Fish was then resold by Osborne and Halyard, both of whom were in need of money.  (T 458-59).

(T 461-463, 842, 1013).  Osborne and Halyard sold the marijuana that was stolen during the robbery.[16]  (T 894).

### 3.  Corroborating Evidence

The testimony of the cooperating witnesses was corroborated by, among other things, the testimony of various federal and local law enforcement officers (see, e.g., T 60-95 (drugs dropped by Osborne), 170-94 (audio and video recording of gun transactions), 933-1007 (recovery of handgun from Osborne), 1202-10 (surveillance video), 1570-74 (search-Crips graffiti), 1767-81 (search-recovered ammunition), 1697-71, 1726-33, 1740-49, 1749-67, 1981-95, 2307-42 (crime scene evidence), 1721-25, (photographs), 1783-89 (motor vehicle records), 1791-1811 (Osborne's arrest), 2239-46 (Derick Hernandez stop); audio recordings of cell phone conversations and copies of text messages intercepted via the wiretap of Osborne's cell phone during the early months of 2013 (see, e.g., T 138-69, 2273-94 (and government exhibits)); social media postings and photographs demonstrating the existence of the Rollin' 60s Crips enterprise, the gang's structure, and Osborne's position within the gang (see, e.g., T 264-65 (stipulation and government exhibits)); ShotSpotter audio

---

[16]  Osborne, Reynaldo Hernandez and Rollin' 60s members "Sahiem" and "Juice" attempted another robbery of a drug dealer in Suffolk County in 2012; however, Hernandez left prior to the completion of the robbery and it was not successful, according to Osborne.  (T 1155-61).

recordings of gunfire from several shooting incidents (see, e.g., T 975-93 (and government exhibits)); and the testimony of several expert witnesses, including a ballistics expert and medical doctors (see, e.g., T 29-59 (drug expert); T 97-138 (chemist); T 1181-1202, 2299-2307 (medical); T 2481 (ballistics)).

B. Defense Case

Defense counsel advised the district court that Osborne was interested in calling one of the individuals — Derick Hernandez — involved in the attempted murder of Gardner (T 2553-54) and the two NCPD detectives — George Colby and John Mitchell — who were most involved in that investigation (A 243-44) in his defense. Ultimately, Osborne called no witnesses. Nor did he testify. (T 2653-54).

C. Verdict

On April 11, 2016, the jury convicted Osborne of all counts of the indictment. (T 3021-34).

III. Sentencing

In anticipation of sentencing, the United States Probation Department ("Probation") prepared a presentence investigation report ("PSR")[17] indicating that Osborne's total offense level was 51 and the applicable range under the Sentencing

---

[17] The PSR and U.S. Probation Department Sentence Recommendation ("Recommendation") have been filed with the Court under seal.

Guidelines was life imprisonment.  (PSR ¶¶ 160, 193).  This range was arrived at by grouping of convictions (4.5 units) and applying the greater of the adjusted offense levels for each of the numerous counts of conviction (level 47).  (PSR ¶¶ 155-57).  Osborne's criminal history was VI (based upon a criminal history score of 15 given Osborne's numerous prior crimes).  (PSR ¶ 169).

Probation recommended concurrent life sentences on Counts One, Two, and Eighteen; 240 months (concurrent to each other and to all other counts) on Counts Three, Four, Six, Seven, Ten, Eleven and Sixteen; 120 months (concurrent to each other and to all other counts) on Counts Nine, Fifteen, Twenty and Twenty-One; 360 months (concurrent to each other and to all other counts) on Counts Twelve and Thirteen; 60 months (consecutive to all other counts) on Count Nineteen; and 300 months (consecutive to each other and to all other counts) on Counts Five, Eight, Fourteen and Seventeen.  (Recommendation at 1).

At the January 13, 2017 sentencing hearing, the district noted that there had been no objections by either party to the findings in the PSR.  (A 280).  The government misspoke in representing that, in addition to the life sentences Osborne faced on Counts One, Two and Eighteen, he also faced an additional 115 years' imprisonment on the remaining counts.  (A 281, 283).  In

reality, the government's position supported three life sentences, to be followed by 135 years' imprisonment.

The district court imposed consecutive life sentences on Counts One, Two and Eighteen. (A 290). It also imposed statutory maximum concurrent sentences of 20 years on Counts Three, Four, Six, Seven, Ten, Eleven and Sixteen. (Id.). The court further imposed concurrent statutory maximum sentences of ten years on Counts Nine, Fifteen, Twenty and Twenty-One, and statutory maximum sentences of 30 years on Counts Twelve and Thirteen, to run concurrently with each other but consecutively to all other counts. (A 290-91). Finally, the court imposed a statutory minimum consecutive sentence of five years on Count Nineteen, to be followed by mandatory consecutive sentences of 25 years on Counts Five, Eight, Fourteen and Seventeen. (A 291-92).

<u>ARGUMENT</u>

<u>POINT ONE</u>

THE EVIDENCE WAS SUFFICIENT TO
CONVICT OSBORNE OF RACKETEERING, RACKETEERING
CONSPIRACY, VIOLENT CRIMES IN AID OF RACKETEERING,
<u>AND CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCES</u>

Osborne contends that the evidence was insufficient to support five of the six racketeering predicate acts that supported his conviction for racketeering and racketeering conspiracy, as well as the substantive counts related to those racketeering acts. (Br. 35-36). Specifically, Osborne argues that there was insufficient evidence to support an agreement by Osborne and others to distribute controlled substances as is described in Count Eighteen and Count One (Racketeering Act Six). (Br. 37-39). Osborne also contends that there was insufficient evidence to establish that the Hobbs Act robberies outlined in the indictment were related to the activities of the gang. (Br. 39-41). Finally, Osborne argues that the evidence was insufficient to demonstrate that he attempted to murder and assault Johnny Green or that he conspired to murder and assault rival gang members. (Br. 41-46).

These claims are all unavailing.

I. <u>Legal Standard</u>

It is well established that a defendant challenging the sufficiency of the evidence "bears a heavy burden, as the standard of review is exceedingly deferential." <u>United States v. Brock</u>,

789 F.3d 60, 63 (2d Cir. 2015) (citation and internal quotation marks omitted). Indeed, a jury verdict must be upheld if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" See United States v. Autori, 212 F.3d 105, 114 (2d Cir. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in Jackson)).

Moreover, in considering the sufficiency of the evidence, a reviewing court must analyze pieces of evidence "not in isolation but in conjunction," see United States v. Miller, 116 F.3d 641, 676 (2d Cir. 1997); see also United States v. Reifler, 446 F.3d 65, 94-95 (2d Cir. 2006). Furthermore, "'to avoid usurping the role of the jury,'" Autori, 212 F.3d at 114 (quoting United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999)), the court must resolve all issues of credibility in favor of the jury's verdict, see, e.g., United States v. Jackson, 345 F.3d 59, 65 (2d Cir. 2003), and "'credit[] every inference that the jury might have drawn in favor of the government,'" United States v. Temple, 447 F.3d 130, 136-37 (2d Cir. 2006) (quoting United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999)).

II.  The Evidence Was Sufficient

A.  The Evidence Established That Osborne Conspired
    With Others, Including Gang Members, To Distribute
    Controlled Substances (Count One, Racketeering Act
    Six; Count Eighteen)[18]

In the context of a conspiracy conviction, i.e., where the government must prove that "two or more persons entered into a joint enterprise for an unlawful purpose," United States v. Torres, 604 F.3d 58, 65 (2d Cir. 2010), the deference accorded the verdict is especially important. This is "because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (internal quotation marks and citations omitted). Indeed, the government is not required to show "proof of an explicit agreement but can [establish a conspiracy] by showing that the parties [had] a tacit understanding to carry out the prohibited conduct." See Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999); see also United States v. Rea, 958 F.2d 1206, 1214 (2d Cir. 1992). Nor is the government required to show that the defendant knew all of the members of the conspiracy, or all of its details, as long as it shows that the defendant knew

---

[18]  Other substantive counts are impacted by Osborne's argument (see, e.g., Count Nineteen, which references the use of a firearm in connection with a narcotics crime).

of the conspiracy's "general nature and extent." See United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008) (citation and internal quotation marks omitted). Finally, although the government must offer evidence of the defendant's "purposeful behavior aimed at furthering the goals of the conspiracy," see United States v. Chavez, 549 F.3d 119, 125 (2d Cir. 2008) (internal quotation marks and citation omitted), "[t]he size of the defendant's role does not determine whether that person may be convicted of conspiracy charges," United States v. Vanwort, 887 F.2d 375, 386 (2d Cir. 1989). "Rather, what is important is whether the defendant willfully participated in the activities of the conspiracy with knowledge of its illegal ends." Id.

Here, Osborne contends that while the evidence established that he may have possessed or distributed controlled substances, there was no evidence that he agreed with others, including gang members, to do so. (Br. 37-39). Putting aside the fact that the language in the affected counts does not require Osborne to conspire with anyone in particular (A 25, 32-33), the evidence was more than sufficient to show not only that Osborne conspired to traffic in drugs but that he did so with and for the benefit of fellow gang members.

First, Jeffrey Appiagyei testified that he assisted Osborne in his drug trafficking from early 2012 until Osborne's

arrest in April of 2013. Specifically, Osborne began to sell powder cocaine and crack cocaine to Appiagyei knowing that Appiagyei would, in turn, resell those drugs. (GA 252). In addition to agreeing to sell narcotics to Appiagyei for resale, Osborne also enlisted Appiagyei to cook powder cocaine into crack cocaine for Osborne, himself, to sell. (GA 253). Appiagyei estimated that he was cooking between 8 to 15 grams of crack cocaine every week for Osborne for this purpose. (GA 255, 256-57).

Appiagyei further testified that by the Summer of 2012, he began to process, or "stretch," and package heroin for Osborne. (GA 256). Osborne would bring Appiagyei about 10 grams of heroin a week, to which Appiagyei added other substances, both reducing the potency and increasing the quantity. Eventually, Osborne even began packaging his own heroin at Appiagyei's residence. (GA 256-57).

Appiagyei also testified that Osborne supplied him with heroin, which Appiagyei resold. (GA 257).

Second, Reynaldo Hernandez testified that he agreed with Osborne on several occasions to distribute cocaine base. Specifically, Hernandez testified that he and Osborne pooled their money to purchase crack cocaine from a supplier in Brooklyn. (GA 193, 214-15). Crips member Lobban drove them to Brooklyn,

where they purchased approximately 40 grams of crack, which they later resold. (Id.). Hernandez additionally testified that he witnessed Osborne purchase distribution quantities of narcotics from his supplier, and he also saw Osborne selling narcotics to individuals who were going to resell those narcotics. (GA 216, 217). Hernandez further explained that on many occasions, he discussed Osborne's drug trafficking operation with Osborne, and he witnessed Osborne selling crack, heroin, molly and marijuana. (GA 215-19).

Third, Robinson testified that he regularly purchased marijuana from Osborne, which Robinson later resold. (GA 229). He also testified that Osborne tried to recruit him to sell crack and methylone for him. (GA 246-47).

Fourth, Halyard, a member of Osborne's gang for a decade, testified about Osborne and senior Rollin' 60s members giving him his start in the crack cocaine business as early as 2003. (GA 86-87). Halyard further detailed the various substances that Osborne had sold over the years. (GA 97, 98-96, 124, 125-27).

Fifth, at the time of his arrest, Osborne was in possession of a quantity of heroin and methylone that a narcotics expert testified was consistent with distribution, rather than personal use. (GA 69-70, 71-72, 73-78, 279); GX 59, 343). Given that the same expert testified that heroin and methylone are not

manufactured in the United States (GA 67), Osborne must have acquired these distribution quantities from someone else, namely, his drug supplier, with the intent to distribute these narcotics.

Sixth, cell phone calls and text messages from Osborne demonstrated that Osborne agreed with others, including fellow gang members, to distribute narcotics. (GA 79-82, 128-60, 223-24, 257-62; GX 104, 105, 206, 206A). For example, the jury heard several cell phone conversations between and among Osborne, Appiagyei, and Appiagyei's brother Alex, during which they discussed the purchase and sale of cocaine, heroin, marijuana, and drug processing and packaging materials. (GA 257-60). Additionally, Osborne enlisted Crips associate Antonio Baker to sell some low-grade marijuana for him, discussed selling crack cocaine to Crips member "YP" for resale, and spoke to Crips member Gary Mosley's father about a heroin supplier who was selling high quality heroin. (GA 128-29, 135-36, 137, 141-42, 142-43, 143, 147-48, 154).

In short, Osborne's argument that his drug trafficking operation represented nothing more than the simple "buy-seller" exception (Br. 37-39) (citing United States v. Hawkins, 547 F.3d 66, 72 (2d Cir. 2008)), is wholly without merit. (Br. 37-39). Not only is this "exception" limited, but it does not apply here, where "there is 'additional evidence showing an agreement to join

together to accomplish an objective beyond the sale transaction.'"
United States v. Parker, 554 F.3d 230, 237 (2d Cir. 2009) (quoting
Hawkins, 547 F.3d at 72).[19]

The evidence also was more than sufficient to show that
Osborne not only agreed with fellow gang members to distribute
narcotics but that his drug dealing both benefitted the gang and
was facilitated by the gang.[20]

Halyard, Reynaldo Hernandez, and Robinson all testified
about the gang's involvement in narcotics trafficking.  Indeed,
Halyard testified that Osborne and senior Rollin' 60s members gave
him his start in the crack cocaine business as early as 2003.
(GA 86-87).  Halyard also stated that Osborne, himself, trafficked
in multiple types of narcotics (GA 125-27), supplying many other
gang members with his own drugs or providing them with the
assistance of his own suppliers (GA 98-99, 181-82, 193, 213-19,
221, 233-34).  Halyard and Hernandez, in turn, also provided

---

[19]    Although there is no hard and fast list of factors for
determining when the buyer-seller relationship ripens into a
conspiracy, this Court has identified several relevant
consideration, including "whether there was prolonged cooperation
between the parties, a level of mutual trust, standardized
dealings, sales on credit, and the quantity of drugs involved.""
Hawkins, 547 F.3d at 74 (citation and internal quotation marks
omitted).  See also United States v. Wexler, 522 F.3d 194, 211 (2d
Cir. 2008) (Raggi, J. concurring in part and dissenting in part).

[20]    To the extent Osborne's argument is really a
"relatedness" argument, see the discussion, infra, at 36-37.

examples of reverse transactions, in which gang members supplied Osborne with drugs or otherwise assisted him in his efforts to find supply. (GA 181-82, 218). Indeed, Hernandez explained that gang members even provided Osborne with drug proceeds to help him get back on his feet when he returned home from prison. (GA 201). Robinson explained that Osborne gave gang members discount prices on drugs. (GA 245).

The effort to keep supply flowing among gang members was also helped by gang members' robberies of drug dealers. (GA 100-03, 168, 171-73, 180, 193, 221). Further, Osborne and fellow gang members' drug dealings benefitted from the security of gang self-dealing, particularly in light of the gang's rules against cooperation with law enforcement; members also enjoyed the security of knowing that rival drug dealers would leave them alone given the fear the gang instilled. (GA 105, 127, 207, 213-14, 234). Clearly, being a member of the Rollin' 60s helped Osborne and his fellow gang members sell drugs.

Osborne's drug dealing and the drug dealing of his members also benefitted the gang. Osborne and his fellow drug dealing gang members used money they made from selling drugs to purchase firearms that were then used to control their territory and to win their ongoing war with the Roosevelt Bloods. (GA 90, 145, 151, 196, 200-01, 202-03, 231, 311). Their drug trafficking

also made them more appealing to prospective recruits. As Denzell Smith testified, when considering whether to join the Bloods or the Crips, young people were drawn to the gang whose members had a lot of "money, females, power and respect in the neighborhood." (GA 291-92). In short, the Rollin' 60s needed to enrich its members to survive.

B.  The Evidence Established That The "Trackside"
    And "Fish" Robberies Were Related To The Affairs
    Of The Enterprise (Count One, Racketeering Acts
    Two And Three)

Osborne also argues that the evidence was insufficient to establish that the robberies of drug dealers ("Trackside" and "Fish") were related to the affairs of the gang. (Br. 39-41). This argument, too, is belied by the evidence.

To establish a pattern of racketeering activity, the government must prove that the criminal acts it claims are racketeering acts are related and pose a threat of continued criminal activity. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989). Further, to satisfy the "relatedness" requirement, racketeering acts must not only be "related to each other ('horizontal' relatedness)," "they must be related to the enterprise ('vertical' relatedness)." United States v. Minicone, 960 F.2d 1099, 1106 (2d Cir. 1992). Vertical relatedness "may be established by evidence that the defendant was 'enabled to commit the predicate offenses solely by virtue of his position in the

enterprise or involvement in or control over the affairs of the enterprise,' or that 'the predicate offenses are related to the activities of that enterprise.'" Id. (quoting United States v. Robilotto, 828 F.2d 940, 947-48 (2d Cir. 1987) (internal quotation marks and emphasis omitted)).  However, "it is not necessary that the offense be in furtherance of the enterprise's activities for the offense to be related to the activities of the enterprise." United States v. Bruno, 383 F.3d 65, 84 (2d Cir. 2004) (citing Miller, 116 F.3d at 676).  Indeed, this Court has noted that "[t]he question of whether acts form a pattern is 'rarely a problem with a criminal enterprise, as distinct from a lawful enterprise that commits occasional criminal acts.'" United States v. Vernace, 811 F.3d 609, 617 (2d Cir. 2016), cert. denied, 137 S. Ct. 691 (2017), quoting Minicone, 960 F.2d at 1108) (citation and internal quotation marks omitted).

Here, the evidence firmly established that the robberies of the drug dealer at Trackside and the drug dealer named Fish were related to the enterprise.  Not only did the robberies enrich core members of the enterprise, including Osborne, see United States v. Payne, 591 F.3d 46, 64-65 (2d Cir. 2010) (robberies that enrich core members of an enterprise are related to the enterprise), but the robberies also furthered the drug-related activities of the enterprise.

As to the first of these robberies – Trackside, the proceeds (several grams of crack cocaine, powder cocaine and approximately $1,500 in cash) were divided among the participants (Osborne, Halyard, Bryan Henry and Eric Smith), all of whom were gang members. (GA 95, 96, 97, 108). Halyard also sold his drug proceeds, noting that it was likely that Osborne sold his as well, as Halyard never knew Osborne to use any drugs other than marijuana. (GA 100-01).

Similarly, after the Fish robbery, the proceeds were divided among the participants, including Osborne, Halyard and Hernandez, with Osborne and Halyard receiving the bulk of the proceeds, which were destined to be sold. (GA 103, 193). Kwame Lake and Terrell Dash, two lower level gang members, also were given marijuana from the robbery for having provided Halyard with the target. (Id.).

Finally, since participation in such robberies could form the basis of promotion in the gang (GA 88, 197, 200, 230), either of the robberies could have resulted in the enhanced status of any of the participants.

C.   The Evidence Was Sufficient To
     Convict Osborne Of The Attempted
     Murder And Assault Of Johnny Green
     (Count One, Racketeering Act Five;
     Counts Fifteen, Sixteen, and Seventeen)

Osborne contends that the evidence was insufficient to prove his participation in the January 30, 2013 shooting of Bloods

member Johnny Green.   Specifically, he claims that Halyard's

rendition of Osborne's admission in connection with the shooting

was too confusing to prove Osborne's involvement.   (Br. 41-42).

He further contends that Halyard had every reason to attempt to

curry favor with the government given the crimes that he himself

had committed.  (Br. 43).  This claim, too, is unavailing.

Here, there was ample evidence to find that Osborne

participated in the attempted murder and assault of Green.  Halyard

testified that Derrick Hernandez warned him to be careful because

there had been a recent shooting of a Bloods member.  (GA 123).

After that conversation, Halyard went to Osborne's house, where

Osborne admitted that "him and Frank just shot up a guy named Fat

Johnny."  (Id.).[21]  Osborne also told Halyard that the shooting had

---

[21]     Osborne argues that the tense of one of Halyard's cross-
examination responses — "we have to go over there and light up Fat
Johnny" — renders it unclear whether the conversation occurred
before or after the shooting.  (Br. 41-42).  In context, however,
it is clear that the word "have" is simply a typographical or other
error:

> Q:   On a prior occasion it was your testimony
>      that Mr. Osborne made a comment that
>      suggested he was present when at Pleasant
>      at the time of the Fat Johnny shooting?
>
> A:   Correct.
>
> Q:   Exactly what were his words?
>
> A:   He said, you know, we have to go over
>      there and light up Fat Johnny.  I asked

occurred on "Pleasant" and that a "forty and the 4-pound" (id.) were used to commit it, facts later corroborated by the police investigation and an eyewitness who was on Pleasant Avenue at the time of the shooting (GA 185-87, 188, 189-92).

        In addition to Halyard's testimony, Jose Bonifacio, a resident of Pleasant Avenue, testified that he saw a "silver or champagne" Chevy with the numbers "1" and "1" in a yellow New York license plate drive down the block at the time of the shooting on January 30, 2013. Bonifacio further testified that he heard several "pop" sounds followed by screams of "I got shot." (GA 185-87). Gerard Harrison of the New York State DMV explained that Monet Smith was the owner of a 2002 silver Chevy Impala with the yellow New York license plate "FXZ 1139" on January 30, 2013. (GA 278). Reynaldo Hernandez testified that Monet Smith was Lobban's girlfriend and the mother of Lobban's child, as well as the car's owner. (GA 219-20). Halyard also identified a DMV photo of the registered owner of a silver Impala as Lobban's girlfriend. (GA 123-24; GX 278). Additionally, Detective George Colby testified that on March 2, 2013, he stopped Lobban in the silver

---

        him what guns were used and he said the 40 and the 4-pound.

(GA 175).

41

Chevy Impala and arrested[22] him for marijuana possession.[23] (GA 321-23).

     D.     The Evidence Was Sufficient To Establish
             Osborne's Membership In The Conspiracy
             to Murder And Assault Rival Gang Members
             (Count One, Racketeering Act One; Count Twenty)

Osborne argues that the evidence was insufficient to show that he conspired to kill or assault Bloods gang members during the period identified in the indictment - January 2005 through April 2013. Specifically, he claims that the proof underlying these convictions, namely, Osborne's enactment of the "on sight rule," his ordering of McClenic's murder, and his numerous personal attempts to shoot or kill Bloods did not constitute the kind of specific intent required to prove murder

---

[22]    Halyard further testified that Osborne had defended Lobban's attempt to escape arrest in connection with this incident to the gang, claiming that it was not fear of arrest on a small amount of marijuana that motivated Lobban's run. Instead, Lobban was concerned because he and Osborne had overheard police radio reports identifying the car at the time of Green's shooting. (GA 123-24).

[23]    In addition to the evidence regarding the shooting, Robinson testified regarding a related incident from the Summer of 2012. Robinson explained that he had observed Bloods members Johnny Green, Jermaine Green, "JR" and others in a Roosevelt deli. Robinson, who was unarmed at the time, reached out to fellow Rollin' 60s members to obtain a firearm. Robinson detailed how Osborne himself arrived at the deli armed and prepared to shoot the Bloods, who had left shortly before Osborne's arrival. (GA 236-37, 240-42).

under New York State law.  (Br. 43-46).  These claims, too, are unavailing.

New York Penal Law § 105.15 states that a person is guilty of conspiracy to murder when, with the intent that conduct constituting a Class A felony, such as murder, be performed, he agrees with one or more persons to engage in or cause the performance of such conduct.  New York Penal Law § 125.25(1), in turn, provides that a person is guilty of murder when, with the intent to cause the death of another person, he causes the death of such person.

New York Penal Law § 105.05 states that a person is guilty of conspiracy to assault when, with the intent that such a felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct.  A person commits assault with a dangerous weapon, under New York Penal Law § 120.05(2), when, with the intent to cause physical injury to another, he causes such injury to such person or to a third person by means of a deadly weapon or dangerous instrument.

Here, the evidence demonstrating the existence of an agreement between the gang's members and Osborne, as well as Osborne's active participation in the conspiracy was overwhelming. For example, every Rollin' 60s cooperating witness testified that the Rollin' 60s Crips were at war with the Roosevelt Bloods and

were required to inflict the maximum possible damage upon rival Bloods gang members by the use of weapons and firearms when possible, with the goal of injuring and killing rivals.  (GA 105, 177-78, 197, 231-32, 239).  The evidence was also clear that this edict came from Osborne.  (GA 106, 107, 197).

Osborne nevertheless contends that the testimony of several gang members demonstrates that even if it could be demonstrated that he played a role in instituting the "on sight rule," the rule itself fails to satisfy the requirements of New York State law because the rule did not absolutely require that Bloods members be killed or assaulted.  (Br. 43-45) (citing People v. Ozarowski, 38 N.Y.2d 481, 489 (1976) (stating that to be guilty of conspiracy defendant must have the specific intent to commit the underlying offense)).  However, the fact that members may have, on occasion, failed to abide by the rule — often for reasons related to the presence of police or other deterrents to crime[24] — does not erase the rule's existence or the fact that the trial evidence clearly demonstrated that the rule was often invoked. Indeed, the jury was presented with numerous examples of shootings, assaults and murders, all of which were committed pursuant to the

---

[24]    Halyard, Hernandez, and Robinson all explained that the "on sight rule" and attacks on rivals were subject to common sense, and that you would not attack a rival if there were potential witnesses or police in the area.  (GA 178, 202, 239, 244).

44

"on sight rule."  (GA 106, 108-09, 107, 108, 110, 111, 112-13, 206, 227, 231-32, 243-44, 292, 293-94, 295-97, 308, 312).

Osborne also encouraged the application of the rule by providing weapons (GA 91-2, 176, 196, 202-04, 231), and by enhancing members' positions in the gang based upon their resort to such violence (GA 110, 197, 199, 239).

In addition to the "on sight rule," the conspiracy was evidenced by the fact that Osborne, himself, participated in incidents of violence directed at rivals.  For example, Osborne quickly responded to Robinson's call for a gun to shoot Bloods in a neighborhood deli (see GA 236-37, 240-42), participated in the shooting of Johnny Green, whose only "crime" was his Bloods membership (GA 175), and the attempted shooting of King Carter (GA 93-94, 106), any of which incidents could support his conviction for conspiracy to murder and to commit other acts of violence.

Beyond that, the government proved that Osborne ordered the killing of Bloods member McClenic.  (GA 113, 114, 161-65, 200, 204, 209).  While Osborne contends that the proof of his involvement in the McClenic murder was wanting (Br. 45-46), that contention is belied by the evidence.  The government presented ample proof that in the Fall of 2010, Osborne ordered the murder of McClenic, who had been assaulting Rollins' 60s gang members

while Osborne was in prison. (GA 113-15, 114, 161-65, 183, 200, 204, 209). McClenic was subsequently located by members of the gang, who provided his location to Crips members, including Lobban, Bryan Henry, and Eric Smith, the last of whom actually shot and killed McClenic. (GA 114, 165, 209).

Further, in the wake of the murder, after having himself been retaliated against, Osborne ordered the shootings of the homes of Bloods gang members, including McClenic's. (GA 115-18, 211-12). While Osborne argues that ordering the shooting of a home does not show an intent to murder or assault (Br. 46), a rational jury could infer that murder is exactly what Osborne intended when he ordered a shooting into an occupied residence by multiple gang members. (GA 174). These shootings involved the use of three firearms (a revolver, a .45 caliber pistol, and a 9 mm Mac-10 style sub-machinegun), and in each instance, dozens of shots were fired. Bullets penetrated these homes, ripping through bedrooms, living rooms, and hallways. (GA 174, 211-12, 264-68, 270-74, 327-34).

                         *    *    *

Accordingly, because the evidence was more than sufficient to demonstrate Osborne's agreement with others, including gang members, to traffic in drugs, and because the proof also was more than sufficient to show his participation in the

various crimes of violence that were related to the Rollin' 60s Crips enterprise, his sufficiency challenge should be denied.

POINT TWO

THE DISCOURT COURT CORRECTLY FOUND THAT THE
GOVERNMENT'S RACE NEUTRAL EXPLANATION FOR
STRIKING JUROR NUMBER 25 WAS NOT PRETEXTUAL

Osborne also argues that this Court should reverse his convictions and order a new trial because the government purportedly improperly struck a juror based on race, in violation of the Fourteenth Amendment. (Br. 47-49). This claim is meritless.

I.   Factual Background

On March 8, 2016, the parties appeared before United States District Judge Joanna Seybert for jury selection. (GA 59). Beginning on March 8 and continuing on March 9, Judge Seybert selected the first 28 qualified jurors as the pool from which the final 12 jurors would be chosen. Osborne was provided with ten peremptory challenges; the government was provided with six.[25] (A 211-16).

The government used four of its six peremptory challenges to strike African-American jurors: Jurors 23, 10, 22 and 25. Following the first three of these strikes, defense counsel argued that a _prima facie_ case of discrimination had been

---

[25]   On March 10, 2018, Judge Seybert selected the first 12 qualified jurors as the pool from which six alternate jurors would be selected. Osborne and the government were each given three challenges. (GA 62, 63-65). Osborne raises no claims in his appeal regarding the selection of the six alternate jurors.

established, thus requiring the government to articulate race-neutral reasons for its strikes. (A 212-13). The government offered, and the district court accepted, the race-neutral reasons for the government's strikes, noting that "[the]panel has been, probably over half have been African-Americans if not more."[26] (A 211-16).

After the government struck Juror 25, defense counsel again raised a *Batson* challenge, and the government again proffered race-neutral reasons for its strike. (A 216). Specifically, the government noted that Juror 25 had stated during voir dire that her "older brother had a drug problem" and had been arrested.[27] (A 216 (citing A 201)). The district court again denied the Batson challenge and excused Juror 25. (A 217).

## II.  The Applicable Law

### A.  The *Batson* Ruling

The Supreme Court has held that the government's use of peremptory challenges to strike potential jurors because of their race violates the Equal Protection Clause of the Fourteenth

---

[26]  Osborne does not argue that the removal of any of these jurors violated the Fourteenth Amendment or that the government offered a pretextual reason for striking them.

[27]  In response to these statements, the district court inquired whether there was anything about the way her brother had been treated by law enforcement that would cause Juror 25 a problem in the instant case, to which she replied, "[n]ot to my knowledge. He was much older so he really was like involved." (A 201-02).

49

Amendment.  See Batson v. Kentucky, 476 U.S. 79 (1986).  The ruling
in Batson has been extended to, among other things, peremptory
challenges based on gender.  J.E.B. v. Alabama ex rel. T.B., 511
U.S. 127 (1994); see also United States v. Martinez, 621 F.3d 101,
107-08 (2d Cir. 2010) (defendant may not make gender-based
strikes).

     B.    Procedures Under *Batson*

     Batson and its progeny outline a three-part process by
which challenges to peremptory strikes are analyzed.  See Batson,
476 U.S. at 96-98.  First, the party alleging a discriminatory
strike must make a prima facie showing that the other party has
exercised peremptory challenges on the basis of race, gender or
another cognizable factor.  If the requisite showing has been made,
the burden then shifts to the non-moving party to articulate a
neutral explanation for striking the jurors in question.  Finally,
the presiding judge must determine whether the moving party has
carried his or her burden of proving purposeful discrimination.
See, e.g., Hernandez v. New York, 500 U.S. 352, 358-59 (1991);
United States v. Diaz, 176 F.3d 52, 76 (2d Cir. 1999).

     With respect to the second step in the analysis, the
Supreme Court has held that "[i]n evaluating the race neutrality
of an attorney's explanation, a court must determine whether,
assuming the proffered reasons for the peremptory challenges are
true, the challenges violate the Equal Protection Clause as a

matter of law." Hernandez, 500 U.S. at 359. A "neutral" explanation means "an explanation based on something other than the race of the juror." Id. at 360. "At this [second] step of the inquiry, the issue is the facial validity of the [attorney's] explanation. Unless a discriminatory intent is inherent in the [attorney's] explanation, the reason offered will be deemed race neutral." Id.; see also Purkett v. Elem., 514 U.S. 765, 767-68 (1995). Furthermore, a neutral explanation need not be "persuasive, or even plausible" for the non-movant to meet his obligation and advance the inquiry to the third step. Purkett v. Elem., 514 U.S. at 767-68.

With respect to the third step in the Batson analysis, "the movant must satisfy his or her burden of persuasion and prove intentional race discrimination." Barnes v. Anderson, 202 F.3d 150, 156 (2d Cir. 1999). Deciding whether a movant has met his burden "compels courts to determine the credibility of the proffered explanations." Id. (internal citation and quotation marks omitted).

C.   The Standard Of Review

The presiding judge's evaluation of whether a proffered explanation is pretextual is reviewed for clear error and is entitled to "great deference." Hernandez, 500 U.S. at 369; Barnes, 202 F.3d at 156; United States v. Franklyn, 157 F.3d 90, 97 (2d

Cir. 1998). This deference makes "particular sense" in the context

of <u>Batson</u> challenges:

> Deference to trial court findings on the issue
> of discriminatory intent makes particular
> sense in this context because, as we noted in
> <u>Batson</u>, the finding largely will turn on
> evaluation of credibility. In the typical
> peremptory challenge inquiry, the decisive
> question will be whether counsel's race-
> neutral explanation for a peremptory challenge
> should be believed. There will seldom be much
> evidence bearing on that issue, and the best
> evidence often will be the demeanor of the
> attorney who exercises the challenge. As with
> the state of mind of a juror, evaluation of
> the prosecutor's state of mind based on
> demeanor and credibility lies peculiarly
> within a trial judge's province.

<u>Hernandez</u>, 500 U.S. at 365 (internal citations and quotation marks

omitted); <u>see also</u> <u>McKinney v. Artuz</u>, 326 F.3d 87, 100-01 (2d Cir.

2003). Thus, in the absence of "exceptional circumstances,"

appellate courts defer to the trial court's factual findings.

<u>Hernandez</u>, 500 U.S. at 366.

III. The District Court's Finding That The
     Government's Race-Neutral Explanation
     <u>Was Not Pretextual Was Not Clearly Erroneous</u>

Osborne does not question the facial validity of the

government's reasons for striking Juror 25, nor does he contend

that they were inherently discriminatory. (Br. 49). Indeed, the

government informed the district court that it had struck Juror 25

because her brother had a drug problem that had led to a prior

arrest (A 216-17), a sufficiently race-neutral reason for the strike. See Hernandez, 500 U.S. at 359-60.

Osborne nonetheless contends that the government's proffered justification for striking Juror 25 was merely pretextual, alleging that the government had failed to strike two non-African American jurors – Juror 14 and Alternate Juror 1 — who had provided similar background information. (Br. 49). But this contention is based on a misreading of the facts. While it is true that Juror 14's brother also had been caught trafficking drugs, Juror 14 had been excused on the consent of both parties for reasons related to financial hardship prior to any "for cause" challenges from either party. (A 197-198; GA 60). Further, it was not Alternate Juror 1's brother, but a more distant uncle, who had been arrested on drug charges. (A 208-09). Moreover, both Alternate Juror 1's father and uncle were former New York City Police Department officers (A 209), thus providing an additional rationale for the government's choosing not to strike Alternate Juror 1 from the jury. Indeed, Alternate Juror 1 ultimately was stricken by Osborne himself in the alternate rounds. (GA 63).

Accordingly, because the government provided sound, race-neutral reasons for its strike of Juror 25, and because these reasons were not pretextual, Osborne's Batson claim should be denied.

POINT THREE

THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY
REGARDING THE APPLICATION OF *PINKERTON* LIABILITY

Osborne argues, for the first time on appeal, that this
Court should reverse his convictions on Count Ten, the attempted
murder of Maurice Gardner, and Count Eleven, the related assault
with a dangerous weapon, both violations of 18 U.S.C. 1959(a) (the
Violent Crimes In Aid of Racketeering or "VICAR" statute), because
the district court purportedly erroneously instructed the jury
that it could apply Pinkerton liability in reaching its decision.
(Br. 50-58). This argument, too, is unavailing.

I.  Applicable Law

    A.  The Standard Of Review

    "[A] jury instruction is erroneous if it misleads the
jury as to the correct legal standard or does not adequately inform
the jury on the law." United States v. Bok, 156 F.3d 157, 160 (2d
Cir. 1998) (internal quotation marks and citation omitted).

    This Court generally "review[s] challenged jury
instructions de novo but will reverse only if all of the
instructions, taken as a whole, caused a defendant prejudice."
Id.; see also United States v. Al Kassar, 660 F.3d 108, 127 (2d
Cir. 2011) (court does not look only to the particular words or
phrases questioned by the defendant, but must review instructions
as a whole to see if the entire charge delivered a correct

54

interpretation of the law). Where no objection was made to the jury instruction, as here, a plain error standard of review applies. See United States v. Botti, 711 F.3d 299, 308 (2d Cir. 2013); see also Fed. R. Crim. P. 30(d), 52(b). Under this standard of review, an appellate court "has discretion to reverse only if the instruction contains (1) error, (2) that is plain, and (3) that affects substantial rights." Botti, 711 F.3d at 308 (alterations, internal quotation marks, and citation omitted); see also United States v. Olano, 507 U.S. 725, 735-36 (1993). Moreover, even if those three conditions are met, "a court may exercise its discretion to correct the error only if the error seriously affected the fairness, integrity or public reputation of judicial proceedings." Id. (alterations, internal quotation marks, and citation omitted).

B.   The VICAR Statute And *Pinkerton* Liability

18 U.S.C. § 1959(a) reads in relevant part:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished . . . .

55

18 U.S.C. § 1959(a).  The violations of New York State law relevant to the charges here are New York Penal Law §§ 110/125.25(1) (attempted murder) and New York Penal Law § 120.05(2) (assault with a dangerous weapon.  (A 29).  Each count also alleged that Osborne was liable as a principal under New York Penal Law § 20.00 (aiding and abetting).  (Id.).  While under New York State law accessorial conduct may not be equated with mere membership in a conspiracy, see People v. McGee, 49 N.Y.2d 48, 56-58 (1979), it is also true that "a conspirator's conduct in many instances will suffice to establish liability as an accomplice," id. at 57. Moreover, New York Penal Law § 20.00[28] specifically provides that a person who "solicits, requests, commands, importunes" a criminal act is liable as an accessory and thus as a principal.  See also People v. Mateo, 2 N.Y.3d 383, 407-09 (2004) (defendant who "commanded" the murder was liable as a principal).

By contrast, under Pinkerton v. United States, 328 U.S. 640 (1946), a conspirator may be found guilty of foreseeable

---

[28]    NYPL § 20.00 reads in relevant part:

When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

substantive offenses committed by his co-conspirators in furtherance of the conspiracy.  See United States v. Gallerani, 68 F.3d 611, 620 (2d Cir. 1995) ("Once a conspiracy has been established, the criminal liability of its members extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy." (internal quotation marks and citation omitted)); see also United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998) (quoting United States v. Romero, 897 F.2d 47, 51 (2d Cir. 1990) ("'a conspirator can be held responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if [the conspirator] did not himself participate in the substantive crimes.'")). "Whether a particular crime is foreseeable and in furtherance of the conspiracy is a factual matter for the jury."  Romero, 897 F.2d at 51.

II. The Giving Of The *Pinkerton* Charge
    Does Not Vitiate Osborne's
    Convictions On Counts Ten And Eleven

    Osborne contends that the district court erred in providing the jury with a Pinkerton instruction as to Counts Ten and Eleven because a defendant cannot be guilty of the underlying substantive New York State crimes (attempted murder and assault with a dangerous weapon) based on a Pinkerton theory of liability.

(Br. 50-53). That argument is directly contrary to controlling precedent.

Specifically, in Diaz, 176 F.3d at 99-100, this Court held that Pinkerton was applicable to counts charging the commission of Connecticut State crimes in aid of racketeering under VICAR. See also United States v. Bagaric, 706 F.2d 42, 62-63 (2d Cir. 1983) (within judge's discretion to charge a predicate racketeering offense by a generic description rather than giving elements in full), abrogated on other grounds by National Org. for Women, Inc. v. Scheidler, 510 U.S. 249 (1994). Indeed, the Court characterized the appellants' claim in that gang-related case involving four New Haven murders, namely, that "the district court was obliged to look to Connecticut law to determine the propriety and language of a Pinkerton instruction," as "meritless." Diaz, 176 F.3d at 100. Relying on Miller, 116 F.3d at 675 ("RICO's allusion to state crimes was not intended to incorporate elements of state crimes, but only to provide a general substantive frame of reference"), the Court upheld a conspiracy to assault charge lacking an "overt act" jury instruction. Id. at 96. Later, the Court also noted, "the racketeering statutes are not meant to incorporate state procedural and evidentiary law; rather, references to state law in these statutes merely serve a definitional purpose, that is, to identify generally the kind of

58

conduct made illegal by the federal statute." Id. at 100 (citing United States v. Coonan, 938 F.2d 1553, 1564 (2d Cir. 1991) ("Congress did not intend to incorporate the various states' procedural and evidentiary rules into the [racketeering] statute." (internal quotation marks and citation omitted)); United States v. Paone, 782 F.2d 386, 393 (2d Cir. 1986).

Osborne nevertheless argues that decisions since Diaz, e.g., United States v. Carillo, 229 F.3d 177 (2d Cir. 2000), United States v. Feliciano, 223 F.3d 102 (2d Cir. 2000), and United States v. Pimentel, 346 F.3d 285 (2d Cir. 2003), make clear that even if federal racketeering statutes like VICAR do not incorporate state procedural law, they must take into account the law governing the substantive state crimes at issue in the case. (Br. 54-57). This same argument, however, was previously made and rejected in United States v. Sanchez, 623 F. App'x 35, 38-39 (2d Cir. 2015), cert. denied, 136 S. Ct. 1235 (2016), an unpublished decision decided less than a year before the district court instructed the jury in this case. Indeed, in Sanchez, this Court held that because it had not "expressly disavowed Diaz's broad language, much less reversed its holding, . . . Diaz remains controlling authority." Id. at 39. This is unsurprising given that this Court in Carillo refused to convene in banc to deliberate on the continuing authority of Diaz. Carillo, 229 F.3d at 186. Because of this,

any error occasioned by the giving of the <u>Pinkerton</u> charge was not plain.[29]

Finally, even if the district court erred in delivering a <u>Pinkerton</u> instruction, Osborne cannot establish that such error affected his "substantial rights," or "'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings,'" as required under plain error review. <u>Botti</u>, 711 F.3d at 308-15 (citation omitted). Here, the facts demonstrated that Osborne, the leader of the Rollin' 60s, ordered Denzel Smith to kill Gardner, in line with Osborne's directive against cooperation. (GA 121-22, 298-305, 313). Moreover, Smith attempted to carry out Osborne's order using a firearm that had been previously used by Rollin' 60s members in the course of other shootings, namely, the shooting of Bloods member Cornell Brown and the shooting of Christopher Anderson at the Midway Deli. (GA 335). Clearly, these facts are sufficient under New York State law to convict Osborne of aiding and abetting the crimes of attempted

---

[29]    Osborne's other authority is simply inapposite. For example, <u>Feliciano</u> and <u>Pimentel</u> involved a district court's failure to instruct a jury on all the underlying elements of the state-law offenses at issue. While this Court may have suggested that such failure could be tantamount to plain error under certain circumstances, <u>see</u> <u>Pimentel</u>, 346 F.3d at 302-04, here the district court specifically instructed the jury on the underlying elements of Counts Ten and Eleven, including the law of aiding and abetting. (GA 338-39, 340, 341-43).

60

murder and assault.  <u>See</u> <u>Mateo</u>, 2 N.Y.3d at 407.  Indeed, the jury must have made this very finding in convicting Osborne of Count One, Racketerring Act Four, Subpart B, because the district court's <u>Pinkerton</u> charge did not extend to that racketeering act — it only applied to Counts Four, Five, Seven, Eight, Ten, Eleven, Twelve and Fourteen.  (GA 344, 347).

Accordingly, even if the district court erred in providing a <u>Pinkerton</u> instruction in its charge, Osborne's claim should be denied.

POINT FOUR

THE DISTRICT COURT DID NOT ERR IN DENYING
A *FRANKS* HEARING; NOR DID IT WRONGLY
REFUSE TO SUPPRESS THE EVIDENCE OF THE SEARCH

Osborne also claims that the district court erred in denying him a Franks hearing related to a wiretap of Osborne's cell phone and a search warrant application for a search of Osborne's home. (Br. 59-69). This is because, according to Osborne, the wiretap application contained purportedly purposeful material misinformation about Osborne's involvement in the murder of confidential informant Maurice Gardner. (Br. 64-68). Osborne further asserts that, because the search warrant application relied in part on information learned from the wiretap, it, too, was defective and required suppression of the fruits of the search. (Br. 68, 69).

These claims are unavailing.

I.   The Relevant Facts

     A.   The Wiretap Of Osborne's Phone

          As part of its investigation into the Rollin' 60s, on March 22, 2013, NCPD and the Nassau County District Attorney's Office ("NCDAO") sought authorization to intercept calls on Osborne's cellular phone (the "wiretap application"). (A 37-39). The wiretap application included, inter alia, an affidavit from NCPD Detective John Mitchell (the "Mitchell Affidavit"), which established overwhelming probable cause that Osborne and the

62

Rollin' 60s sold firearms and narcotics and committed acts of violence. (A 54-112).

Among other things, the Mitchell Affidavit detailed numerous crimes committed by Osborne and his gang, including illegal firearms sales (A 64-69), narcotics sales (A 70-76), attempted murder (A 63-64, 76-77, 80-83) and a robbery (A 92-93). Since Osborne was the leader of the gang, other members were expected to follow Osborne's orders and share proceeds from their illegal endeavors for the betterment of Osborne and the gang. (A 56-57, 62).

Some of these crimes detailed in the Mitchell Affidavit involved Osborne personally. For example, the affidavit included information that Gardner had informed law enforcement officials that Osborne played "an integral role" in the Rollin' 60s gun running enterprise, which included the purchase of guns in North Carolina and later sale by Osborne and others in Nassau County. (A 64, 66).

The Mitchell Affidavit also included information that Gardner had purchased a gun from Halyard in Osborne's basement, with Osborne present. (See A 65, 67). Specifically, on May 15, 2012, Gardner agreed to buy a firearm from Halyard. (Id.). Halyard told Gardner to come to Osborne's house to conduct the transaction. (Id.). When Gardner arrived at Osborne's house,

Osborne greeted Gardner and instructed him to come inside. (Id.).
Osborne then escorted Gardner to the basement where Gardner met
Halyard and bought a firearm. (Id.).

Further, the Mitchell Affidavit set forth an attempted
gun sale between Osborne and Gardner that involved Osborne
personally and also showed the collaboration between Osborne and
the gang to sell firearms. (A 69-70). Gardner called Osborne's
cell phone and one of Osborne's fellow gang members answered.
(Id.). Gardner and Osborne's underling made arrangements to
conduct a firearm transaction. (Id.). Gardner traveled to the
pre-arranged location, and Osborne entered Gardner's car and began
negotiating a price for the firearm that he was going to sell to
Gardner. (Id.). Osborne told Gardner that he would consummate
the transaction later. (Id.).

Moreover, the Mitchell Affidavit described a text
message exchange between a confidential informant and Osborne,
during which Osborne discussed the sale of a firearm. (A 84). It
further detailed text messages between Osborne and an informant on
Osborne's cell phone in which Osborne discussed "narcotics related
activities, such as weighing drugs." (Id.).

The Mitchell Affidavit also referenced a rap video in
which Osborne admitted that he held a leadership position within
a gang (A 105 ("[B]ecause I'm a G from the top of the scene")),

sold narcotics (A 104 ("Play the trap spot hard")), had access to firearms (A 102 ("I fuck around and put a whole thirty clip inside of you . . . . . Big gun holder)), and would kill anyone who was cooperating with law enforcement (A 103 ("I kill a rat when I see a rat")). Additionally, the affidavit discussed two other rap videos in which members of the Rollin' 60s brandished firearms and discussed selling narcotics and committing acts of violence on behalf of the gang.[30] (A 84-88, 93-98, 101-05).

In addition to these crimes committed by Osborne and his gang contained in the Mitchell Affidavit, the affidavit stated that Osborne had shot Gardner in an attempted murder of the suspected confidential informant, which information was based, in part, on what Gardner had told law enforcement officials. (A 81-83 ("Upon interview of [Gardner,] I learned the following information . . . .")). Specifically, Detective Mitchell stated that Gardner had told him that Derick Hernandez had lured Gardner out of his house and led Gardner into Osborne's path, where Osborne, who was wearing a red hooded sweatshirt,[31] proceeded to

---

[30]    Osborne, as gang leader, was featured in one of these videos. (A 93-98).

[31]    Osborne wrongly asserts that Detective Mitchell believed that there were two shooters: the man in the red hooded sweatshirt and Osborne. (Br. 63). Instead, Detective Mitchell stated that Gardner told him that Osborne was the man in the red hooded sweatshirt. (A 82).

65

shoot Gardner several times causing paralysis from the waist down.[32] (A 81-83).

On March 22, 2013, after reviewing the wiretap application, The Honorable Frank A. Gulotta, Jr., Justice of the Supreme Court, authorized the interception of calls on Osborne's cellphone from March 22, 2013 to April 20, 2013. (A 113-17). During that time, the NCPD intercepted numerous calls demonstrating that Osborne was trafficking in narcotics (the "wiretap evidence").

B.    The Search Of Osborne's Home

On April 12, 2013, The Honorable Tammy Robbins, Acting Justice of the Supreme Court, authorized a search of Osborne's home pursuant to a search warrant. (A 131(b)-159). In support of that warrant, Detective Mitchell submitted an additional affidavit detailing facts establishing probable cause to search the home, including numerous cell phone calls intercepted pursuant to the wiretap that made it clear that Osborne was selling narcotics from his home and evidence of the May 15, 2012 illegal gun sale that had occurred in Osborne's basement. (A 143-50). On April 17,

---

[32]    In fact, not only did Gardner identify Osborne as the shooter in the hospital, as of the date that Osborne filed his Franks motion, Gardner continued to believe that Osborne had shot him. (A 166).

2013, law enforcement officers executed that search warrant and recovered ammunition, among other items.  (GA 274-77).

    C.    <u>Pre-Trial Motions</u>

        Prior to trial, Osborne moved for: (1) a <u>Franks</u> hearing to determine whether the wiretap evidence should be suppressed because of inaccuracies in one of the wiretap affidavits; and (2) suppression of evidence recovered from his home as the result of the purportedly faulty wiretap application that relied on information contained in the wiretap affidavit.  (A 11, Dkt. No. 176; GA 1-5).  The government opposed those motions. (A 11 Dkt. No. 183; GA 6-58).  The basis of the motion was that subsequent to the filing of the affidavits, the government learned that although Osborne and Hernandez had conspired to kill Gardner, Osborne was not the shooter (<u>id.</u>); rather, Osborne and Hernandez had directed a younger gang member (Denzel Smith) to murder Gardner <u>id.</u>; <u>see also</u> GA 298-307).  Indeed, it was only after Halyard began to meet with members of law enforcement, subsequent to Osborne's arrest in April of 2013 and after Detective Mitchell had submitted the affidavits in support of the wiretap and search warrant, that law enforcement officials first learned that Osborne was not the shooter.  (GA 324-25).  After Halyard told the NCDAO this

information, the NCDAO informed Osborne that it had information that he was not the shooter.[33]

On January 25, 2016, the parties appeared for oral argument on the motion. (A 160). After hearing extensive argument (A 163-87), the district court denied Osborne's motion, holding:

> After reviewing all of the information and materials in the case, the government's argument is the more substantial one. It appears that there was a great deal of probable cause based on the information that Detective Mitchell conveyed, albeit a portion of it with regard to the October shooting of the confidential informant that paralyzed him. But there were so many other pieces that fit in to give a judge the justification to order a[n] eavesdropping warrant.

> There were numerous texts and calls between various alleged members of the group. The necessity is clear to me. I don't think that the case law requires any more . . . .

> I don't see that one incident of misinformation even including the business with the telephone, the cell phone, which really could be any place. The government has indicated on more than one occasion that others were using Mr. Osborne's cell phone. And there is enough going on communication-wise between Mr. Osborne, Mr. Hernandez, and other gang members that it was indeed justified.

---

[33] On October 4, 2013, the NCDAO met with attorneys for Osborne and Derick Hernandez in the chambers of The Honorable William C. Donnino, Nassau County Supreme Court Justice, and made an in camera disclosure of the fact that a witness had reported information that someone other than Osborne was the shooter in the Gardner incident.

(A 187-88).

## II. Applicable Law

### A. The Standard Of Review

On appeal from a district court's ruling on a motion to suppress evidence, this Court "review[s] legal conclusions de novo and findings of fact for clear error." United States v. Freeman, 735 F.3d 92, 95 (2d Cir. 2013).

### B. Requirement Of A *Franks* Hearing

Where a defendant contends that an affidavit in support of a wiretap or search warrant contained deliberately misleading or recklessly false information, the analysis of Franks v. Delaware, 438 U.S. 154 (1978), applies. See United States v. Rajaratnam, 719 F.3d 139, 151-52 (2d Cir. 2013) (applying Franks, which involved a physical search, to a wiretap). Under Franks, a defendant is entitled to a hearing if he "make[s] a substantial preliminary showing that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." Salameh, 152 F.3d at 113 (internal quotation marks omitted); see also United States v. Awadallah, 349 F.3d 42, 64-65 (2d Cir. 2003).

Indeed, a defendant seeking to make the first showing of an intentional or reckless misstatement or omission must show more

than inadvertent error. "[E]very statement in a warrant affidavit does not have to be true." United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005) (internal quotation marks and citation omitted). Nor is "[a]n affiant . . . expected to include in an affidavit every piece of information gathered in the course of an investigation." Awadallah, 349 F.3d at 67-68 (citation and internal quotation marks omitted); see also Rajaratnam, 719 F.3d at 154 (quoting Awadallah, 349 F.3d at 67-68).

The moving defendant must also show that any misstatements or omissions alleged were material. To determine if false information was material, i.e., "'necessary to the [issuing] judge's probable cause finding[,]' . . . 'a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant.'" United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000) (quoting Salameh, 152 F.3d at 113). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate. As with the inclusion of false information, '[o]missions from an affidavit that are claimed to be material are governed by the same rules.'" Id. (quoting United States v. Ferguson, 758 F.2d 843, 848 (2d Cir. 1985)); see also Rajaratnam, 719 F.3d at 146.

C.    The "Good Faith" Exception

Even if it is determined that there is a problem with a search warrant, evidence obtained via that warrant may nevertheless be admitted. As the Supreme Court has stated, "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way." United States v. Leon, 468 U.S. 897, 919-20 (1984). Hence, suppression of evidence is a "last resort," Hudson v. Michigan, 547 U.S. 586, 591 (2006), appropriate only when law enforcement conduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. 135, 144 (2009); see United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992) (evidence seized pursuant to a warrant is admissible even if the warrant lacks probable cause as long as the executing officers relied upon the warrant in "objective good faith").

III. The District Court Did Not Err In
     Refusing To Conduct A *Franks* Hearing

The district court's denial of the suppression of the wiretap was correct under Franks because the information that

Osborne shot Gardner was not material.[34] Even if the information regarding the Gardner attempted murder was stripped from the Mitchell Affidavit, it contained sufficient probable cause to believe that Osborne and the Rollin' 60s were engaged in firearms trafficking, narcotics trafficking, robberies and other gang-related activities to justify the wiretap. (A 187-88). For example, the affidavit included: (1) statements provided by Gardner, showing that Rollin' 60s members "worked together to contribute to the Rollin 60's gun running enterprise," in which

---

[34] Although Osborne raised a claim of intentional falsehood in the district court, the district court did not reach this question in light of its finding that the information was not material (A 187-88), and this Court need not decide it either. Nevertheless, the government has always maintained that any inaccurate information contained in the Mitchell Affidavit was inadvertent. Gardner, who knew Osborne, told law enforcement officers that Osborne, whom Gardner claimed was wearing a red hooded sweatshirt, walked past him, turned around and shot him in the back. (A 81-83). Further, Gardner's eyewitness account was corroborated by a different eyewitness who told law enforcement that while he could not identify the person who shot Gardner, the shooter was wearing a red hooded sweatshirt. (A 166-67). Another witness informed law enforcement officers that Osborne was wearing a red hooded sweatshirt the night Gardner was shot. (Id.). Moreover, as the district court observed, there was significant evidence connecting Hernandez, who had lured Gardner out of his house and into the shooter's path, to Osborne. (A 167-68). Additionally, Osborne had a motive to kill Gardner because Gardner was cooperating with law enforcement, nothing short of a major violation of the gang's rules. (Id.). Indeed, the district court correctly placed little weight on Osborne's evidentiary argument, namely, that phone records showed that Osborne's cell phone was in a different town at the time of the attempted murder, because there was evidence that Rollin 60s members, including Osborne (who lent his cell phone to someone else to arrange the attempted firearm sale with Gardner), shared their phones. (A 69, 187-88; GA 214).

Osborne played "an integral role" (A 64-66); (2) text messages over Osborne's cell phone with a different confidential informant (CI #4), in which Osborne discussed selling firearms (A 84); (3) a conversation on Osborne's cell phone between Gardner and one of Osborne's fellow gang members arranging for the sale of a firearm (A 69-70); (4) facts about a face-to-face meeting between Osborne and Gardner during which Osborne negotiated a price for a firearm that he intended to sell to Gardner (id.); (5) text messages between Osborne and an informant (CI #4), in which Osborne discussed "narcotics related activities" (A 84); (6) information about an audio and video recording of a May 15, 2012 gun transaction that occurred in Osborne's home while Osborne was present (A 65, 67); (7) extensive evidence that Osborne's fellow gang members sold drugs (A 70-76), committed robberies (A 92-93), sold firearms (A 65-69), and committed acts of violence (A 63-64, 76-77,80-83), all for the benefit of the organization (A 56-57); and (8) several rap videos in which Osborne and members of his gang brandished firearms and/or discussed selling narcotics and committing acts of violence on behalf of the gang (A 84-88, 93-98, 101-05).

While Osborne argues that none of this evidence establishes his personal involvement in any crimes (Br. 66-67), this is an unfair reading of the evidence. Although Osborne did

not personally sell the gun to Gardner on May 15, 2012, he nevertheless lent his basement for the gun's sale. Further, the fact that Osborne did not follow through on a potential sale of a firearm to Gardner does not erase the fact that he did conspire to sell Gardner a gun. Moreover, the fact that the evidence outlined numerous examples of gang-related criminal activity does not negate the fact that Osborne served as leader of the gang, both exhorting members to criminal activity and personally benefitting from it. Taken together, there is more than sufficient evidence to establish probable cause for the wiretap even without the information related to the Gardner attempted murder.

Finally, even if the district court erred, the error was harmless because the evidence of Osborne's guilt was overwhelming. See Latine v. Mann, 25 F.3d 1162, 1167-68 (2d Cir. 1994) (the strength of the government's case is probably the most critical factor in determining whether an error is harmless). Even without the wiretap evidence, every one of the six cooperating witnesses testified that Osborne was the leader of the Rollin' 60s. (See, e.g., Halyard (GA 84-85); Hernandez (GA 196-98); Robinson (GA 229); Smith (GA 290); Appiagyei (GA 250-51); Morris (GA 280)). In addition to that testimony, the government introduced Facebook records (GX 177D, 179C, 179E, 180C p.2, 180F p. 5, 181G), photographs (GX 137, 147, 177F, 177G, 286-88; GA 248-

49) and an admission that Osborne made to a prison official (GX 3500-STR-1; GA 316-17) demonstrating that Osborne was a member of the gang.

Likewise, the evidence adduced at trial that Osborne committed robberies was strong. Indeed, cooperating witnesses Halyard, Hernandez and Morris testified that they personally committed robberies with Osborne. (See, e.g., GA 100-03, 167-70, 171-73, 193, 221-22, 284-86).

Finally, the government called several cooperating witnesses who, in painstaking detail, testified that Osborne sold cocaine base, cocaine, marijuana, heroin and methylone. (See, e.g., GA 97, 98-99, 124, 125-27, 193, 213, 214-19, 229, 233-35, 246-47, 252-53, 254, 255-58, 283-84, 285). Additionally, the evidence adduced at trial established that Osborne possessed quantities of heroin and methylone that were consistent with distribution at the time of his arrest. (See, e.g., GA 68, 71-72, 73-78, 279).

## IV. The Search Was Valid

Even assuming there was a defect in the wiretap affidavit that tainted the search warrant affidavit, Osborne has not demonstrated that the law enforcement officials who carried out the search acted in anything other than good faith.[35] See, e.g.,

---

[35] Neither Detective Colby nor Detective Mitchell were present during the search of Osborne's home. (See, e.g., GA 314,

Leon, 468 U.S. at 920-233.  Indeed, there is simply no information to establish that the "affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" or is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."  See id. at 923 (internal quotation marks and citation omitted). Accordingly, the evidence recovered pursuant to the search warrant should not be suppressed.

---

318-20).  Instead, Detective Mark Berte conducted that search. (See GA 274-771).

POINT FIVE

THE DISTRICT COURT DID NOT ABUSE
ITS DISCRETION IN PRECLUDING OSBORNE
FROM CALLING CERTAIN DEFENSE WITNESSES

Osborne further claims that the district court violated his Sixth Amendment Confrontation Clause right and his Fifth Amendment right to due process by prohibiting him from calling Detective Mitchell and recalling Detective Colby as defense witnesses. Specifically, he argues that it was his defense that these law enforcement officials either lied during the investigation or encouraged the cooperating witnesses to give false inculpatory testimony at trial. (Br. 70-73). Osborne also argues, for the first time on appeal, that the detectives' testimony would demonstrate that Gary Mosely, not Osborne, ordered the attack on Gardner. (Br. 73).

These claims are also unavailing.

I.   The Relevant Facts

Following the government's case, Osborne's counsel sought to call NCPD Detectives George Colby and John Mitchell as defense witnesses. (A 243-58). The government asked for an offer of proof. (A 244-45). This was because Detective Colby had already testified in the government's case, with the district court permitting defense counsel latitude to expand the scope of cross-

examination beyond the direct testimony.[36] (A 237-42). The government also was concerned that Osborne's true motive behind calling Detective Mitchell was to re-open the court's ruling on the wiretap application. (A 244-45). In response, Osborne's counsel provided the following proffered reason for the testimony: "[t]he investigation as it related to the phone call analysis, and cell phone tower records and question Detective Colby about his knowledge and participation in the charge of Mr. Osborne with illegal gun sales in the first state indictment." (A 246). The government argued that this proffered reason was an improper, irrelevant attempt to revisit the validity of the wiretap, which was not before the jury. (A 247-48). The government further

---

[36] Indeed, Osborne's counsel raised many of the issues now raised by Osborne in connection with Detective Colby's cross-examination. (A 236-37). Moreover, the district court "allowed him to get into it, over [the government's] objections, to see if it established any bias or prejudice." (A 237). As a result, Osborne's counsel was permitted to ask Detective Colby questions about his opportunities to meet with cooperating witnesses. (A 238-39). Counsel was also permitted to ask questions about Detective Colby's review (none) of phone records (A 239), and at what point he had formed any conclusions about Osborne's role in the shooting of Gardner (A 239-40). Detective Colby testified that Gardner had told him and Detective Mitchell in the hospital that Osborne was the shooter. (Id.). Detective Colby also testified that he first learned that Osborne was not the shooter in June 2013 (after Osborne's April 17, 2013 New York State arrest on attempted murder and firearms charges), when Halyard told him that Osborne, though involved in the shooting, did not actually fire the gun. (A 240-41). Detective Colby also stated that, at first, he did not believe Halyard because Gardner, himself, had stated that Osborne was the shooter. (A 241).

pointed out that, to the extent Osborne was interested in the government's handling of confidential informant Gardner, Osborne had ample opportunity to inquire of Gardner's official handler, FBI Special Agent David Biddescombe, who had testified in the government's case. (A 247-48).

In response, Osborne buttressed the government's concerns that he was mostly interested in re-opening the _bona_ _fides_ of the wiretap application:

> THE DEFENDANT: . . . John Mitchell and John Mitchell's affidavit he falsified evidence pertaining to a conspiracy murder. He falsified phone records, saying me and Hernandez were speaking about the . . . shooting of a confidential informant two hours surrounding the shooting and records were falsified, and he lied to a judge.
>
> That's what I want him to admit on the stand, but that was the main reasons for this whole entire case, not only did he withhold evidence that I was not at the scene of the crime and I'm not saying they still charging me with shooting this thing, but evidence was falsified. This officer lied to a judge, and he shouldn't be able to interact with the witnesses on this case.

(A 250).

As to Osborne's concerns that Detective Mitchell was "interacting" with the witnesses, the government replied:

> MS. BOECKMAN: . . . The government, as the court knows, has to assist the marshal service. . . . In order for me to meet with an incarcerated witness in my facility I need agents that have handcuffs.

* * *

. . . We need two agents as required by
the marshal service with every cooperator.
They are not allowed to be alone in a room
with me. They have to be either outside the
room – the prisoners are cuffed when they are
brought up. There is nothing inappropriate.
These two detectives have been working on this
case with the FBI in conjunction with the FBI.
They are essentially case agents on the case,
and have been present for all other the
witnesses. I wouldn't attempt to conceal it.

So, yes, Detective Mitchell has had
exposure to the cooperators in conjunction
with agents from the Federal Bureau of
Investigation and the United States Attorney's
Office . . . .

(A 251-52).

Later in the hearing, Osborne responded to the

government's arguments as follows:

THE DEFENDANT: I disagree with everything
she's saying.

. . . Detective Mitchell withheld evidence
that could prove that . . . I was not even
present when the confidential informant got
shot and they had evidence before they even
submitted that into the affidavit.

They were well aware of the phone records
. . . . They know I didn't commit the crime.
They know I wasn't the shooter and they know
I never sold this man any guns.

They know this, but they still put in
affidavit I sold him guns. They falsified
evidence saying picked me out of a lineup.
They didn't pick me out of any lineup. . . .
Even if he's trying to pick me out they coerced
him to say that because they had evidence to
prove I was not on the phone talking about

>shooting him and they had clear evidence to
>prove I was nowhere near the scene of the crime
>and he shouldn't be a police officer for lying
>to a judge, falsifying statements to a judge
>and he's still able to interact with the
>witnesses before they get on the stand.

(A 254-55).

Based on this proffer, the district court refused to permit the defense to call the two detectives. (A 258). Specifically, the court noted that Osborne was "not charged with being the shooter" in the Gardner assault and that "whether it's right or it's wrong, [it] had decided the wiretap application. . . . . (A 257). In short, the testimony sought by Osborne was no longer relevant.

II. The Law

Although the Constitution guarantees a defendant's right to present a defense, e.g., Watson v. Greene, 640 F.3d 501, 509 (2d Cir. 2011); United States v. Holmes, 44 F.3d 1150, 1157 (2d Cir. 1995), that right is not without limitation and may yield to "accommodate other legitimate interests in the criminal trial process," Rock v. Arkansas, 483 U.S. 44, 55 (1987) (quotation marks and citation omitted); Chambers v. Mississippi, 410 U.S. 284, 302 (1973). Trial judges retain "wide latitude" to impose "reasonable" limits on witness examination and to exclude cumulative evidence. Holmes, 44 F.3d at 1157 (citing Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). But restrictions on the right to present

evidence "'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" Michigan v. Lucas, 500 U.S. 145, 151 (1991) (quoting Rock, 483 U.S. at 56). In general, a district court is said to have abused its discretion "when its decision cannot be located within the range of permissible decisions or is based on a clearly erroneous factual finding or an error of law." United States v. Rigas, 490 F.3d 208, 238 (2d Cir. 2007) (internal quotation marks and citation omitted).

## III. The District Court Did Not Err In Limiting Irrelevant Testimony

Osborne argues that the district court's decision to preclude the witnesses was an abuse of discretion of constitutional dimension. (Br. 72-73 (citing Chapman v. California, 386 U.S. 18, 24 (1967)). Specifically, he claims that he was not seeking to relitigate the district court's ruling on the wiretap affidavit, but to show that Detectives Colby and Mitchell had improperly influenced Gardner into identifying him as one of the shooters. He also claims that, had he been able to make such an inquiry, he could have shown that that the true shooter, Denzel Smith, had been pressured into implicating him not only for the Gardner shooting but for other acts alleged in the indictment. (Br. 73).

Here, however, Osborne had a full opportunity to cross-examine Detective Colby at trial about all of these topics. Indeed, the district court, over the government's objection,

afforded Osborne significant latitude during cross-examination to expand the scope of Detective Colby's cross-examination.[37]  (See A 229-42).

Further, a careful review of Osborne's argument at trial makes clear that he very much wanted to relitigate the specifics of the district court's wiretap ruling.  (A 243-58).  Indeed, Gardner did not testify at trial, so the question of whether Detectives Colby and Mitchell "improperly influenced" Gardner only impacted the validity of the wiretap application, which was not relevant evidence.[38]  In any event, in addition to his opportunity to cross-examine Detective Colby about this matter, Osborne was free to challenge Smith, who participated in the Gardner shooting, or any of the other cooperating witnesses about any purported

---

[37]    Unsurprisingly, Osborne's counsel did not explore the topic of undue influence because there was no good faith basis to do so.  See United States v. Katsougrakis, 715 F.2d 769, 779 (2d Cir. 1983) (no error in prohibiting counsel from questioning witness when counsel "could not produce a source or other information to verify its suspicions").

[38]    It is the goal of the Federal Rules of Evidence to promote the admission of relevant evidence — evidence that "has any tendency to make a fact more or less probable than it would be without the evidence."  See Fed. R. Evid. 102, 401.  Federal Rule of Evidence 403 also provides, however, that even relevant evidence may be precluded in cases in which its "probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

attempts by the detectives to coach or coerce their testimony, or any other information for that matter.

Lastly, with respect to Osborne's final purported reason for calling Detective Mitchell, namely, to demonstrate that Gary Mosely, not Osborne, ordered the attack on Gardner, Osborne never raised this reason below.  When asked by the district court for the reasoning behind the request to call the detectives in the defense case, Osborne argued that he wanted to put the detectives on the stand to show that Detective Mitchell had lied in the application for the wiretap and that both detectives had improperly influenced Gardner and the cooperating witnesses.  (A 243-58). For that reason and because the theory of Mosely's purported involvement in the Gardner attempted murder and assault could have been explored with Detective Colby and any of the cooperating witnesses, Osborne cannot demonstrate error, plain or otherwise.

POINT SIX

THE GOVERNMENT DID NOT ELICIT
IMPROPER HEARSAY TESTIMONY

Osborne further argues, again for the first time on
appeal, that the district court erred in permitting cooperating
witness Daron Morris to testify that Lobban had told him that
Osborne "ordered the hit on Gardner." (Br. 74-76).

This claim also is unavailing.

I.  Relevant Facts

During the direct testimony of cooperating witness Daron
Morris, he testified that when he first spoke to Osborne in prison
about the Gardner shooting, Osborne told him that he had shot
Gardner:

> Q:  Let's break it down.
>
>     You have a conversation with Mr.
>     Osborne where?
>
> A:  In Nassau County Jail.
>
> Q:  And you were telling him what about your
>     own crimes?
>
> A:  That somehow there was mentioned that --
>     I brung it up that October 12, 2013, that
>     I shot a guy that I was incarcerated for
>     at the time that I was with him.
>
> Q:  So you told him you were arrested for
>     shooting someone on October 13, 2012?
>
> A:  Yes.
>
> Q:  And what did he say in response to you
>     telling him that you were charged in

>           Nassau County with the shooting on
>           October 13, 2012?
>
>     A:    He said, oh, I have a shooting the same
>           day.
>
>     Q:    And what about that -- what happened to
>           the person that he had a shooting for on
>           that day, what did he tell you?
>
>     A:    That the person was paralyzed in a
>           wheelchair.
>
>     Q:    And what if anything did he say in
>           addition that [sic] he had a shooting?
>
>           Did he say anything additionally
>           about the shooting?
>
>     A:    Yes.
>
>           The only conversation we had he told
>           me he was there during the shooting and
>           he said he had a red hoodie on and he
>           won't be able to be identified . . . .

(GA 280-81).

Morris further testified that when he had a later conversation with Osborne, Osborne instead claimed that he had sent another person to do the shooting:

>     A.    . . . .[A]nd then another time we spoke
>           about it, he said that he wasn't there,
>           but he sent the Little Homies to do it
>           because he felt violated that the guns
>           was [sic] bought at his crib.
>
>     Q.    So Mr. Osborne -- initially you have
>           multiple conversations on this subject?
>
>     A.    Yes.
>
>     Q.    And in the first conversation he says
>           that he was present for the shooting?

A.    Yes.

Q.    And in a second conversation he says what?

A.    That he wasn't there, but he said that he sent the Little Homie to do it because he felt violated that the guns was bought at his crib.

(GA 281).

During Morris's cross-examination, Osborne's counsel asked this series of questions in response to this testimony about Osborne's involvement in the Gardner attempted murder:

Q:    You said there were rumors that Raphael Osborne had actually personally shot Maurice Gardner with a gun?

A:    I told you I never heard that prior to him coming in and then when me and him had conversations and that was it.

Q:    You hadn't heard any rumors until he came into the jail that he was in fact charged with shooting Maurice Gardner?

A:    Yes.

Q:    And then you did hear rumors after he came to the jail, yes?  People talked about it?

A:    About that?

Q:    Yeah.

A:    I really don't recall that happening so much.

Q:    You don't recall that happening?

A:    No.

Q:  And do you recall rumors about people discussing the fact that the shooter was wearing a red hoodie?

A:  No.

   He told me he was wearing a red hoodie and he said he's gonna beat it. He said they won't be able to identify him.

Q:  Let's refresh.

                    *    *    *

   Did you hear rumors at the jail when you were talking to other inmates about the fact that the shooter was wearing a red hoodie?

A:  Not that I recall, no.

Q:  Did you hear those rumors when you were at GEO?[39]

A:  No.

Q:  In fact, when you were debriefed by the government you told them that Mr. Osborne had told you that he was present when Mo Diddy was shot, right?

A:  Yes.

Q:  And it was your understanding that he shot Mo Diddy, wasn't it?

A:  He said he was there, yes.

Q:  He said he was there?

A:  Yes.

---

[39]   GEO is a private detention facility.

Q:  On the basis of that recollection you concluded that he was representing to you that he shot him?

A:  Pretty much.  He was there, so if you're there and you say I can't be identify [sic] because I was wearing a red hoodie, that's the only way I can take that.

Q:  Since that time have you learned that that's not true?

A:  Like I told the government the other time we spoke about it he told me he wasn't there.

Q:  Have you learned it from any other sources that Mr. Osborne was not the shooter?

A:   This guy Rah [Lobban], he told me that Gusto was at his house and they got the call after it was done saying it was them, Rah and his sister and Gusto was at Rah's house.

(GA 287-88).

On re-direct of Morris, the government sought to clarify

the testimony as follows:

Q:  You also mentioned on cross-examination that you talked to Rah dollar [Lobban] about this [Gardner attempted murder]?

A:  Yes.

                    *     *     *

     This was during the while I was cooperating he [Lobban] came in.

Q:  In Nassau jail?

A:  Yes.

Q:   He tells you about what about Gusto's
     role in this shooting?

A:   He said he wasn't there, that Gusto was
     at his house, Rah dollar, his sister and
     Gusto and they was in the basement,
     something like that he said, and he got
     the call after it was done.

Q:   He got the call after it was done?

A:   Gusto did.  He said Rah dollar's sister
     was going like this (indicating).

Q:   Don't talk about it on the phone?

A:   Yes.

Q:   Now this conversation was clarifying that
     Gusto orders the hit, doesn't do the hit?

A:   Yes.

(A 227-28).

## II.   The Standard Of Review

Federal Rule of Evidence 801(c) defines "hearsay" as a
statement that (1) "the declarant does not make while testifying
at the current trial or hearing;" and (2) "a party offers in
evidence to prove the truth of the matter asserted . . . ."  Failure
to raise a hearsay objection in the district court precludes review
of that objection on appeal for anything other than plain error.
See Olano, 507 U.S. at 732-33; Singleton v. Wulff, 428 U.S. 106,
120-21 (1976); United States v. Yu-Leung, 51 F.3d 1116, 1122 (2d
Cir. 1995).  Moreover, where a party purposely refrains from
objecting in the district court for strategic reasons, he waives
that claim entirely.  See United States v. Quinones, 511 F.3d 289,

321-22 (2d Cir. 2007); <u>Yu-Leung</u>, 51 F.3d at 1122-23; <u>see also</u> <u>Ohler</u>
<u>v. United States</u>, 529 U.S. 753, 759-60 (2000) (where defendant
introduces evidence, he waives right to challenge it as
inadmissible).

## III. <u>No Improper Hearsay Was Admitted</u>

Osborne contends that Morris testified on redirect
examination, in violation of Federal Rule of Evidence 801(c)(c),
that Lobban had told him that Osborne "ordered the hit on Gardner."
(Br. 74). But that is not an accurate characterization of Morris's
testimony. Indeed, as the testimony above makes clear, Morris's
redirect testimony about Lobban's statement was aimed merely at
clarifying Morris's earlier misunderstanding, based on Osborne's
own conflicting statements, about Osborne's role in the Gardner
shooting. (A 228 ("Now this conversation was clarifying that
[Osborne] orders the hit, doesn't do the hit?")).

However, even if Osborne's interpretation of Morris's
testimony is correct, he cannot prevail. Here, it is obvious that
Osborne's counsel made a strategic decision not to object to the
government's redirect examination because he wanted to discredit
Morris by suggesting that Morris had only learned the details of
the Gardner shooting from other inmates like Lobban, not from
Osborne himself. Proof of that strategy is evident from Osborne's
counsel's own elicitation of the offending hearsay testimony

during his cross-examination of Morris (GA 281), a fact that is glaringly absent from Osborne's brief on appeal.

Finally, even if Osborne did not waive his current hearsay claim, he cannot show plain error. Despite Osborne's statements to the contrary (Br. 75-76), the evidence that Osborne ordered the attack on Gardner was very strong. For example, Smith testified that Osborne and one of Osborne's top lieutenants, Derick Hernandez, ordered him to shoot and kill Gardner. (GA 298-301, 313). Morris testified, among other things, that Osborne had admitted that he ordered one of his younger gang members — referring to Smith — to kill Gardner. (GA 280-82, 286). Further, Halyard testified that after Osborne had learned that Gardner was out of a coma, he was upset that the person Hernandez had recruited to shoot Gardner did not kill him. (GA 122). Halyard further recounted two conversations that he had had with Derick Hernandez; during the second conversation, Hernandez identified Smith as the shooter that he and Osborne had recruited for the attempted murder. (GA 121, 122). Moreover, Halyard, as well as Reynaldo Hernandez and Appiagyei, testified that Osborne had been suspicious of Gardner's possible cooperation before the attack was ordered (GA 119-20, 226, 263) — a suspicion that was corroborated by the government's introduction of a telephone conversation recorded on the day of the attempted murder (GX 102) during which Osborne told

a fellow gang member that Gardner was cooperating with law enforcement and putting the gang in jeopardy.

       In sum, even assuming that Osborne has correctly characterized the evidence, because Osborne introduced similarly offending testimony as part of his trial strategy, and because the evidence of Osborne's involvement in the Gardner shooting was more than sufficient to prove his involvement, Osborne's hearsay claim should be denied.

POINT SEVEN

THE DISTRICT COURT PROPERLY ADMITTED CRIME
SCENE AND AUTOPSY PHOTOS DURING THE TRIAL

To corroborate the cooperating witnesses' testimony about various murders of Bloods gang members committed by members of the Rollin' 60s Crips, the government introduced — without an objection from Osborne[40] — a single autopsy photograph for each of the murder victims: Lord Carter, Kail Ferro, and James McClenic. The government also introduced — again without objection — a crime scene photograph related to the Ferro murder. (A 222, 224, 225-26).

Osborne now argues, again for the first time on appeal, that the district court erred in admitting those photographs. Specifically, Osborne contends that the photographs were so inflammatory as to deny him a fair trial. (Br. 76).

This argument is meritless.

I.  The Law

As noted supra, at 82 n.38, it is the goal of the Federal Rules of Evidence to promote the admission of relevant evidence, that is, evidence that "has any tendency to make a fact more or

---

[40]    Federal Rule of Evidence 103 states, in relevant part, that "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and . . . "if the ruling admits evidence, a party, on the record, . . . timely objects or moves to strike . . . ."

94

less probable than it would be without the evidence." See Fed. R. Evid. 102, 401. Moreover, as this Court has stated, "[a]ll relevant evidence is admissible unless excluded by the constitution, a statute, or a rule." United States v. Onumonu, 967 F.2d 782, 786 (2d Cir. 1992). Indeed, Rule 403, which addresses the exclusion of relevant evidence on prejudice and other grounds, instructs that, to justify suppression, it is not sufficient that an item's probative value be somewhat less than its pernicious potential; rather, relevant evidence may not be excluded unless its "probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added); see also Costantino v. Herzog, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

## II. The Morgue Photographs Were Not Unfairly Prejudicial

Osborne contends that the government offered the morgue photographs of Carter, Ferro, or McClenic simply to "prove a general conspiracy among Crips members to murder and/or assault Bloods" and therefore the photographs are not relevant. (Br. 76-77). This contention, however, ignores the fact that Osborne was charged with offenses that required the government to prove beyond

a reasonable doubt that the Rollin' 60s Crips engaged in various criminal activity, including violent crimes such as murder, attempted murder, and robbery.

Specifically, the indictment charged that the Rollin' 60s Crips was a racketeering enterprise that engaged in racketeering activity, including murder, attempted murder, robbery, narcotics trafficking, witness tampering and witness retaliation. (A 19-26).[41] During the course of the trial, several witnesses including Halyard, Reynaldo Hernandez, and Robinson testified that Osborne was not only a member of the Rollin' 60s Crips, but its leader. (GA 85, 87 183, 194, 228-29, 290, 309-10). Moreover, Halyard, Hernandez and Robinson also testified that other members of the Rollin' 60s Crips — Cody Hernandez, Devon Cabrera and Eric Smith — murdered members of the rival Bloods gang, namely, Carter (GA 90, 107, 206), Ferro (GA 89, 108-09, 184, 204-05), and McClenic (GA 113-15, 163-66, 184, 207, 209-10). Indeed, the photographic evidence was provided to corroborate the testimony of these cooperating witnesses, whose credibility Osborne repeatedly challenged throughout the trial. Thus, the district court's admission of the photographs was proper and, in any event, not plain error. See United States v. Pierce, 785 F.3d

---

[41]    The indictment also charges various substantive counts related to these violent racketeering acts. (See A 26-34).

832, 840 (2d Cir. 2015) (reviewing court can only review the admission of evidence without objection for plain error); see also United States v. Coonan, 938 F.2d 1553, 1565 (2d Cir. 1991).

Nor is it of any moment that the government did not need the photographs to prove the deaths. (See Br. 77). Merely because the photographs are somewhat graphic in nature does not mean that they were unfairly prejudicial under Rule 403. In fact, courts have routinely admitted arguably far more forceful evidence of guilt, even when there are alternatives. See, e.g., United States v. Polouizzi, 564 F.3d 142, 152 (2d Cir. 2009) (images of child pornography); United States v. Velazquez, 246 F.3d 204, 211 (2d Cir. 2001) (autopsy photos); Salameh, 152 F.3d at 122 (finding no abuse of discretion to admit a "significant" number of "graphic" and "disturbing" photos of World Trade Center bombing victims, including corpse of a pregnant woman, despite defendants' stipulation offer). Such evidence "not only satisfies the formal definition of an offense, [it] tells a colorful story with descriptive richness." Old Chief v. United States, 519 U.S. 172, 187 (1997). Indeed, such evidence has "force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. This persuasive

power of the concrete and particular is often essential to the capacity of jurors to satisfy the obligations that the law places on them." Id.

Finally, even if Osborne could show some error in the admission of the photographs, he has failed to demonstrate that such error affected his substantial rights or offended justice. See Olano, 507 U.S. at 734. Indeed, the murders of Carter, Ferro, and McClenic were part of a larger narrative that included numerous acts of violence by the Rollin' 60s Crips making it difficult to demonstrate that they were unduly prejudicial.

Accordingly, because the morgue photographs were relevant to the charges against Osborne and not unduly prejudicial, Osborne's claim that the admission of the photographs was erroneous should be denied.

POINT EIGHT

OSBORNE'S SENTENCE WAS REASONABLE

Osborne also claims that his sentence of more than three life terms is substantively unreasonable because the statutory terms required to be imposed for his five convictions for violations of 18 U.S.C. § 924(c) is "essentially a life sentence" and "sufficient" to satisfy the sentencing goals of 18 U.S.C. § 3553(a). (Br. 78-79).

This argument, too, lacks merit.

I.   The Reasonableness Standard

This Court reviews sentences for reasonableness. United States v. Crosby, 397 F.3d 103, 114-15 (2d Cir. 2005), abrogated on other grounds by United States v. Fagans, 406 F.3d 138, 142 (2d Cir. 2005). With respect to substantive reasonableness, a defendant bears a particularly heavy burden "because [this Court's] review of a sentence for substantive reasonableness is particularly deferential." See United States v. Broxmeyer, 699 F.3d 265, 289 (2d Cir. 2012). Indeed, substantive unreasonableness review is narrow, akin to review for abuse of discretion, see, e.g., United States v. Norman, 776 F.3d 67, 85 (2d Cir. 2015), and thus this Court will set aside a district court's decision on the ground of substantive unreasonableness "only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions," see United States v. Cavera, 550 F.3d

180, 189 (2d Cir. 2009) (en banc) (citation and internal quotation marks omitted).

In reviewing sentences, this Court does "'not substitute [its] own judgment for the district court's on the question of what is sufficient to meet the [18 U.S.C.] § 3553(a) considerations in any particular case' [and does] 'not second guess the weight (or lack thereof) that the judge accorded to a given [§ 3553(a)] factor or to a specific argument made pursuant to that factor.'" United States v. Fernandez, 443 F.3d 19, 34 (2d Cir. 2006) (quoting Cavera, 550 F.3d at 189, and United States v. Pope, 554 F.3d 240, 247 (2d Cir. 2009); see also United States v. Hernandez, 377 F. App'x 81, 83 (2d Cir. 2010). As the Supreme Court observed, the sentencing judge has greater familiarity with the facts of the case and the individual defendant and is therefore "'in a superior position to find facts and judge their import under § 3353(a).'" See Kimbrough v. United States, 552 U.S. 85, 89 (2007) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)).

Finally, a multiple life sentence does not render a sentence substantively unreasonable. See also United States v. Yousef, 327 F.3d 56, 163 (2d Cir. 2003) (holding that sentences that exceed a defendant's life expectancy do not constitute cruel and unusual punishment when based upon proper application of the Sentencing Guidelines or statutorily mandated consecutive terms).

II.  The Sentence Was Reasonable Given The Crimes

Here, the district court accurately determined Osborne's Sentencing Guidelines range as life and then sentenced him in light of that range and the other factors set forth in 18 U.S.C. § 3553(a).  (A 280, 290-294).  Specifically, the court pointed out that the trial evidence proved that Osborne, "along with . . . gang members that [he] recruited and directed, committed murder, attempted murder, and an enormous amount of racketeering acts. [Osborne] used firearms indiscriminately, and terrorized the neighborhood for a substantial period of time . . . ."  (A 285). Further, in imposing sentence, the court not only took into account the "extreme seriousness" of the offenses, but Osborne's refusal to "recognize his culpability."  (A 292).

Accordingly, because the district court fashioned an appropriate sentence in accordance with the Guidelines and within the range of permissible options before it, Osborne's claim that his sentence is unreasonable should be denied.

POINT NINE

THE WRITTEN JUDGMENT IS CONSISENT
WITH THE ORAL PRONOUNCEMENT OF SENTENCE

Finally, Osborne contends that his written judgment should be amended to reflect the purported oral pronouncement of sentence, namely, three life consecutive sentences plus 115 years. (Br. 79-80).

This contention also fails.

Although Osborne is correct that the district court mistakenly stated that its sentence "should total 115 years" (A 291), the oral pronouncement made clear that the court imposed a sentence of imprisonment of three life sentences plus 135 years. Indeed, after imposing three life sentences, the court pronounced the following sentence: 10 years' imprisonment for Counts Nine, Fifteen, Twenty and Twenty-One; 20 years' imprisonment for Counts Three, Four, Six, Seven, Ten, Eleven, Sixteen; and 30 years' imprisonment for Counts Twelve and Thirteen to run concurrently to each other but consecutively to the other counts; and five years for Count Nineteen (the first 18 U.S.C. § 924(c)), to be followed by 25-year consecutive sentences for each of the remaining § 924(c) violations (Counts Five, Eight, Fourteen and Seventeen). (A 290-92). Thus, the court's oral pronouncement of sentence was three life sentences plus 135 years (30 years for Count Twelve plus 105

years for the § 924(c) counts), which is consistent with the written judgment.  (See A 297).

Accordingly, because the written sentence comports with the oral sentence, the Court should reject Osborne's request to amend the judgment.

103

CONCLUSION

        For the reasons stated above, the judgment should be
affirmed in all respects.

Dated:      Brooklyn, New York
            February 21, 2018

                              Respectfully submitted,

                              RICHARD P. DONOGHUE,
                              United States Attorney,
                              Eastern District of New York.

                      By:     _____/s/_____
                              NICOLE BOECKMANN
                              Assistant U.S. Attorney

JO ANN M. NAVICKAS,
NICOLE BOECKMANN,
CHRISTOPHER C. CAFFERONE,
Assistant United States Attorneys,
     (Of Counsel).
MICHAEL MAFFEI
Special Assistant United States Attorneys,
     (Of Counsel)

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

     1.   This brief of 21,208 words complies with the Court's February 14, 2018 order granting the government's motion for an oversized brief of 22,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

     2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word in 12-point Courier New font.

Dated: Brooklyn, New York
       February 21, 2018

                                 /s/
                            JO ANN M. NAVICKAS
                            Assistant U.S. Attorney

S P E C I A L   A P P E N D I X

TABLE OF CONTENTS

                                                                    Page

Judgment and Conviction,
 United States v. Osborne, 14-CR-264 (JS),
 Filed Jan. 17, 2017 .......................................SPA 1

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
                        Sheet 1

# UNITED STATES DISTRICT COURT

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 17 2017 ★

LONG ISLAND OFFICE

### Eastern District of New York

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| | ) | |
| RAPHAEL OSBORNE | ) | Case Number:  CR 14-264 (JS)   Deft. #2 |
| | ) | |
| (AUSA Nicole Boeckmann) | ) | USM Number:  83520-053 |
| | ) | |
| | ) | Richard Miller, Esq. |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1rssss - 21rssss of superseding indictment (S-5), as redacted for trial
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18-1962(c), -1963 | Racketeering | 4/17/2013 | 1rssss |
| 18-1962(d), -1963 | Racketeering conspiracy | 4/17/2013 | 2rssss |
| 18-1951(a) | Hobbs Act robbery conspiracies | 12/20/2010 | 3, 6rssss |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   earlier indictments   ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/13/2017
Date of Imposition of Judgment

/s/ Joanna Seybert

Signature of Judge

JOANNA SEYBERT, U.S.D.J.
Name and Title of Judge

1/17/2017
Date

SPA2

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 1A

| | | | Judgment—Page | 2 | of | 6 |

DEFENDANT:  RAPHAEL OSBORNE
CASE NUMBER:  CR 14-264 (JS)   Deft. #2

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18-1951(a) | Hobbs Act robberies | 12/20/2010 | 4, 7rssss |
| 18-924(c)(1)(C)(i) | Brandishing firearms during crimes of violence | 12/20/2010 | 5, 8rssss |
| 18-1959(a)(5) | Conspiracy to commit murder in aid of racketeering | 4/30/2013 | 9, 15, 20rssss |
| 18-1959(a)(3) | Attempted murder in aid of racketeering John Doe 1, 2 | 1/30/2013 | 10, 16rssss |
| 18-1959(a)(3) | Assault with a dangerous weapon in aid of racketeering of John Doe 1 | 10/13/2012 | 11rssss |
| 18-1513(a)(1)(B), (2)(B) | Witness retaliation | 10/13/2012 | 12rssss |
| -1513(f), (a)(1)(B), (2)(B) | Witness retaliation conspiracy | 10/13/2012 | 13rssss |
| 18-924(c)(1)(C)(i) | Discharging a firearm during crimes of violence | 1/30/2013 | 14, 17rssss |
| 21-846; -841(a)(1), (b)(1)(A)(iii), (b)(1)(B)(i), (b)(1)(C), (b)(1)(B)(vii) | Conspiracy to distribute and possess with intent to distribute at least 280g. cocaine base, 100g. heroin, 100Kg. marijuana, and methylone | 4/17/2013 | 18rssss |
| 18-924(c)(1)(A)(i) | Possession of firearm during controlled substance off. | 4/17/2013 | 19rssss |
| 18-922(g)(1); 924(a)(2) | Illegal possession of ammunition | 4/17/2013 | 21rssss |

SPA3

AO 245B (Rev. 11/16)   Judgment in Criminal Case
           Sheet 2 — Imprisonment

| | Judgment — Page | 3 | of | 6 |
|---|---|---|---|---|

DEFENDANT:  RAPHAEL OSBORNE
CASE NUMBER:  CR 14-264 (JS)    Deft. #2

## IMPRISONMENT

        The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

1620 mos. (i.e., 135 yrs.) plus 3 consecutive life terms:
Counts 3, 4, 6, 7, 10, 11, 16: 240 mos.; Counts 9, 15, 20, 21: 120 mos.; Counts 12, 13: 360 mos. (ALL CONCURRENT)
Counts 1, 2, 18: LIFE,  consecutive to each other and to all other counts.   Count 19: 60 mos., consecutive to all other counts.
Counts 5, 8, 14, 17: 300 mos., consecutive to each other and to all other counts.

☐  The court makes the following recommendations to the Bureau of Prisons:

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at  _____  ☐ a.m.  ☐ p.m.    on  _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on  _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

a  _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

SPA4

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
        Sheet 3 — Supervised Release

| | Judgment—Page | 4 | of | 6 |
|---|---|---|---|---|

DEFENDANT:  RAPHAEL OSBORNE
CASE NUMBER:  CR 14-264 (JS)   Deft. #2

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :   NONE _____

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
         ☐ The above drug testing condition is suspended, based on the court's determination that you
            pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
            Sheet 5 — Criminal Monetary Penalties

|  |  |  |
|---|---|---|
| Judgment — Page | 5 | of 6 |

DEFENDANT: RAPHAEL OSBORNE
CASE NUMBER: CR 14-264 (JS)   Deft. #2

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 2,100.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | |
|---|---|---|
| **TOTALS** | $ _____ | $ _____ |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
　　　　　　　　　　　Sheet 6 — Schedule of Payments

Judgment — Page __6__ of __6__

DEFENDANT:  RAPHAEL OSBORNE
CASE NUMBER:  CR 14-264 (JS)   Deft. #2

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☑  Lump sum payment of $ __2,100.00__ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B   ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C   ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
    term of supervision; or

E   ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.